# PLAINTIFF'S EXHIBIT "A"

Page 1

1                     UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                        JACKSONVILLE DIVISION
3                        CASE NO.: 3:18-cv-1072-J-39JBT
4
    LESTER COUNTS,
5
             Plaintiff,
6
    vs.
7
    ALTMAN POLLOCK and DANIELS, INC.,
8   and BRAD WILLIAM LEE,
9            Defendants.
    _____/
10
11
    DEPOSITION OF:     JEREMY REIMER, CPC, CPB
12
    DATE TAKEN:        January 28, 2020
13
    TIME:              10:00 a.m. to 12:02 p.m.
14
    PLACE:             Office of Jeremy Reimer, CPC, CPB
15                     8875 Hidden River Parkway
                       Suite 300
16                     Tampa, Florida 33637
17  TAKEN BY:          The Plaintiff
18  REPORTED BY:       Victoria White
                       Court Reporter and Notary Public
19
20
21
22
23
24
25

Page 2

```
 1    A P P E A R A N C E S:
 2    RICHARD A. STAGGARD, ESQUIRE
      OF: FARAH & FARAH, P.A.
 3           10 West Adams Street
             3rd Floor
 4           Jacksonville, Florida 32202
             904.396.5555
 5           Rstaggard@farahandfarah.com
 6           APPEARING ON BEHALF OF THE PLAINTIFF
 7    BRIAN D. STOKES, ESQUIRE
      OF: ALVAREZ WINTHROP THOMPSON & STOREY, PA.
 8           390 N Orange Avenue
             Suite 600
 9           Orlando, Florida 32801
             407.210.2796
10           Bdstokes@awtspa.com
11           APPEARING ON BEHALF OF THE DEFENDANTS
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1
                        INDEX OF PROCEEDINGS
2
3       Witness                                          Page
        JEREMY REIMER, CPC, CPB
4            Examination by Mr. Staggard                    5
             CERTIFICATE OF OATH                           74
5            CERTIFICATE OF REPORTER                        75
             ERRATA SHEET                                  76
6            READ AND SIGN LETTER                          77
7
                        INDEX OF EXHIBITS
8
        Exhibit              Description             Marked
9       Plaintiff's 1        Invoices                   10
10      Plaintiff's 2        Subpoena to Testify at      11
                             Deposition in a Civil Action
11
        Plaintiff's 3        Folder                      30
12
        Plaintiff's 4        Thumb Drive (Retained by    30
13                           Counsel)
14      Plaintiff's 5        September 12, 2019 Report   30
15      Plaintiff's 6        October 28, 2019 Expert     30
                             Report Addendum
16
        Plaintiff's 7        CV                          61
17
        Plaintiff's 8        Deposition History List     62
18                           (2016-2019)
19      Plaintiff's 9        Fee Schedule for            63
                             Professional Services
20
        Plaintiff's 10       Photos of Book Covers       64
21
        Plaintiff's 11       Retention Letter            69
22                           (Will forward upon receipt)
23      Plaintiff's 12       Disc                        70
                             (Will forward upon receipt)
24
        Plaintiff's 13       Hardcopies from Disc        70
25                           (Will forward upon receipt)

Page 4

1                    S T I P U L A T I O N S

2

3        It is hereby stipulated and agreed by and between counsel

4    for the respective parties and the deponent that the reading and

5    signing of the deposition be reserved.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2                        *  *  *  *  *

3          THE COURT REPORTER:  Do you swear or affirm the

4       testimony you will give in this matter will be the

5       truth, the whole truth, and nothing but the truth?

6          THE WITNESS:  I do.

7                    JEREMY REIMER, CPC, CPB,

8    having first been duly sworn, was examined and testified as

9    follows:

10                        EXAMINATION

11   BY MR. STAGGARD:

12          Q.    Can you please state your name for the record,

13   please?

14          A.    Yes, my name is Jeremy Reimer.

15          Q.    Can you spell your last name, please?

16          A.    R-E-I-M-E-R.

17          Q.    Mr. Reimer, you've been identified by the

18   defendants in this lawsuit as what we call a billing and

19   coding expert; is that indeed the area of your expertise?

20          A.    Medical billing and medical coding, yes.

21          Q.    Can you give the jurors the benefit of your

22   educational background, please?

23          A.    Sure.  I have a Bachelor's degree in finance, I

24   have earned the Certified Professional Coder or CPC, as well

25   as the Certified Professional Biller, CPB, designations from

Page 6

1    the American Academy of Professional Coders.  I have taught

2    advanced medical coding here in Tampa at Hillsborough

3    Community College.  I have served as the practicum advisor

4    for the medical coding, as well as the medical billing

5    programs.  I was also the program director for both the

6    medical coding and medical billing programs at HCC.

7         Q.   How did you obtain the CPC and CPB designations?

8         A.   Those are tests that are offered from the AAPC.

9    One must sit for a test, it's a timed test.  You have to

10   have a passing score above a certain percentage for each.

11   After that, one must maintain a certain number of continuing

12   education units or CEUs to keep one's certifications active.

13        Q.   Do you have to take any course of study in order

14   to obtain those certifications?

15        A.   I don't believe it's mandatory; however, an

16   advanced knowledge of anatomy, physiology, medical coding,

17   medical billing, disease processes, all of those would be

18   necessary in order to successfully complete the exams.

19        Q.   And what is your advanced knowledge in those

20   areas?

21        A.   I have worked in positions that had a great deal

22   of exposure to medical coding, as well as medical billing.

23   Also, I did various self-study courses; the AAPC, as well as

24   other organizations, have examination materials, exam preps,

25   things like that.

Page 7

```
1        Q.    How much of your practice, percentage-wise, is

2   litigated cases versus providing some kind of consulting

3   work, either to health insurance companies or medical

4   doctors?

5        A.    Well, my practice is primarily three main

6   customer bases.  So, the first thing would be I serve as a

7   patient advocate; I help individuals who have questions

8   about their medical bills.  The second facet would be I

9   serve as a practice advocate; I work with medical providers

10  who have either had claims denied or who they, themselves,

11  have been accused of improper coding and billing.  And then

12  the third prong, if you will, would be reviewing medical

13  records and bills in personal injury cases.

14             Not all of them -- I don't necessarily track

15  which are pre-suit or in active litigation, so there's a mix

16  between those.

17       Q.    And how is the percentage of your practice

18  broken down between those three areas, percentage-wise,

19  between patients, practice and litigation?

20       A.    So my patient -- and this ebbs and flows, but I

21  would estimate over the past few years, my work as a

22  practice advocate maybe -- it could be anywhere from 20,

23  25 percent, it could be as high as 30 percent.  The practice

24  advocate is relatively smaller, I can go anywhere 5 to

25  15 percent.  The majority of my time is spent in cases such
```

Page 8

1    as this, it could be anywhere 60, 75 percent of the time.

2          Q.   So do you charge the $300 per hour, saying for

3    regardless of what type of client it is and which area it

4    falls under?

5          A.   No.

6          Q.   Okay.  So what do you charge a patient?

7          A.   Well, a lot of my patients have been paying via

8    barter, so it depends.  I've tried different things.

9    Typically, they don't have a lot of money.  In the past I

10   believe I did an hourly fee, I've tried to do a percentage

11   of recovery, but I would say the main form of payment from

12   my patients are some kind of barter.  I helped a plumber

13   once, he did plumbing.

14         Q.   And, then, how about practices, medical

15   practices?

16         A.   Medical practices would be $300 an hour.

17         Q.   And you said, I think, that was about five

18   percent of your time?

19         A.   It could anywhere 5, 10 percent, there's been

20   times there's been more, 15 percent, but that's typically

21   the lowest percentage of my time.

22         Q.   And, then, the litigation, would it be fair to

23   say, then, that the litigation -- if the patient practice

24   is -- a lot of it's on the barter system, would it be fair

25   to say that the large majority of your income through your

Page 9

1    business is through litigated cases like this?

2           A.    Yes.

3           Q.    And you charge, as I understand it, $300 per

4    hour for your consultant services?

5           A.    For my review and analysis in a case.  Review

6    and analysis, any kind of written reports, if requested.

7           Q.    And then deposition time?

8           A.    Depositions are $500 an hour for a standard

9    deposition, $600 an hour for a video deposition.

10          Q.    And then what about trial testimony?

11          A.    My trial testimony is a flat fee, I charge

12    $2,000 for my trial testimony, that typically includes my

13    preparation, as well as travel time.

14          Q.    Do you charge by the hour for travel time?

15          A.    No, that would be included in the trial flat

16    fee.

17          Q.    Do you charge -- and is that regardless of where

18    you have to go?

19          A.    Yes.  However, it would not include hard costs

20    that I may incur, airfare, hotel, things like that.

21          Q.    So if this matter were to proceed to trial in

22    Jacksonville, your testimony fee would be $2,000 plus

23    expenses?

24          A.    Yes.

25          Q.    How much prep time would you typically

Page 10

1    anticipate in a case like this?

2            A.    I don't know.  It's hard to say.  Mr. Stokes

3    informed me that there was additional bills coming, so that

4    would change any estimate that I were to give today.

5            Q.    Has your testimony ever been limited or excluded

6    in any court of law?

7            A.    Not that I'm aware of.  I don't necessarily

8    track that, though.

9            Q.    Have you ever had to testify at what is called a

10   Daubert hearing?

11           A.    I don't believe so.

12           Q.    Do you have any formal medical training?

13           A.    In terms of?

14           Q.    In terms of attendance at medical school or any

15   degrees in the medical field?

16           A.    No, I have not gone to medical school.  My

17   formal medical training consists of CPR and first aid.

18           Q.    All right.  Have you brought your billing to

19   date?

20           A.    Yes.

21           Q.    And may I see that, please?

22           MR. STAGGARD:  I'll have this marked as

23           Exhibit 1.

24           (Plaintiff's Exhibit No. 1 was marked for

25           identification.)

Page 11

1    BY MR. STAGGARD:

2         Q.    You have handed me, Mr. Reimer, three pieces of

3    paper marked invoice.  For the record, one is dated

4    September 3, 2019, the other is September 12, 2019, and the

5    third one is October 28th of 2019 and the September 3rd bill

6    is for $3,050; is that correct?

7         A.    Yes.

8         Q.    And the September 12th bill is for $1,650?

9         A.    Yes.

10         Q.    And the October 28th bill is for $900?

11         A.    Correct.

12         Q.    Do you have -- other than what we have paid you

13    for, your deposition, your appearance today, have you

14    incurred or billed for anything else with respect to this

15    file?

16         A.    No.

17              MR. STAGGARD:  And I will have marked as

18         Plaintiff's Exhibit 2, a copy of the subpoena that

19         was served in this case.  I'll show it to counsel and

20         I'll have that marked as plaintiff's Exhibit 2.

21              (Plaintiff's Exhibit No. 2 was marked for

22         identification.)

23    BY MR. STAGGARD:

24         Q.    Mr. Reimer, I'll hand you a document that's been

25    marked Plaintiff's Exhibit 2.  Do you recall being served

Page 12

1   with a copy of that subpoena?

2       A.   I was not served a copy of the subpoena, I

3   received it via e-mail.

4       Q.   Did you review the Schedule A or attachments?

5       A.   Yes.

6       Q.   If we needed to serve you with a subpoena, what

7   physical address should we use to serve you with a subpoena?

8       A.   Well, that depends.  I'm not always here, so I

9   would say it's typically best to put me in touch with the

10  process server and I can meet him at a mutually convenient

11  location.

12      Q.   And would that communication be best through

13  e-mail or through -- we'll do it through counsel, if we need

14  to serve you with a subpoena.

15           There's no physical address that you reside at

16  that we can serve a subpoena at?

17      A.   Well, I have a physical address that I reside

18  at, but I prefer process servers not coming to my home.  So,

19  I don't have an issue meeting process servers -- typically,

20  what I'm being served with is something I've already

21  received electronically.

22      Q.   Let me ask you this:  In lieu of personal

23  service of a subpoena, if we needed to serve you with a

24  subpoena in the future, would you be willing to accept

25  electronic service as actual regular physical service?

Page 13

1              A.    I would leave that up to my client's discretion.

2              Q.    Well, then you've got to give me an address to

3        serve you at.

4              A.    I guess, you can try here, and if I'm here then

5        they can serve me, and if I'm not, then I can make

6        arrangements to meet the process server.

7                    MR. STOKES:  We'll work something out with you,

8              if you need to serve...

9        BY MR. STAGGARD:

10             Q.    All right.  So did you bring a copy of your

11       report with you, your report and your addendum that we can

12       have marked as an exhibit to the deposition?

13             A.    Yes.

14             Q.    And I understand you did a report and an

15       addendum; is that correct?

16             A.    Yes.

17             Q.    What I would like to do is to summarize your

18       findings by provider and amount of alleged overcharge and

19       then we'll get into the details of those findings; is that

20       fair enough?

21             A.    Okay.

22             Q.    Which of Mr. Counts' medical providers do you

23       feel, for one reason or another, provided him bills in

24       excess of what they should have been?

25             A.    Well, I would state it more which providers had

Page 14

```
1    questionable or unreasonable charges.
2         Q.    Okay.
3         A.    So if I'm putting it in those terms and going
4    through my report, Advanced Pain Management had unreasonable
5    charges or questionable charges.
6         Q.    And how much did those total?  We'll get into
7    the weeds on the actual bills themselves, but how much do
8    they total?  Or how much were -- how much was in excess of
9    what you felt was reasonable?
10        A.    Well, the total of the unreasonable charges and
11   questionable or unreasonable charges, $7,933.
12        Q.    And how much were the actual charges?
13        A.    $14,100.
14        Q.    So charges of $14,100 and you felt that $7,933
15   were questionable or unreasonable?
16        A.    Based on documentation, as well as the usual,
17   customary and reasonable benchmarks, yes, just under $8,000
18   is unreasonable.
19        Q.    Okay.  Who was the next provider?
20        A.    Silver Chiropractic, their total charges were
21   $7,531.  The total of their questionable or unreasonable
22   charges, $4,608.  Advanced Diagnostics, their total charges
23   were $2,592, the total of the unreasonable charges is
24   $1,680.  Baptist Health Hospital, their total charges were
25   $1,809, the total unreasonable charges, $911.  Bay Meadows
```

Page 15

1   MRI, total charges $1,300; total unreasonable, $856.

2   Emergency Resources Group, total charges submitted $717;

3   total unreasonable charges $717.

4       Q.   So you felt that -- why did you feel that the

5   entirety of the Emergency Resources bill was an overcharge

6   or questionable -- you say questionable and unreasonable; is

7   that the term?

8       A.   Questionable and/or unreasonable.

9       Q.   Why is that?

10      A.   Here on page 10, there's a description, they

11  billed the patient for a level-4 emergency room visit, CPT

12  code 99284.  The documentation does not support a level-4

13  visit; in fact, the hospital who billed the facility portion

14  of this particular visit, billed it as a Level 3.  So in

15  this instance, I do not feel -- or based upon coding and

16  billing guidelines -- that the documentation supports the

17  charges that were rendered by Emergency Resources Group,

18  those particular charges have been upcoded.  Since there was

19  only one charge of $717, that amount is unreasonable.

20          However, on page 10, I did show, had they used

21  the appropriate code for that visit, what a reasonable

22  payment range would be for that particular service.

23          Moving on to the Nassau County BOCC, they

24  provided the ambulance transportation; their total charges

25  were $625.  There were no unreasonable charges on that bill.

Page 16

1          Finally, MBB Radiology, their total charges were

2     $102; the unreasonable charges were only $48.

3          Q.   So adding all of those up, how much of Lester

4     Counts' medical expenses are either questionable or

5     unreasonable?

6          A.   Well, I didn't add all those up in my report.

7          Q.   Okay.

8          A.   So if one wanted to do that, that could be done;

9     however, in my report I did look at it a slightly different

10    way.   I did add up even if the correct codes had been used

11    by those various providers, I calculated the average

12    payments for that scenario.   So, the total of those, this

13    does not count addendum for Jax Spine, but the total of what

14    I just read was $28,776.

15         Q.   And then your October 28 --

16         A.   So of that one thousand -- I'm sorry, $16,405

17    would be unreasonable.   So a total of $28,776, $16,405 is

18    unreasonable, leaving $12,371 as the upper boundary of what

19    would be reasonable.

20         Q.   And, then, what are the total charges in

21    Jacksonville Spine Center that you reviewed to date and then

22    what do you find to be questionable or unreasonable?

23         A.   So, to date, I have reviewed charges totaling

24    $9,306; total and unreasonable charges, $3,931.

25         Q.   What documents have you reviewed to prepare

Page 17

1  these reports?

2      A.  I reviewed -- I reviewed a disc of records of

3  bills and records that was sent to me by my client.  They're

4  written on the first pages of both the report, as well as

5  the addendum.

6      Q.  Did you review any documents, other than the

7  medical records and the medical bills of each of these

8  providers that are listed on the initial report and the

9  addendum?

10     A.  Not to my knowledge.  I don't believe I was sent

11 depositions or anything like that.  So I believe it's just

12 the bills and records from those providers.

13     Q.  Have you reviewed any records from Mr. Counts'

14 insurance company?

15     A.  I don't believe so.

16     Q.  Are you aware of any contractual adjustments

17 Mr. Counts' insurance company made?

18     A.  Not as I sit here today.  Whether or not they're

19 in the records, they very well may be, but that's not

20 something I would typically factor into my reports.

21     Q.  When you review charges for usual and customary

22 rate, do you use any sources of any insurance companies, the

23 major ones, UHC, Blue Cross Blue Shield, to determine what

24 their -- and use their reimbursement rates for applying a

25 reasonable charge to the bills that you reviewed?

Page 18

1          A.    Well, where would those be?

2          Q.    I'm just asking you a question; do you review

3     any of those?

4          A.    You asked the question as though that exists, as

5     though one can do that.  Those rates are not publicly

6     available, they're not published for the general public to

7     use.  I believe, one, it would be self-defeating for them to

8     publish their reimbursement rates; 2, it may very well be

9     illegal.  It could be considered a form of price fixing or

10    collusion.

11         Q.    But you are aware that there are insurance

12    companies that have reimbursement rates for medical

13    providers?

14         A.    Sure, but I am not aware of any that publish

15    them for the public domain.

16         Q.    What sources do you use to determine what is --

17    what are reasonable charges?

18         A.    That's a good question.  So the first step would

19    be what are we defining as usual, customary and reasonable.

20    So in the absence of a Florida state or a Florida statutory

21    definition, I would defer to what I believe is a national

22    definition of usual, customary and reasonable, and it's the

23    amount that is paid for medical service or procedure in a

24    given area.  So with that in mind, what do providers of

25    these procedures and services accept as payment.  What would

Page 19

1    a patient expect to pay for these.

2            So, I utilize the Resource Based Relative Value

3    Scale, which is the payment methodology used throughout

4    healthcare; in fact, it is endorsed by the AMA, as well as

5    specifically stated as the almost exclusive payment

6    reimbursement methodology used in healthcare.

7            Since insurance companies don't publish their

8    rates, there is an entity that does publish their payment

9    rates utilizing this methodology; it's the entity that

10   purchases more healthcare than any other entity in the

11   country and that would be the Medicare rate.  So utilizing

12   the Medicare rate, which is publicly available information,

13   utilizing the methodology that's peer-reviewed annually, I

14   calculate an average payment, here's what one would expect

15   to pay on average for that particular service or procedure

16   in that locality.  The payments are adjusted to the city or

17   locality in which the treatment took place.

18           I'm aware of payments that occur above that

19   particular average payment.  The highest that I'm aware of

20   that occurs with any consistency or frequency, also

21   utilizing the Resource Based Relative Value Scale or RBRVS,

22   is the lesser of the billed amount or the 200 percent of the

23   Medicare payment.

24           This particular benchmark is used in Florida

25   Statute, by the PIP statute in particular, it's used by the

Page 20

```
 1    Agency for Healthcare Administration, AHCA, in their fee
 2    disputes.  It's also used throughout the country as the
 3    upper boundary of what is reasonable for healthcare service
 4    or procedure.
 5            Q.   And did you apply those in this case?
 6            A.   Yes.
 7            Q.   All right.  Let's look through your
 8    September 12th bill -- I'm sorry, your September 12th
 9    initial report.  By the way -- and let's start on the first
10    page, because you identify some organizations in your
11    billing and coding guidelines, and quite frankly throw
12    around some inflammatory language here; Healthcare Fraud
13    Unit, False Claims Act.
14                 Are you alleging that any of Mr. Counts' medical
15    providers have engaged in making false claims or engaged in
16    fraud?
17            A.   Well, first, I'm not sure why it's inflammatory,
18    these are simply to discuss and describe why does this
19    matter.  Why does it matter whether a healthcare provider
20    utilizes the correct code or follows proper coding and
21    billing guidelines.  I have not made accusations of fraud;
22    however, other entities reviewing these same records, very
23    well may.  The Office of the Inspector General views any
24    kind of improper coding as fraud.
25                 So, while I don't specifically accuse anyone of
```

Page 21

1    fraud, that doesn't mean somebody else who reviewed the same

2    or similar records would make that same conclusion.

3         Q.   Do you intend to offer any opinion at trials in

4    this matter that any of Mr. Counts' medical providers

5    engaged in fraud?

6         A.   I don't intend to.  It would probably be a

7    better question for my client, but I don't -- I don't --

8         Q.   Mr. Reimer, this is the only chance I have to

9    ask you your opinions --

10        A.   Okay.  Hang on a second.  I wasn't finished.

11   Let's not interrupt each other.

12        Q.   Okay.

13        A.   I have not -- I have not accused anyone in my

14   report of fraud.  I have not said anyone committed fraud.

15   But, frankly, some of the bills I read, seeing a doctor

16   charge a patient for something which has no basis in the

17   medical records, somebody could make that accusation.

18   Somebody could also call it abuse, billing in a way that

19   maximizes or unjustly inflates a patient's bill.

20        So I don't intend on making any accusations of

21   fraud, but I don't know if I would necessarily rule that

22   out, as I sit here today, but it's certainly not my

23   intention.

24        Q.   Are you going to offer any opinions that any of

25   Mr. Counts' medical providers have made false claims?

Page 22

1          A.   Well, it's The False Claims Act, and I don't

2     know if they've submitted some of these bills to entities

3     that fall under the False Claims Act, then, perhaps, that

4     claim would be made.  But I don't intend on providing

5     testimony to that extent.

6          Q.   You then identify usual, customary and

7     reasonable as the, quote, the amount paid for a medical

8     service in a geographic area based on what providers in the

9     area usually charge for the same or similar medical service;

10    is that your definition of usual and customary?

11         A.   That is the United States definition, as found

12    on the US Healthcare website, healthcare.gov, yes.

13         Q.   And can you tell me what research you've done,

14    with respect to medical charges in the City of Jacksonville,

15    for the services Mr. Counts' medical providers provided to

16    him?

17         A.   In what way?  Research in what way?

18         Q.   Research to find out what doctors in the

19    Jacksonville community charged for the services rendered to

20    Mr. Counts?

21         A.   Well, I have available -- there are charge

22    databases or there is medical charge information, which is

23    published on an annual basis.  I have what's called a

24    National Fee Analyzer by OPTUM.  So I very well could

25    compare charges to charges.  The charges in that particular

Page 23

1   publication are listed on a national level and then one

2   would apply a geographic adjustment factor to the charges to

3   localize them to the Jacksonville community.

4           However, if you're asking did I do any kind of

5   survey or call doctors, the answer would be no; that would

6   be considered price fixing.  According to the Department of

7   Justice, back in 1996, they published what's called

8   statements of anti-trust enforcement policy in healthcare.

9   Doctors are only allowed to discuss their fees under a very

10  limited set of circumstances; none of those circumstances

11  would apply in this case or would apply to me calling them

12  in order to create some kind of survey.

13          Q.   Then, how do you determine -- if you're going to

14  allege that Mr. Counts' medical providers charged in excess

15  of the UCR rate and the UCR rate is based upon the

16  geographic area where those services are rendered, how can

17  you make that opinion when you don't know what doctors in

18  Jacksonville charge for these services?

19          A.   Well, that's kind of false premise or false

20  conclusion there.  The definition of what's usual, customary

21  and reasonable is what's paid for medical service, and I can

22  relatively easily find out what is typically paid or paid

23  most frequently for those services in the Jacksonville

24  region.  The numbers in my report are localized to the city

25  or locality of treatment in each and every example.

Page 24

1          Q.    But you would agree with me that the second part

2     of the UCR definition states that what is paid for services

3     is based upon what providers in the area usually charge for

4     the same or similar medical services?

5          A.    Well, the definition says that, and that would

6     apply to the CPT codes; otherwise, how would you compare

7     apples to apples.  So it's based on what they accept as

8     payment for those specific procedures and services.

9          Q.    And, then, going on to the next paragraph, what

10    is the Resource Based Relative Value Scale?

11         A.    So the Resource Based Relative Value Scale,

12    that's a good question.  The Resource Based Relative Value

13    Scale is the healthcare system utilized by all, virtually

14    all, healthcare payers.  It's comprised of three components;

15    each service, each procedure, surgery, what have you, is

16    comprised of a physician work component, the practice

17    expense component, and there's also a professional liability

18    or malpractice component.

19              Each office, visit, x-ray, surgical procedure,

20    injection, what have you, is comprised of those three

21    components; they each have an inherent value that is

22    measured in relative value units.  A Level 3 existing

23    patient office visit might be worth 2.1 units, an

24    initial-level cervical fusion could be 37.8.  One would take

25    a base rate or conversion factor, multiply by the relative

Page 25

1    value units to come up with the payment for that particular

2    service or procedure.

3         Q.   Do you have any of these in the materials that

4    you've brought today?

5         A.   Yes.  Your office had asked me to bring some

6    things with me, I put them on a thumb drive for you, if you

7    would like to -- this is yours.

8         Q.   Okay.  And what is contained on that thumb

9    drive?

10        A.   On that thumb drive -- so one of the Schedule A

11   requests was publications, treatises, manuals, textbooks,

12   other documents used as a reference or considered

13   authoritative by you for support of your opinion.

14            So in here are a few things; one, that

15   Department of Justice statement of anti-trust enforcement

16   policy, which explains the situations under which doctors

17   can talk about their fees, and also, in a roundabout way,

18   explains why surveys or other things like that do not exist

19   or would be illegal to try to partake in.

20            There are documents in there explaining the

21   RBRVS methodology, as well as documents from various medical

22   professional societies that discuss the use of RBRVS and/or

23   promote the use of RBRVS.

24            There are also several reimbursement guides on

25   that thumb drive utilizing the same methodology to determine

Page 26

```
1    reasonable payment, as I have here today; those, again,

2    using RBRVS methodology, as well as the relative value

3    units, in order to calculate and/or display what would be a

4    reasonable and/or expected payment for various services and

5    procedures.

6          Q.   And do you have the hard copies there in your

7    folder?

8          A.   Not all of them, no.

9          Q.   Okay.  Are all of the documents in your folder

10   on the thumb drive?

11         A.   Not necessarily, because there might be some

12   things in here that don't have anything to do with this

13   case.  Like, I'm looking right here, I have something here

14   about diagnosis-related groups.  That's DRG, those apply

15   specifically to inpatient hospital stays; there were no

16   inpatient hospital stays here in this case.

17         Q.   Well, what I would like to do is, just out of

18   completeness is, whatever's in that folder of yours, we're

19   going to have that marked as Plaintiff's Composite

20   Exhibit 3.

21         A.   No, I gave you the documents that you've asked

22   for in Schedule A.  I have another deposition immediately

23   following this one at noon.  So what you asked for is on the

24   disc.  There's things in here that don't apply to this case.

25         Q.   Are there things in there that you relied upon?
```

Page 27

1          A.    They're on the thumb drive.

2          Q.    So any document in that folder that -- you're

3    refusing to allow me to mark that folder?

4          A.    Well, there's things in here that have nothing

5    to do with your case that I keep in here just as general

6    reference for questions that I may answer.  So, like I said,

7    there's things in here about diagnosis-related groups that

8    weren't even a factor in this particular case.

9          Q.    I'd like to mark that as Plaintiff's Exhibit 3.

10   Are you refusing to allow me to do it?  Please mark it --

11         A.    You asked me the things -- I need this for my

12   next depo.  You asked me to bring items --

13              MR. STOKES:  He's not asking to take it with

14         him, he just --

15              THE WITNESS:  Well, I get that, but now I have

16         to wait -- do you want to do that now within the

17         confines of ten to noon.  I'm not waiting after --

18         the people who are up there don't work for me.  And

19         who's paying for the copies that will be made?

20              MR. STOKES:  Don't worry about that, I'll take

21         care of paying for the copies.

22              MR. STAGGARD:  All I want to do is mark it.  Do

23         you have a problem --

24              THE WITNESS:  I have a problem with that,

25         because you asked me to bring things and I put them

Page 28

```
1        there on the thumb drive.  So these are copies of

2        what's there.  Then why did I make the thumb drive?

3             MR. STAGGARD:  I would like to mark a copy of

4        that as 3, and the thumb drive as 4.

5             THE WITNESS:  Everything on here -- what I have

6        in here is on there.  It's --

7             MR. STOKES:  I think --

8             THE WITNESS:  If you want to make copies, then

9        let's make copies now; I have a hard stop for this at

10       12:00.  I'm not doing that afterwards and then

11       waiting for them to come back when I may have

12       questions that refer to this in my next depo.

13            MR. STOKES:  Let me try to come up with a

14       solution.

15            MR. STAGGARD:  We've only got two hours, I'm not

16       using up half my time to make copies.  So mark that

17       and we'll get copies at an appropriate time --

18            MR. STOKES:  Or you can copy them later after

19       your 12:00 to 2:00 depo.  It doesn't have to be --

20            THE WITNESS:  Are you going to pay for standing

21       in front of the copier?  Are you going to pay for

22       that time, too?  My time is valuable.

23            MR. STOKES:  I'll take care of that.  All right.

24       I'll pay for that so we can move on and not continue

25       to fight over something.
```

Page 29

1          THE WITNESS:  There's stuff in here that doesn't

2     apply.

3          MR. STOKES:  I understand, Jeremy, but he has a

4     right -- you brought it, he has a right to get it.  I

5     don't want to spend the course of time fighting over

6     this, let's move on.

7          MR. STAGGARD:  So, for the record, we're marking

8     the contents of Mr. Reimer's folder.

9          THE WITNESS:  When are these coming back?  When

10    are we doing them?

11         MR. STOKES:  He's not taking them.  We'll work

12    something out as to whether you do it or I do it or

13    the court reporter does it, we'll work that out.

14         THE WITNESS:  I have a deposition right after

15    this and I will need these.

16         MR. STOKES:  We'll work that out.  Let's move on

17    with the substance of the deposition, rather than

18    spending time fighting over that.  We'll work that

19    out.

20         THE WITNESS:  Okay.

21         MR. STAGGARD:  It's fine.  You can have it for

22    the deposition, I just want it marked for this

23    deposition.  So Plaintiff's Exhibit 3 and Plaintiff's

24    Exhibit 4, which is the thumb drive.

25         THE COURT REPORTER:  What was the --

Page 30

```
 1              MR. STAGGARD:  Three is the folder that
 2       Mr. Reimer has in front of him, one was his bill.
 3       2 --
 4              MR. STOKES:  -- was the subpoena.
 5              MR. STAGGARD:  3 is the folder, 4 is the thumb
 6       drive and then 5 will be his September 12th report,
 7       and 6 will be his October 28th addendum.
 8              (Plaintiff's Exhibit Nos. 3, 4, 5 and 6 were
 9       marked for identification.)
10  BY MR. STAGGARD:
11       Q.   Let's march through your findings here.
12              Advanced Pain Management; can you explain for me
13  what a Level 5 office visit is and what goes to a Level 5
14  visit?
15       A.   A Level 5 visit is the highest severity code
16  available.  It requires a comprehensive history, a
17  comprehensive exam, high complexity medical decision-making,
18  a high severity problem, a physician would document 40
19  minutes spent face-to-face with the patient.
20       Q.   And you -- I'm going to use the term overcharge,
21  because it's just easier, rather than questionable or
22  unreasonable.  What are the reasons you found this to be an
23  overcharge?
24       A.   I wouldn't use the term overcharge, it's a
25  particular charge on the patient's bill that's been upcoded;
```

Page 31

1    the documentation does not support that a Level 5 visit

2    transpired.

3        Q.    Do you expect the length of the visit to be

4    found in every single medical record?

5        A.    If the doctor wants to charge for a Level 5, it

6    would need to be, yes.  Level 5 visits are not meant for

7    regularly scheduled follow-up visits; the patient has to be

8    damn near dying in order to justify a Level 5.  That was

9    clearly not the case for this visit.

10       Q.    So would it be your testimony that none of

11   Mr. Counts' treatment, anywhere along the line, would ever

12   qualify as a registered Level 5 because he was never, quote,

13   damn near dying?

14       A.    That would not be my testimony, no.

15       Q.    All right.  Well, you just said that a Level 5,

16   you have to be damn near dying; do you see anywhere in the

17   medical records that Mr. Counts was damn near dying?

18       A.    Well, if the doctor documented greater than 40

19   minutes face-to-face, the time spent with the patient could

20   be the determining factor for the visit.  So that would be

21   an instance where I would say a Level 5 is okay and

22   justified.

23       Q.    So is it based on time or is it based on

24   severity of the patient's injuries?

25       A.    All of the above.

Page 32

1          Q.    What else did you see from this date that

2     disqualified it as a Level 5, from your perspective?

3          A.    I would have to review specifically the

4     documentation from that visit, in order to give that

5     specific of an answer.

6          Q.    Did you provide for any amount that would have

7     been reasonable for that date of service or did you

8     completely wipe it out?

9          A.    In what way?

10         Q.    All right.  Well, for example, on the emergency

11    room bill, you said it wasn't documented so you wiped the

12    whole bill out and said that the whole bill was unreasonable

13    and that they shouldn't have charged anything?

14              MR. STOKES:  Object to form.

15              THE WITNESS:  That's not what I testified to.

16    BY MR. STAGGARD:

17         Q.    Well, then, we'll go back through that.  I must

18    have misunderstood you.

19              Did you provide what would have been a

20    reasonable charge for this office visit?

21         A.    In the total that I previously gave, and which

22    is listed on page 11 of the report, the table on that page

23    compares all the charges submitted for review to reasonable

24    benchmark standards based on the correct codes for the

25    various services and procedures.  So in that particular

Page 33

1   table, even if the doctor would have used the correct code,

2   the payment for what would be appropriate, based on the

3   documentation, is included in those totals.

4        Q.   What would have been the appropriate code for

5   the 5/21/18 office visit at Advanced Pain Management?

6        A.   I don't have the documentation.  I don't have

7   the records from that visit in front of me.  I would have to

8   go back and look at that.

9        Q.   You made -- is it fair to say that you made no

10  determination as to what proper level it would have been on

11  that date?

12       A.   I'd say that's entirely unfair, based on what I

13  just said about the total on page 11 containing the payments

14  for the appropriate codes for each and every service and

15  procedure.

16       Q.   And you're talking about the average payment and

17  the high payment?

18       A.   Yes.

19       Q.   How did you -- were those -- those two amounts,

20  did you arrive at those aggregately or did you arrive at

21  those by going through each individual office visit in

22  Mr. Counts' medical bills?

23       A.   What do you mean by "arrive at them

24  aggregately?"

25       Q.   Well, let me just ask you how you arrived at

Page 34

1    them.  The average payment of $6,935, how did you arrive at

2    that?

3             A.    $6,935, is that what you asked?

4             Q.    Yes.

5             A.    I would have gone through each and every charge

6    from each and every provider.

7             Q.    And where did you make those notations on each

8    and every charge as to what that particular charge would

9    have been, average payment; do you have that notated

10   anywhere?

11            A.    No, that would have been when I was going

12   through doing my analysis.

13            Q.    Did you write it down at all?

14            A.    No, it would have just been a formula -- it just

15   would have been a formula, I guess, or as far as, you know,

16   if it was a Level 3, a Level 4, what the payment range would

17   be for those.

18            Q.    Is there anywhere that you have in any of your

19   documentation where I could go in by bill and by office

20   visit and figure out how you arrived at the $6,935 average

21   payment?

22            A.    No.  I could see -- I would have to re-create --

23   I would have to go back and review the documentation and --

24   in order to see.  I don't -- I don't have that here.  Some

25   of them they are listed on, like page 5, where you can see

Page 35

 1    here's what they billed, here's the average payment, here's

 2    that.

 3              Q.   What about high payment; what is high payment?

 4              A.   The high payment is the lesser of the billed

 5    amount or 200 percent of the average payment.

 6              Q.   The average Medicare payment?

 7              A.   200 percent of the Medicare payment in that

 8    particular community, Medicare payment being an average

 9    payment.  Actually, the payment that occurs most frequently

10    statistically speaking, it would be the mode.

11              Q.   And what data did you utilize to determine what

12    the average payment would have been for these medical

13    charges?

14              A.   The information is -- well, they're footnoted.

15    So on page 4, footnote number 9, if you go on the back, it

16    lists the source that was used, the physician fee schedule

17    from the CMS website.  There's other sources one could use

18    that provide that same information.

19              Q.   I'm just asking what source you used and what

20    methodology you used to arrive at the average payment.

21              A.   The source is listed, it's footnoted on the

22    page, 14.

23              Q.   And which footnote is it?

24              A.   Number 9.

25              Q.   And that's for the average -- that's for the

Page 36

1    average payment?

2          A.    The high payment is driven by the average

3    payment.

4          Q.    How so?

5          A.    It is the lesser of the billed amount or two

6    times the average payment.   The high payment is a

7    calculation.

8          Q.    And that's -- if I understand it correctly --

9    the average in that source at footnote 9, is CMS.gov, which

10   is the Centers for Medicare Services?

11         A.    That is the source for the physician payments,

12   yes.

13         Q.    So, Medicare?   CMS is the Centers for Medicare

14   Services?

15         A.    Well, that is the Medicare payment, correct,

16   that is the payment which uses publicly available

17   information utilizing the Resource Based Relative Value

18   Scale.

19         Q.    So are all of your numbers, then, Medicare

20   driven?   Because if your average has got, as its root

21   source, the Medicare website, and then the high is either

22   what the physician charges or 200 percent of the Medicare

23   reimbursement rate, whichever is less, all of these figures

24   are all Medicare driven; is that a fair statement?

25         A.    I would say all of these figures are Resource

Page 37

1    Based Relative Value Scale driven, that's what they're

2    driven by, that particular methodology; the payment

3    methodology that's peer-reviewed annually that has

4    scientific foundation that's used throughout the healthcare

5    industry to determine reasonable payments.  I utilized the

6    Medicare payment because it is publicly available

7    information, based on that methodology.  It is also the

8    payment which occurs more frequently, as Medicare purchases

9    more healthcare than any other entity in the country.

10            So keeping with the definition of usual,

11   customary and reasonable by the federal government, as to

12   the amount paid for a service or procedure, that's why I

13   utilized that methodology.  As well as those benchmarks.

14       Q.    And where can I find the Resource Based Relative

15   Value Scale?

16       A.    What part of it?

17       Q.    The entire thing.

18       A.    Well the Resource Based Relative Value Scale

19   is -- you can find definitions of it in many sources.  You

20   can find definitions on the AMA, you can find definitions on

21   the CMS website, many of the medical societies discuss it

22   there, as well.  The output of the Resource Based Relative

23   Value Scale is probably what you're looking for, which are

24   the RVUs for each and every procedure.  Those, too, are

25   published in many particular places.  First and foremost,

1    they would be published through the national -- the Federal

2    Register, they would be found on the Department of Health

3    and Human Services website, they can be found through CMS,

4    they're found here in various medical coding references.

5              This one here is called the Current Procedural

6    Coding Expert, they're found in the coding software I use,

7    which is OPTUM's Encoder, they're found in the National Fee

8    Analyzer that lists RVUs, the reimbursement guides from

9    various device manufactures, on the thumb drive, utilize

10   RVUs and list that same Medicare payment in their

11   reimbursement guides as the average or expected or

12   reasonable payment for the particular procedures.

13        Q.   And you just held up a rather thick guide, what

14   is that guide?  What's that guide?

15        A.   This is a code book.  So this is a CPT code

16   book, Current Procedural Terminology, that has CPT codes,

17   current procedural terminology or descriptions of the

18   various services and procedures, but this particular book

19   also has relative value unit information.

20        Q.   Did you use any of that relative value unit

21   information in rendering -- in preparing opinions in this

22   matter?

23        A.   Yes.  The relative value units are the component

24   or output of the Resource Based Relative Value Scale.  Each

25   and every service, office visit, procedure, starts out with

Page 39

1    an inherent value.  They're reviewed annually by different

2    panels.  So panels of doctors and medical professionals meet

3    to determine the value of all of the services and procedures

4    that fall under their specialties; so each procedure has an

5    inherent value.  One would then multiply a base rate or

6    conversion factor in order to determine the payment.

7             So, yes, relative value units are a component of

8    the analysis, as they are a component of the methodology,

9    the Resource Based Relative Value Scale.

10        Q.   What specifically from the --

11             MR. STOKES:  Can I have your folder?  If you

12        need it back, let me know.

13   BY MR. STAGGARD:

14        Q.   What specifically from that book did you utilize

15   in preparing your opinion in this matter?

16        A.   I don't know if I used necessarily anything from

17   this particular book, but RVUs are a component to determine

18   the average and high payments.

19        Q.   And then going to the 5/23/18 office visit for

20   Advanced Pain Management, this one, it looks like you

21   alleged there was an improper CPT code utilized; is that a

22   fair statement?

23        A.   Yes.

24        Q.   And it is your testimony or your opinion that

25   these should have been billed as acupuncture treatments?

Page 40

1          A.    Yes.

2          Q.    And what is the difference between an

3    acupuncture treatment and a percutaneous nerve stimulation?

4    Let me ask it differently.  What is a percutaneous nerve

5    stimulation?

6          A.    What is the word for when something is -- the

7    definition is itself?  There's a grammatical word for that.

8    It's a percutaneous electric nerve stimulation.  So what

9    they're doing is they're using needles percutaneously, or

10   not through an open or incisional entry point, to stimulate

11   various nerves.

12              The codes that I listed, what was provided to

13   the patient is acupuncture with electric stimulation.  So

14   utilizing that particular service is best described by those

15   two codes, the 97813 and 97814.  It's not standard or -- I

16   hesitate to use the normal acupuncture, it's a specialized

17   form.

18         Q.    And what qualifications do you have to render

19   opinions concerning what goes into this medical treatment

20   that Dr. Willens provided to his patient?

21         A.    I'm not sure I understand the question.

22         Q.    What qualifications do you have, from a medical

23   standpoint, that you feel qualify you to render opinions

24   concerning what this medical treatment was that Dr. Willens

25   provided to Mr. Counts?

Page 41

1          A.    You asked the same thing twice, and, again, I'm

2     not sure what your -- I've made opinions as to whether or

3     not the documentation supports the codes and the charges

4     that were rendered to the patient.

5          Q.    Have you ever performed a percutaneous

6     electrical nerve stimulation on a patient?

7          A.    No.

8          Q.    Do you know what goes into it?

9          A.    Only based upon the documentation that was

10    presented.

11         Q.    What is unbundling?  Just generally speaking, as

12    you define it.

13         A.    Unbundling, there is a definition listed on

14    page 2 of my report.  Unbundling would be considered billing

15    separately for the components of an all-inclusive procedure,

16    also called fragmented billing or a la carte billing.

17         Q.    And you allege that Dr. Willens, on 6/21 of '18,

18    unbundled lumbar facet injections?

19         A.    I alleged that the supplies used for those

20    lumbar facet injections were unbundled from the charges from

21    the lumbar facet injection themselves.

22         Q.    And what supplies were unbundled?

23         A.    The HCPCS codes are listed on page 4 of the

24    report.

25         Q.    And what is a J1040?

Page 42

1         A.    An injectable substance used for the injection.

2    I don't have a supply book here with me, but one could look

3    that up rather quickly.

4         Q.    What is an A4550?

5         A.    I believe that's a tray.  I believe it's a tray.

6         Q.    And what is an S0020?

7         A.    Without having a supply book here with me,

8    it's -- I believe that's a contrast material.

9         Q.    And an A4212?

10        A.    Another miscellaneous supply, perhaps the needle

11   itself.  When a doctor performs a procedure in his office,

12   the payment for that procedure is higher than had he

13   performed it in a surgery center.  The reason for that

14   increased payment is that the doctor is the one providing

15   the overhead and/or the supplies that are used for that

16   procedure.  So the charge for the procedure and then to

17   charge again for those supplies needed and necessary for

18   that procedure is unbundling.

19        Q.    But by doing it in his office, will it not most

20   of the time, save the payment money because there's no

21   separate facility fee that he bills that you would have

22   maybe incurred at a surgery center?

23        A.    That doesn't justify unbundling.  I'm saving you

24   money by not going there so I'm going to bill you

25   improperly.  Those supplies are included in the physician's

Page 43

1    payment for the injection.  So he's charged him for a Happy

2    Meal and then he's charging him again separately for the

3    french fries or soda; those are already included in the

4    Happy Meal that he charged the patient for, the lumbar facet

5    injection.

6         Q.   And then 6/21, the nerve block injections, as

7    well, there were unbundled charges there?

8         A.   Correct.  In order to bill for an office visit

9    or an evaluation and management at the same time as another

10    procedure, the provider must document that a significant and

11    separately identifiable evaluation and management service

12    was provided that was unrelated to whatever was being

13    performed on that date of service.

14         Q.   And then on page 5 of your report, these are the

15    charges from Dr. Willens that, in your opinion, are above

16    usual, customary and reasonable benchmarks; is that correct?

17         A.    No, these are the charges -- the table there

18    shows the reasonable payment for the charges which were

19    coded correctly on the bill, which were supported by the

20    documentation.  So the ones prior to that table are ones

21    that were not supported by the documentation for various

22    reasons, typically upcoding or unbundling, table 5 shows for

23    all the rest of what was performed, here's what a reasonable

24    payment range would be.

25         Q.   And is that how you intend to offer your

Page 44

1    testimony, that the average payment and the high payment

2    represent a reasonable payment range for each of those dates

3    of service?

4         A.   I tend to offer testimony that here's what an

5    average payment would be, here's what a high payment would

6    be.  The finder of fact, if you will, can use one, the

7    other, somewhere in between or none of the above, if they

8    were so inclined.

9         Q.   So when you have here -- and these are the

10   numbers we went through earlier for Dr. Willens, total

11   charges submitted $14,100, total unreasonable charges

12   $7,933; did you arrive at that figure using the average

13   payment or the high payment?  And I know there's some

14   figures in there for the unbundling, but overall of his

15   medical expenses, when you apply the usual and customary and

16   arrived at those numbers, did you use the average or did you

17   use the high?

18        A.   I think I know what you're asking.  That's a

19   good question.  That would be utilizing the high payment.

20   So what you see there would be the total unreasonable

21   charges, are the total of improperly coded or billed items,

22   plus the total of the charges which exceed the high payment.

23   Does that answer your question?

24        Q.   Yes.

25        A.   So the high payment is what is used.

Page 45

```
 1          Q.   And then Silver Chiropractic, the initial office

 2    visit doctor, Silver charged for a Level 4?

 3          A.   Yes.

 4          Q.   And when you say, "The documentation from this

 5    visit does not support the use of this high severity code,"

 6    is it all those items you've got listed there, comprehensive

 7    history, comprehensive exam, moderate medical decision,

 8    moderate-to-high severity problem, physician time?

 9          A.   Those are the requirements for a Level 4 code;

10    the documentation doesn't support that.  And you would -- a

11    chiropractor would not eligible, or typically eligible, to

12    bill above a Level 3 because the nature of their work is not

13    head-to-toe involving, you know, internal body systems.  So

14    it would not be appropriate for a chiropractor to bill above

15    Level 3.  The same with a podiatrist, they're only viewing

16    the patient from the knee or below the knee.

17          Q.   And then there is some other finding here,

18    unbundling on multiple dates of service; unbundling, just

19    generally speaking, let's go to the top on page 7, what

20    charges were unbundled that should have not been unbundled?

21          A.   The patient was charged for an office visit on

22    2/28/18, charged for a Level 3 follow-up office visit.

23    Those charges are in addition to the charges for other

24    treatment modalities that were performed on that date of

25    service.  In particular, the patient received chiropractic
```

Page 46

1    manipulative treatment -- manipulative, sorry, kind of

2    rolled my tongue there -- or CMT.

3                An office visit or evaluation and management,

4    CPT code 99213, is considered a component of CMT.  So it

5    would be considered unbundling to bill for those two

6    services on the same date of service.

7                Should I continue down the page?

8        Q.    No, that's okay.  And then let's go on to

9    Advanced Diagnostics.

10       A.    So, really the only thing here, it's not

11   necessarily a coding issue, codes are fine, codes are for

12   two MRI, knee and lumbar, those are the appropriate codes,

13   the billed amounts, one was just under 1200, the other was

14   1400; the only real issue here is that those billed amounts

15   are above what a reasonable or even high payment would be

16   for those MRIs.  So there isn't a coding issue, per se.

17       Q.    And by the way, you would agree with me that

18   even though you had come to these conclusions regarding

19   Mr. Counts' medical bills, that he still owes whatever his

20   doctor's charge him?

21       A.    No, I wouldn't.  I wouldn't agree with that, no.

22   No, I wouldn't.

23       Q.    Does your report come in and automatically

24   reduce his bills and what he owes his doctors?

25                MR. STOKES:  Object to form, but go ahead.

Page 47

 1            THE WITNESS:  I don't believe that somebody

 2       writing something down on a piece of paper

 3       automatically obliges one or obligates one to pay

 4       that amount, even if the charges are incorrect or

 5       grossly above what would otherwise be reasonable.

 6       So, no, because a doctor writes something down he

 7       owes it?  No, I don't believe that.

 8  BY MR. STAGGARD:

 9       Q.   So you think that Mr. Counts has the right and

10  the ability to just go to his doctors and say, you know

11  what, you charged me too much, I'm not paying it, and then

12  he can walk away from that without any type of problems from

13  that?

14            MR. STOKES:  Object to the form, but go ahead.

15            THE WITNESS:  What kind of problems?  Because

16       I'm not a lawyer, so I'm not making legal

17       conclusions, but are you going to sit here and tell

18       me that you don't go and negotiate bills with these

19       providers, that in all of your cases and all of your

20       clients, that they pay what that billed amount is?

21       Is that kind of what you're asking me here during my

22       deposition?

23  BY MR. STAGGARD:

24       Q.   What I'm asking you is, do you see your report

25  as a magic wand that Mr. Counts can waive over his medical

Page 48

1    bills and make them reduce to the figures that you suggest?

2              MR. STOKES:  Object to the form.

3              THE WITNESS:  In no way, shape or form does my

4         report conjure any magic.

5    BY MR. STAGGARD:

6         Q.   Therefore, his bills still exist, even in spite

7    of your report?

8         A.   His bills exist, I haven't shredded them, I

9    haven't destroyed them, but does the validity of the bills

10   exist, just because a doctor put it down?  The doctor

11   wouldn't receive payment in any other realm of the known

12   universe, so why would he expect payment here?  Because it's

13   a case in litigation?  Because the patient may or may not be

14   treating under a letter of protection?  No.  If a doctor has

15   unbundled or upcoded or if the documentation doesn't support

16   those charges, they wouldn't be paid.

17              And that's in the folder there.  If it wasn't

18   documented, it wasn't done, and if it wasn't done, the

19   provider should not bill for it.

20        Q.   Let's look at Advanced Diagnostics, for example.

21   The bill was $2,592.  And let's go with the high payment,

22   Mr. Counts pays them $912 of the $2,592; is it your

23   testimony, then, that he can walk away from that and not

24   have to worry about owing the additional $1,600?

25              MR. STOKES:  Object to the form.  Go ahead.

Page 49

```
 1          THE WITNESS:  My testimony might be he might
 2     even pay less than the $912 to satisfy the bill, if
 3     he contacted them and asked them, you know, what is
 4     your self-pay rate.
 5          I think it is a poorly kept secret that there is
 6     a big difference between what providers charge and
 7     what they accept as payment and there's often little
 8     basis in reality for what they charged, compared to
 9     what they accept as payment.
10          I, as a self-pay patient, not using any
11     insurance, have paid for MRIs, which are at or near
12     the Medicare payment, which are at or near basically
13     the same payment that anyone would be paying for
14     them.  So, no, to say that -- I would like to see
15     documentation where Advanced Diagnostics has actually
16     paid $2,600 for those MRI.
17          The definition of usual, customary and
18     reasonable is what is typically paid for those
19     services; $2,600 is not typically paid for those
20     services.
21  BY MR. STAGGARD:
22          Q.   And when you say that doctors accept less or
23  whatever, where is your documentation to support that?
24          A.   I think there's documentation here in the
25  records, if insurance is paid.  I think there's documents
```

Page 50

1    from my own personal experience, being a self-pay patient

2    and working with dozens of self-pay patients.  I think we

3    could probably call Advanced Diagnostics and ask them what

4    their self-pay rate is.  I mean, there's a phone here, I can

5    look up their number and ask them if they have a self-pay

6    rate and we can figure out what exactly your client would be

7    expected to pay for these if he wasn't using insurance.

8         Q.   You mentioned insurance, when you were looking

9    through the bills, did you look through there to see what

10   the contractual write-offs were, with respect to Mr. Counts'

11   health insurance company?

12        A.   No.  No, that's not a component of my analysis.

13   My analysis is based on, first, the definition of what is

14   usual, customary and reasonable, it doesn't mention anything

15   about insurance write-offs or anything like that, it's the

16   amount that's typically paid for a service or a procedure in

17   a community.  Using insurance write-offs would not be good

18   science; a similar person in my position could not perform

19   the same or similar analysis and arrive at the same or

20   similar conclusion.

21        Q.   And then you made a statement before that seemed

22   kind of like a blanket statement, that medical bills are

23   reduced because they accept less.  What publication -- what

24   accepted publication do you rely upon for that premise?

25        A.   I don't rely on accepted publication for that

Page 51

1    premise, I rely on my own personal and professional

2    experience for that premise.  I rely on the dozens of

3    depositions I've read to formulate that premise.  I'm not

4    using that in terms of my analysis.

5              The methodology used for my analysis is

6    explained on page 2 of both the report, as well as the

7    addendum.  I merely brought that up because you said if he

8    pays $912 can he walk away from the rest.  I would argue

9    that -- perhaps not argue, but I would guess that his

10   payment would be quite a bit less than that to satisfy those

11   MRIs in full.

12        Q.   And what do you base that guess on?

13        A.   The fact that I have had MRIs myself that I have

14   paid for without any insurance as a self-pay patient.

15        Q.   Baptist Medical Center, they also overcharged

16   Mr. Counts?

17        A.   Well, I'm not necessarily saying he was

18   overcharged, what I'm saying is a reasonable payment for

19   those services are less than what Mr. Counts is charged.

20        Q.   And Baymeadows MRIs is the same thing as

21   Advanced Diagnostics?

22        A.   Yes, more or less.

23        Q.   And on the emergency room physicians, you've got

24   a paragraph here that's on page 10 of your report, "The

25   documentation from this visit does not support the use of

Page 52

1   this high severity code," and it looks like you drop

2   footnote Roman numeral number 19.

3           And was that -- the finding of an acuity Level 3

4   versus an acuity Level 4, was that something that was found

5   in the actual medical records or was that something that you

6   gleaned and you interpreted from the medical records

7   applying the referenced source?

8       A.   I'm not sure I understand what you're asking.

9       Q.   In other words, was there something in the

10  medical records that said, yeah, this is an acuity Level 3,

11  or did you look at the records, see what was done, looked at

12  the medical diagnosis, and then go to this source at Roman

13  numeral number 19 and determine that the acuity level was

14  actually a 3?

15      A.   Well, the answer's written on page 10; per the

16  records, the patient was assessed as a Level 3.  What's also

17  interesting is the hospital billed this as a Level 3 visit,

18  yet the ER physician billed it as a Level 4 visit, and

19  that's a red flag, those should match.  Or in, I guess,

20  perhaps rare circumstance, the facility might bill for a

21  higher level intensity than the physician, but one would not

22  expect that the reverse to be true.  Typically, it is a red

23  flag when the facility says one thing and, yet, the

24  physician says another.

25      Q.   So was it in the medical records where the

Page 53

1    doctor said Mr. Counts is an acuity Level 3?

2          A.    It was in the medical record where the patient

3    was assessed as an acuity Level 3.

4          Q.    The words acuity Level 3 would be in the medical

5    records?

6          A.    Yes.

7          Q.    And that was not a determination that you made,

8    but you read that from the medical records?

9          A.    Well -- that was in the records, that's a

10   determination that I or another medical coder could make

11   from the records, or even more appropriately, as to whether

12   or not the overall documentation meets the requirement of a

13   Level 4.  A Level 4 emergency room visit is a very severe

14   visit, typically one that could involve the loss of

15   physiological function.  The documentation didn't support

16   that.  He was assessed as a Level 3, the hospital billed

17   this as a Level 3, the doctor charged as a Level 4, not

18   supported by the medical records.

19               Be that as it may, in the totals that I listed,

20   both here on page 10, as well as what would be on the

21   following page, even had the correct code been used, that's

22   what the reasonable payment range would have been for those

23   services.

24         Q.    Then on page 12, contingent physician fees, have

25   you been provided with any letters of protection that were

Page 54

1    assigned or issued in this case?

2         A.   I don't know if they were in the records.   I

3    haven't been provided with them separately.

4         Q.   And then opinion 6.05 of the AMA, fees for

5    medical services, are you just providing that as a

6    background source or are you making any allegations that any

7    of Mr. Counts' treating physicians violated AMA guidelines?

8         A.   Well, the listing of that particular guideline

9    isn't so much to make an accusation against a physician or

10   that they necessarily violated that, what that does is it

11   explains a few things about the determination of what's

12   reasonable for it.  And some are listed there, the

13   difficulty or uniqueness of the services, the time and skill

14   or the experience required.

15             And that's part of -- that's a driving force as

16   to why I list a range.  And the reimbursement guides that

17   are available here on the thumb drive, only the average

18   payment is listed.  So I not only list that, but here's a

19   high payment that I'm aware of that occurs with consistency

20   or frequency above that average payment.

21             It also goes on to say that someone in my

22   position is qualified to make the determination.

23         Q.   Let's go to the addendum that you did.  And it's

24   my understanding, Mr. Reimer, that you've been told that --

25   and I think we talked about it at the outset of your

Page 55

1    deposition -- you've been told that you may be looking at

2    additional Jax Spine and Pain Center bills upcoming in the

3    future?

4          A.    Yes.

5          Q.    Let's go to page 3, upcoding.  And, again, we've

6    talked about that, that's where you find that there was one

7    level of service charged for but that the medical records

8    don't support it; does that say it in a nutshell?

9          A.    Yes, where a higher level of service has been

10   billed than that which was documented.

11         Q.    And then you've got one, two, three, four, five,

12   five dates of service listed here, what would have been the

13   appropriate severity code for those dates?

14         A.    At the most, Level 3s, as these were regularly

15   scheduled office follow-up visits.

16         Q.    And then did you allow for a reasonable charge

17   range for a Level 3 visit for those office visits when you

18   calculated what reasonable charges should have been?

19         A.    Yes.  On the table on page 4, although it is not

20   exclusive to Jax Spine, that table shows the total charges

21   from both the providers I reviewed in my initial report, as

22   well as Jax Spine, but payment allowance or calculations

23   would have been made based on the correct code or based on

24   Level 3 visits in those average and high payments that you

25   see.

Page 56

1          Q.   And, all told, it appears you've reviewed

2     $38,082 in total medical expenses incurred by Mr. Counts,

3     correct?

4          A.   Yes.

5          Q.   And you would propose that those doctors should

6     be billed somewhere between $9,796 and $17,476?

7          A.   No.

8          Q.   Okay.  Then, I've got average payment $9,796,

9     high payment $17,476, where am I mistaken?

10         A.   You asked me if the doctors should have billed

11    those amounts and that's not what my findings -- that is not

12    the result or conclusion of my findings.  My findings are

13    that a reasonable payment for the services which were

14    provided to Mr. Counts by these providers would be between,

15    let's call it, 10- and just under $18,000.

16         Q.   And I don't know what his health insurance

17    company paid, but if his health insurance company paid

18    between $10,000 and $18,000 for those treatments, then would

19    his health insurance company have reimbursed those bills at

20    a reasonable rate, in your opinion?

21         A.   That's an interesting question.  I would say --

22    well, that figure there has payments based upon the correct

23    codes for the procedures.  It is my opinion that the health

24    insurance companies should not have paid anything for

25    incorrectly coded or billed procedures.  So I don't know

Page 57

1   what that would do to the payment between -- whether or not

2   the payment would fall between that range, but it's

3   certainly not the health insurance company's job to fix the

4   bill or to say, oh, well, here, you billed it at this, the

5   documentation supports that.

6           Because in that instance, either one, the doctor

7   gets paid for an incorrect charge, or, two, the only

8   downside is he gets paid for what it should have been.  So,

9   no, if it wasn't documented, it wasn't done, and if it

10  wasn't done, it shouldn't be billed for and it certainly

11  shouldn't be paid for if the documentation does not support

12  the codes and the charges that were rendered.

13      Q.   So if the health insurance company paid for any

14  of the charges on any of the dates of service that you've

15  got in either one of your reports, it's your testimony that

16  those would have been improper payments?

17           MR. STOKES:  Object to form.

18           THE WITNESS:  That they were mistaken.

19  BY MR. STAGGARD:

20      Q.   Let's take that out of the equation.  Let's take

21  whether an insurance company should pay for what you believe

22  is an improperly documented medical bill, let's take that

23  out of the equation for just a second.  Just in terms of the

24  amounts, if the health insurance company or PIP company or

25  the PIP carrier paid between $10,000 and $18,000 for

Page 58

1    Mr. Counts' medical expenses, would you agree with me that

2    that would be a reasonable amount to pay for those medical

3    expenses?

4            A.    I can't --

5                  MR. STOKES:    Object to form, but go ahead.

6                  THE WITNESS:    I can't take that out of the

7            equation, that's not how it works.    If it wasn't

8            documented, it wasn't done, and no one on the other

9            end should pay for charges that are not supported by

10           the documentation, whether it's the patient or

11           someone paying on the patient's behalf.

12   BY MR. STAGGARD:

13           Q.    So if somebody -- hypothetically, if somebody

14   bills for a Level 5 office visit but they only document a

15   Level 3 office visit, you would agree with me that that

16   would be what you would term improper documentation?

17                 MR. STOKES:    Object to the form, but go ahead.

18                 THE WITNESS:    I would state that that is an

19           example of upcoding.

20   BY MR. STAGGARD:

21           Q.    Which would be improper documentation; you've

22   got the medical bill not properly documenting -- not

23   properly documented by the medical record.

24           A.    Well, not necessarily, it's not necessarily an

25   improper documentation, it's upcoding.    If the provider did

Page 59

1    not provide the services that are required for a Level 5,

2    that doesn't necessarily make it improper documentation.

3    Did he provide those services?  If he did, but then didn't

4    document them, then in that case, but either way it's

5    upcoded; you billed the patient for treatment which were for

6    more intense or severe or resource-intensive treatment than

7    that which was actually provided.

8         Q.    In that situation, are you suggesting that the

9    doctor be paid nothing because they did not properly bill

10   the office visit or they did not properly document what they

11   did in that office visit?

12        A.    If the doctor submits a bill for a Level 5 visit

13   but the documentation supports a Level 3, the doctor should

14   not be paid for a Level 5 visit.

15        Q.    Should they be paid for a Level 3 visit?

16        A.    If and when that doctor submits documentation or

17   submits a bill that is supported by the medical records --

18   if and when the doctor submits a bill that is supported by

19   the medical records, he should be paid for that, as long as

20   it's within a certain time.  Typically there's windows.

21        Q.    But if a doctor submits a Level 5 bill with only

22   Level 3 documentation and never submits either a Level 3

23   bill or a Level 5 documentation, that doctor should never be

24   paid for that office visit?

25             MR. STOKES:  Object to the form.

Page 60

1          THE WITNESS:  Correct.  That's correct, he

2      should not be paid.  It is not the payor's job to

3      determine what the right level is.  Think about the

4      scenario that you just explained, because in that

5      scenario one of two things happens:  I get paid for

6      an upcoded office visit or it doesn't matter that I

7      upcoded it, they'll just fix it for me anyway.  So

8      there's no downside, there's only upside.

9          If a Level 5 visit was not documented, as you'll

10      find in this folder, as well as in the thumb drive,

11      based on Department of Health and Human Services

12      guidelines, if a procedure -- may I have my folder

13      back?  Best practices.  "Understands that sending

14      billing information is not sufficient proof that the

15      services were provided.  Understands the importance

16      of submitting records requesting no matter how small

17      the amount is that was paid.  Understands that if it

18      wasn't documented, it wasn't done."  So in your

19      scenario, if you didn't document a Level 5, you

20      shouldn't be paid for a Level 5.

21  BY MR. STAGGARD:

22          Q.   So Mr. Counts could go to his medical doctors

23  and say, hey, you didn't document it properly, I don't owe

24  you a dime --

25          MR. STOKES:  Object to the form.

Page 61

1    BY MR. STAGGARD:

2         Q.   -- for those office visits.  I don't owe you a

3    dime, don't bother suing me, don't report me to collection

4    agency --

5                   MR. STOKES:  Object to the form.

6    BY MR. STAGGARD:

7         Q.   -- because I don't owe you a dime because you

8    didn't properly document the medical procedure.

9                   MR. STOKES:  Object to the form.

10                  THE WITNESS:  I feel like you're asking me a

11              legal question and I wasn't retained to provide legal

12              opinions.  What I'm telling you is, that if a doctor

13              didn't document a Level 5 visit, he should not be

14              paid for a Level 5 visit.  In fact, the Office of the

15              Inspector General considers any kind of improper

16              coding or billing to be fraudulent.

17   BY MR. STAGGARD:

18        Q.   Mr. Reimer, is there a copy of the CV on the

19   thumb drive?

20        A.   I brought one.

21                  MR. STAGGARD:  I will have that marked as the

22              next exhibit, I think it's 7.

23                  (Plaintiff's Exhibit No. 7 was marked for

24              identification.)

25   BY MR. STAGGARD:

Page 62

1          Q.    And, Mr. Reimer, the testimony list I was

2    provided with ended in 2017; do you have a more current

3    testimony list?

4          A.    Yes.

5                MR. STAGGARD:  I'll have that marked as 8.

6                (Plaintiff's Exhibit No. 8 was marked for

7          identification.)

8    BY MR. STAGGARD:

9          Q.    Do you have -- do you know what the breakdown is

10   between -- well, you're typically retained to come in and

11   say that the charges are above usual and customary, correct?

12   To render the opinions that you've rendered in our case; is

13   that a fairly typical case for you?

14         A.    I'm retained to determine the reasonableness of

15   the medical coding and the medical billing.

16         Q.    What percentage of your work is on behalf of

17   defendants who have been sued for personal injuries or

18   damages in a lawsuit versus plaintiffs who are actually

19   bringing the cause of action?

20         A.    Well, two things; one, I don't track cases

21   whether or not they're in active litigation or they're

22   pre-suit.  So I don't know a percentage of who's being sued

23   or whether or not the person is being sued or whether

24   there's just a demand.  I also don't track cases by

25   plaintiff or defense, but if I were to give an estimate, I

Page 63

```
 1   would estimate that probably 90 to 95 percent of my work in
 2   cases like this is for the defense.
 3          Q.    And, Mr. Reimer, what are the other two binders
 4   that you brought there?  You have three binders there.
 5               MR. STOKES:  He's talking about the books.
 6               MR. STAGGARD:  The books right there.
 7               THE WITNESS:  These were my book -- one of them
 8          is an OPTUM book about chiropractic services, another
 9          one is another OPTUM book about neurology and
10          neurosurgery.
11   BY MR. STAGGARD:
12          Q.    And what is OPTUM?
13          A.    OPTUM is a healthcare resource and reference
14   provider, they provide various medical reference books.
15   Since the patient received primarily chiropractic treatment,
16   as well as some injections, those two books could provide
17   resource and reference material or explanation or
18   instruction based on that treatment or involving that
19   treatment.
20               MR. STAGGARD:  And I see in here your fee
21          schedule, so we'll have that marked as the next
22          exhibit, as well.
23               (Plaintiff's Exhibit No. 9 was marked for
24          identification.)
25   BY MR. STAGGARD:
```

Page 64

1          Q.   Did you use anything specifically from those

2     other two books that we just mentioned?

3          A.   Not specifically.  No, I footnoted most of the

4     sources, but I was asked to bring things that could perhaps

5     be related to my opinions, they would have, you know, coding

6     guidelines in there, but I don't believe that I used

7     anything specific from those two books.

8          Q.   How do you buy those books?  How did you buy

9     those books?  Can I can to Amazon?

10         A.   You can go to OPTUM.  You can get books from

11    OPTUM themselves.  I mean, you may be able to find them

12    through a third party like Amazon from another seller, but

13    typically they're purchased directly from the publisher

14    themselves, in this case is OPTUM.

15         Q.   What I would like to do -- I certainly don't

16    want to copy all those books -- is I would like to have the

17    cover --

18         A.   Take a photo of it.

19              MR. STOKES:  Go ahead and let me just get the

20         books and keep asking questions, sir.

21              MR. STAGGARD:  And I'll take them, too.

22                   (Off the record.)

23         (Plaintiff's Composite Exhibit 10 was marked for

24              identification off the record.)

25    BY MR. STAGGARD:

Page 65

1          Q.   Did you take any coursework to take those tests

2     that allowed you to get the certifications that you got?

3          A.   I took course work, as far as there were various

4     practice exams.  I did not take coursework in terms of a

5     program as similar to the one I taught at.  My coursework

6     was self-study coursework.

7          Q.   All right.  And you charged my law firm $1,900

8     for today's deposition, correct?

9          A.   I charged your law firm $1,000 for today's

10    deposition.  There was an additional charge of three hours

11    for the time spent responding to Schedule A of the depo.

12         Q.   And what did you do to respond to Schedule A of

13    the deposition?

14         A.   Looked through my files folders to determine

15    whether or not I had items you were asking for.

16         Q.   And how voluminous were your files or folders?

17         A.   I don't -- I'm not sure how to answer that.

18    Voluminous could be a relative --

19         Q.   How big?  How many pages did you have to go

20    through?

21         A.   I go through a lot of files.  You asked for any

22    publications, treatises, manuals, textbooks or other

23    documents you used as a reference or consider authoritative

24    to support your opinions; that could be a lot of things.

25    I've got a lot of stuff that talks about the use of RBRVS,

Page 66

1    it talks about things that we talked about today, as far as,

2    you know, contacting providers in Jacksonville.  So to take

3    the time to gather those items and put them on the thumb

4    drive.

5         Q.   And that all took three hours?

6         A.   It might have even taken a little more than

7    three hours, but since I sent the bill for three hours I

8    left it at that.

9         Q.   And I'm correct, again, that you've got no local

10   source, as it relates to the city of Jacksonville, as --

11   regarding what physicians in Jacksonville charge for these

12   medical services?

13             MR. STOKES:  Object to the form, but go ahead.

14             THE WITNESS:  No, there's the National Fee

15             Analyzer which lists charges for these services and

16             one can apply the geographic adjustment factor for

17             Jacksonville to get charge information for that

18             specific locality.

19   BY MR. STAGGARD:

20        Q.   Did you utilize that national fee source?

21        A.   No.

22        Q.   Why not?

23        A.   Because the definition of what's usual,

24   customary and reasonable is the amount that is paid for a

25   service or procedure in a community.  Who cares whether or

Page 67

1    not they billed a million dollars, what do doctors in this

2    community accept as payment?

3                Just like every other industry; the value of

4    one's home is not the list prices of homes in the

5    neighborhood.  The value of a car is not the sticker prices

6    of other similar vehicles, it's what people actually pay for

7    these services.  It would be like a law firm saying we

8    charge $3,000 an hour, but all of our clients pay us $300.

9    And I think most people are kind of catching on to that,

10   that there's a big difference between what these medical

11   providers charge and what they accept as payment.

12        Q.   But you would agree with me that your own

13   definition of usual and customary that you use in your

14   report has, as a component to it, what the physician charges

15   in the locality in which that physician practices?

16        A.   What he charges is the CPT code, that's how you

17   determine or differentiate what we're comparing to a

18   payment; otherwise, what are you comparing what to what?  He

19   charged X for this code, okay, well, what gets paid for this

20   code?  So the charges have to do for the specific procedure,

21   for the itemized procedure, that would be where CPT codes

22   come in.

23                I think the definition implies that they don't

24   get paid what they charge.  It's a payment based on what he

25   charges, but what he charges for the CPT code; otherwise,

Page 68

1  how are we making any like-kind comparison?

2      Q.   Have you ever worked with either Mr. Stokes or

3  the Alvarez Winthrop Law Firm before this case?

4      A.   Yes.

5      Q.   How many times?

6      A.   I don't know.

7      Q.   Too much to count?

8      A.   No, just when cases settle or close I dispose of

9  them.  So I don't know the exact number.  I'm sure his firm

10  can answer that better than I can.

11      Q.   Have you met with Mr. Stokes concerning your

12  opinions in this matter or spoken to him on the telephone?

13      A.   No, I believe just prior to the depo was the

14  first time that I met him.  We spoke briefly about the case.

15  I don't really think we got into my opinions, if at all.

16      Q.   How long did you meet for?

17      A.   Ten minutes.  It wasn't a scheduled meeting.  He

18  was here, I invited him back and we spoke.  We had never met

19  before.

20      Q.   Were there any e-mails that went back and forth

21  between your office and his concerning this case?

22      A.   There may have been.  I typically don't keep

23  e-mails.  My e-mails are limited capacity.  I think there

24  was one letter that accompanied the subpoena and there was

25  one letter that I -- the original retention letter that

Page 69

1    would have accompanied the disc.

2              MR. STAGGARD:  We'll have that marked as the

3         next exhibit.

4              (Plaintiff's Exhibit No. 11 was marked for

5         identification.)

6    BY MR. STAGGARD:

7         Q.   What's that folder you have in front of you now?

8         A.   This is my file.  It had those bills in there, a

9    copy of the report, it has the disc of records.  And from

10   that disc -- I usually don't print very much, but I'll print

11   a few of the billing ledgers, just because they're nice to

12   have in my hand, but they're all on this disc.

13        Q.   Can I take a look at that, please?  Okay.  All

14   these hard copies are on the disc?

15        A.   Yes.

16        Q.   And why did you print these hard copies, as

17   opposed to other medical bills?

18        A.   Well, I probably printed them all, unless

19   they're really small and it's just one charge, then I don't

20   necessarily need to print that, but if it's something I

21   don't want to keep looking at a screen, it's just easier to

22   have in my hand.

23             MR. STAGGARD:  We'll have the disc marked as the

24        next exhibit and then the hard copies marked as the

25        exhibit following.

```
                                                          Page 70

 1              (Plaintiff's Exhibit Nos. 12 and 13 were marked
 2         for identification.)
 3              MR. STOKES:  We'll deal with it.
 4              THE WITNESS:  All of those --
 5  BY MR. STAGGARD:
 6         Q.   All of those what, Mr. Reimer?
 7         A.   All of those hard copies are on the disc.
 8         Q.   I understand that --
 9         A.   All of your patient's bills and records.
10              THE WITNESS:  How will I be getting this disc
11         back?  I'll give it to you.  You'll take care of it,
12         that's fine.
13              MR. STOKES:  We'll take care of it.
14  BY MR. STAGGARD:
15         Q.   Do you have anything else from your file that we
16  have not gone through?
17         A.   That's it.
18         Q.   Do you have any other letters that you've not
19  already discussed with me?
20         A.   No.
21         Q.   Mr. Reimer, are there any other books or sources
22  that you have relied upon that you have not produced to me
23  this morning?
24         A.   Well, other sources would be footnoted in my
25  report.  I utilize the coding software, the OPTUM Encoder
```

Page 71

1    Pro.  There isn't necessarily a way to bring that, but all

2    the sources are listed here in my office.

3         Q.    And what is the OPTUM Encoder Pro?

4         A.    Online coding software, which makes it easier

5    not to have to flip pages through a book.

6         Q.    Is that to help you determine CPT codes, as

7    opposed to usual and customary charges?

8         A.    Primarily.  Bundling edits can be found there,

9    as well.  I wouldn't necessarily use that for -- to

10   determine reasonable charges, no.

11        Q.    Did you print out hardcopies of anything -- did

12   you print out hardcopies of any of the findings that you had

13   when you used that report?

14        A.    No.

15        Q.    Did you utilize that -- let me rephrase the

16   question.

17             Did you print out any of the findings you had

18   when you used that program?

19        A.    No.

20        Q.    Did that program provide you with any of the CPT

21   codes that you utilized in your report that you believe

22   would have been the proper CPT codes?

23        A.    It's not really a program that provides them.  I

24   mean, the AMA owns and operates CPT codes, so whether it's

25   from a book or an online software, it's -- the program isn't

Page 72

1    directing me or -- it's not a program -- the software, the

2    online coder, it's actually called an encoder, isn't

3    directing me anything.

4         Q.   Do you have anything else in your physical file

5    that you have not brought with you today?

6         A.   That's my file, manila folder.

7         Q.   Your CV lists a couple of articles that you've

8    written; do you have hardcopies of those -- not with you --

9    but do you have hardcopies in your office?

10        A.   No, I do not.

11        Q.   Do you have any hardcopies of any presentations

12   or PowerPoint presentations that you've done to professional

13   societies over the years?

14        A.   No.

15             MR. STAGGARD:  That's all I have.  Thank you.

16             MR. STOKES:  I have no questions.  I would like

17        Mr. Reimer to reserve his right to read and sign.  If

18        you will send me an errata sheet with my copy.  I'll

19        make the necessary arrangements.

20             MR. STAGGARD:  And, also, I guess, for the

21        record, I also reserve the right to come back, if you

22        are provided with any additional medical bills that

23        we have not discussed today, I reserve the right to

24        come back and take your deposition, with respect to

25        those bills only.

Page 73

1          MR. STOKES:  If you feel the need, we'll make

2      the arrangements.

3          MR. STAGGARD:  Mini and word index, please.

4          (The deposition concluded at 12:02 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

1                    CERTIFICATE OF OATH

2

3     STATE OF FLORIDA

      COUNTY OF HILLSBOROUGH

4

5         I, Victoria White, Notary Public, State of Florida, do

6     hereby certify that JEREMY REIMER, CPC, CPB personally

7     appeared before me and was duly sworn.

8         WITNESS my hand and official seal this 28th day of

9     January, 2020.

10

11

12

13

14

15

16

17

18

19                    Victoria T. White, Court Reporter

                      Notary Public, State of Florida

20                    Notary Commission No. GG 288477

                      Commission Expires:  02/05/2023

21

22

23

24

25

Page 75

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


    I, Victoria White, Stenograph Shorthand Reporter, and
Notary Public, do hereby certify that I was authorized to
and did stenographically report the foregoing deposition of
JEREMY REIMER, CPC, CPB; that the review of the transcript
was requested; and that the foregoing Pages 5 through 73,
inclusive, are a true and complete record of my stenographic
notes.
    I further certify that I am not a relative or employee
of any of the parties, nor am I a relative or counsel
connected with the parties' attorneys or counsel connected
with the action, nor am I financially interested in the
outcome of the action.
    DATED this 9th day of February, 2020.







*Victoria White*

Victoria T. White, Court Reporter
Notary Public, State of Florida
Notary Commission No. GG 288477
Commission Expires:  02/05/2023

Page 76

```
 1                          ERRATA SHEET
 2           DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
 3    IN RE:        LESTER COUNTS vs. ALTMAN POLLOCK and DANIELS,
                    INC. and BRAD WILLIAM LEE
 4    CASE NO.:     3:18-cv-1072-J-39JBT
      DATE:         January 28, 2020
 5    DEPONENT:     JEREMY REIMER, CPC, CPB
 6    PAGE #    LINE #      CORRECTION              REASON
      ------------------------------------------------------
 7    _____
      _____
 8    _____
      _____
 9    _____
      _____
10    _____
      _____
11    _____
      _____
12    _____
      _____
13    _____
      _____
14    _____
      _____
15    _____
      _____
16    _____
      _____
17    _____
      _____
18    _____
      _____
19    _____
      _____
20    _____
      _____
21
22    Under penalties of perjury, I declare that I have read the
      foregoing document and that the facts stated are true.
23
      Dated:_____Signed:_____
24
25
```

Page 77

```
 1              WITNESS NOTIFICATION LETTER
 2    JEREMY REIMER, CPC, CPB              02/12/20
      c/o
 3    BRIAN D. STOKES, ESQUIRE
      ALVAREZ WINTHROP THOMPSON & STOREY, PA.
 4    390 North Orange Avenue
      Suite 600
 5    Orlando, Florida 32801
 6    In Re:  January 28, 2020 deposition of JEREMY REIMER, CPC,
      CPB
 7
      Dear Mr. Stokes,
 8
             Enclosed please find a copy of the deposition of
 9    JEREMY REIMER, CPC, CPB taken on January 28, 2020.
10       Please have your client read this deposition and note
      any corrections on the enclosed signature page/errata sheet,
11    and return to Orange Legal/Veritext, 633 East Colonial
      Drive, Orlando, Florida 32803 or sign below to waive review
12    of this transcript.
13       It is suggested that the review of this transcript be
      completed within 30 days of your receipt of this letter, as
14    considered reasonable under Federal Rules*; however, there
      is no Florida Statute to this regard.  The original of this
15    transcript has been forwarded to the ordering party and your
      errata, once received, will be forwarded to all ordering
16    parties for inclusion in the transcript.
17    Sincerely,
18
      Victoria White, Court Reporter
19    Orange Legal
20    cc:  Richard A. Staggard, Esquire
21    Waiver:
22    I, _____, hereby waive the reading & signing of
      my deposition transcript.
23
      _____        _____
24    Deponent Signature        Date
25    *Federal Civil Procedure Rule 30(e)/Florida Civil
      Procedure Rule 1.310(e)
```

[& - 8875]

**&**

**&** 2:2,7 77:3,22

**0**

**02/05/2023** 74:20 75:24
**02/12/20** 77:2

**1**

**1** 3:9 10:23,24
**1,000** 65:9
**1,300** 15:1
**1,600** 48:24
**1,650** 11:8
**1,680** 14:24
**1,809** 14:25
**1,900** 65:7
**1.310** 77:25
**10** 2:3 3:9,20 8:19 15:10,20 51:24 52:15 53:20 56:15 64:23
**10,000** 56:18 57:25
**102** 16:2
**1072** 1:3 76:4
**10:00** 1:13
**11** 3:10,21 32:22 33:13 69:4
**12** 3:14,23 11:4 53:24 70:1
**12,371** 16:18
**1200** 46:13
**12:00** 28:10,19
**12:02** 1:13 73:4
**12th** 11:8 20:8,8 30:6
**13** 3:24 70:1
**14** 35:22
**14,100** 14:13,14 44:11
**1400** 46:14

**15** 7:25 8:20
**16,405** 16:16,17
**17,476** 56:6,9
**18** 41:17
**18,000** 56:15,18 57:25
**19** 52:2,13
**1996** 23:7

**2**

**2** 3:10 11:18,20,21 11:25 18:8 30:3 41:14 51:6
**2,000** 9:12,22
**2,592** 14:23 48:21 48:22
**2,600** 49:16,19
**2.1** 24:23
**2/28/18** 45:22
**20** 7:22
**200** 19:22 35:5,7 36:22
**2016-2019** 3:18
**2017** 62:2
**2019** 3:14,15 11:4,4 11:5
**2020** 1:12 74:9 75:16 76:4 77:6,9
**22697** 74:18 75:22
**25** 7:23
**28** 1:12 3:15 16:15 76:4 77:6,9
**28,776** 16:14,17
**288477** 74:20 75:24
**28th** 11:5,10 30:7 74:8
**2:00** 28:19

**3**

**3** 3:11 11:4 15:14 24:22 26:20 27:9 28:4 29:23 30:5,8

**34:16** 45:12,15,22 52:3,10,14,16,17 53:1,3,4,16,17 55:5 55:17,24 58:15 59:13,15,22,22
**3,000** 67:8
**3,050** 11:6
**3,931** 16:24
**30** 3:11,12,14,15 7:23 77:13,25
**300** 1:15 8:2,16 9:3 67:8
**32202** 2:4
**32801** 2:9 77:5
**32803** 77:11
**33637** 1:16
**37.8.** 24:24
**38,082** 56:2
**390** 2:8 77:4
**39jbt** 1:3 76:4
**3:18** 1:3 76:4
**3rd** 2:3 11:5
**3s** 55:14

**4**

**4** 3:12 15:11,12 28:4 29:24 30:5,8 34:16 35:15 41:23 45:2,9 52:4,18 53:13,13,17 55:19
**4,608** 14:22
**40** 30:18 31:18
**407.210.2796** 2:9
**48** 16:2

**5**

**5** 3:4,14 7:24 8:19 30:6,8,13,13,15 31:1,5,6,8,12,15,21 32:2 34:25 43:14 43:22 58:14 59:1 59:12,14,21,23

**60:**9,19,20 61:13 61:14 75:8
**5/21/18** 33:5
**5/23/18** 39:19
**500** 9:8

**6**

**6** 3:15 30:7,8
**6,935** 34:1,3,20
**6.05** 54:4
**6/21** 41:17 43:6
**60** 8:1
**600** 2:8 9:9 77:4
**61** 3:16
**62** 3:17
**625** 15:25
**63** 3:19
**633** 77:11
**64** 3:20
**69** 3:21

**7**

**7** 3:16 45:19 61:22 61:23
**7,531** 14:21
**7,933** 14:11,14 44:12
**70** 3:23,24
**717** 15:2,3,19
**73** 75:8
**74** 3:4
**75** 3:5 8:1
**76** 3:5
**77** 3:6

**8**

**8** 3:17 62:5,6
**8,000** 14:17
**856** 15:1
**8875** 1:15

[9 - asked]                                                                    Page 79

**9**

**9**  3:19 35:15,24
36:9 63:23
**9,306**  16:24
**9,796**  56:6,8
**90**  63:1
**900**  11:10
**904.396.5555**  2:4
**911**  14:25
**912**  48:22 49:2 51:8
**95**  63:1
**97813**  40:15
**97814**  40:15
**99213**  46:4
**99284**  15:12
**9th**  75:16

**a**

**a.m.**  1:13
**a4212**  42:9
**a4550**  42:4
**aapc**  6:8,23
**ability**  47:10
**able**  64:11
**absence**  18:20
**abuse**  21:18
**academy**  6:1
**accept**  12:24 18:25
24:7 49:7,9,22
50:23 67:2,11
**accepted**  50:24,25
**accompanied**  68:24
69:1
**accusation**  21:17
54:9
**accusations**  20:21
21:20
**accuse**  20:25
**accused**  7:11 21:13
**act**  20:13 22:1,3

**action**  3:10 62:19
75:14,15
**active**  6:12 7:15
62:21
**actual**  12:25 14:7
14:12 52:5
**acuity**  52:3,4,10,13
53:1,3,4
**acupuncture**  39:25
40:3,13,16
**adams**  2:3
**add**  16:6,10
**addendum**  3:15
13:11,15 16:13
17:5,9 30:7 51:7
54:23
**adding**  16:3
**addition**  45:23
**additional**  10:3
48:24 55:2 65:10
72:22
**address**  12:7,15,17
13:2
**adjusted**  19:16
**adjustment**  23:2
66:16
**adjustments**  17:16
**administration**
20:1
**advanced**  6:2,16,19
14:4,22 30:12 33:5
39:20 46:9 48:20
49:15 50:3 51:21
**advisor**  6:3
**advocate**  7:7,9,22
7:24
**affirm**  5:3
**agency**  20:1 61:4
**aggregately**  33:20
33:24

**agree**  24:1 46:17,21
58:1,15 67:12
**agreed**  4:3
**ahca**  20:1
**ahead**  46:25 47:14
48:25 58:5,17
64:19 66:13
**aid**  10:17
**airfare**  9:20
**allegations**  54:6
**allege**  23:14 41:17
**alleged**  13:18 39:21
41:19
**alleging**  20:14
**allow**  27:3,10 55:16
**allowance**  55:22
**allowed**  23:9 65:2
**altman**  1:7 76:3
**alvarez**  2:7 68:3
77:3
**ama**  19:4 37:20
54:4,7 71:24
**amazon**  64:9,12
**ambulance**  15:24
**american**  6:1
**amount**  13:18
15:19 18:23 19:22
22:7 32:6 35:5 36:5
37:12 47:4,20
50:16 58:2 60:17
66:24
**amounts**  33:19
46:13,14 56:11
57:24
**analysis**  9:5,6
34:12 39:8 50:12
50:13,19 51:4,5
**analyzer**  22:24
38:8 66:15
**anatomy**  6:16

**annual**  22:23
**annually**  19:13
37:3 39:1
**answer**  23:5 27:6
32:5 44:23 65:17
68:10
**answer's**  52:15
**anti**  23:8 25:15
**anticipate**  10:1
**anyway**  60:7
**appearance**  11:13
**appeared**  74:7
**appearing**  2:6,11
**appears**  56:1
**apples**  24:7,7
**apply**  20:5 23:2,11
23:11 24:6 26:14
26:24 29:2 44:15
66:16
**applying**  17:24
52:7
**appropriate**  15:21
28:17 33:2,4,14
45:14 46:12 55:13
**appropriately**
53:11
**area**  5:19 8:3 18:24
22:8,9 23:16 24:3
**areas**  6:20 7:18
**argue**  51:8,9
**arrangements**  13:6
72:19 73:2
**arrive**  33:20,20,23
34:1 35:20 44:12
50:19
**arrived**  33:25
34:20 44:16
**articles**  72:7
**asked**  18:4 25:5
26:21,23 27:11,12
27:25 34:3 41:1

**[asked - car]**                                                                                    Page 80

49:3 56:10 64:4
65:21
**asking** 18:2 23:4
27:13 35:19 44:18
47:21,24 52:8
61:10 64:20 65:15
**assessed** 52:16 53:3
53:16
**assigned** 54:1
**attachments** 12:4
**attendance** 10:14
**attorneys** 75:13
**authoritative** 25:13
65:23
**authorized** 75:5
**automatically**
46:23 47:3
**available** 18:6
19:12 22:21 30:16
36:16 37:6 54:17
**avenue** 2:8 77:4
**average** 16:11
19:14,15,19 33:16
34:1,9,20 35:1,5,6
35:8,12,20,25 36:1
36:2,6,9,20 38:11
39:18 44:1,5,12,16
54:17,20 55:24
56:8
**aware** 10:7 17:16
18:11,14 19:18,19
54:19
**awtspa.com** 2:10

**b**

**bachelor's** 5:23
**back** 23:7 28:11
29:9 32:17 33:8
34:23 35:15 39:12
60:13 68:18,20
70:11 72:21,24

**background** 5:22
54:6
**baptist** 14:24 51:15
**barter** 8:8,12,24
**base** 24:25 39:5
51:12
**based** 14:16 15:15
19:2,21 22:8 23:15
24:3,7,10,11,12
31:23,23 32:24
33:2,12 36:17 37:1
37:7,14,18,22
38:24 39:9 41:9
50:13 55:23,23
56:22 60:11 63:18
67:24
**bases** 7:6
**basically** 49:12
**basis** 21:16 22:23
49:8
**bay** 14:25
**baymeadows** 51:20
**bdstokes** 2:10
**behalf** 2:6,11 58:11
62:16
**believe** 6:15 8:10
10:11 17:10,11,15
18:7,21 42:5,5,8
47:1,7 57:21 64:6
68:13 71:21
**benchmark** 19:24
32:24
**benchmarks** 14:17
37:13 43:16
**benefit** 5:21
**best** 12:9,12 40:14
60:13
**better** 21:7 68:10
**big** 49:6 65:19
67:10

**bill** 11:5,8,10 15:5
15:25 20:8 21:19
30:2,25 32:11,12
32:12 34:19 42:24
43:8,19 45:12,14
46:5 48:19,21 49:2
52:20 57:4,22
58:22 59:9,12,17
59:18,21,23 66:7
**billed** 11:14 15:11
15:13,14 19:22
35:1,4 36:5 39:25
44:21 46:13,14
47:20 52:17,18
53:16 55:10 56:6
56:10,25 57:4,10
59:5 67:1
**biller** 5:25
**billing** 5:18,20 6:4
6:6,17,22 7:11
10:18 15:16 20:11
20:21 21:18 41:14
41:16,16 60:14
61:16 62:15 69:11
**bills** 7:8,13 10:3
13:23 14:7 17:3,7
17:12,25 21:15
22:2 33:22 42:21
46:19,24 47:18
48:1,6,8,9 50:9,22
55:2 56:19 58:14
69:8,17 70:9 72:22
72:25
**binders** 63:3,4
**bit** 51:10
**blanket** 50:22
**block** 43:6
**blue** 17:23,23
**bocc** 15:23
**body** 45:13

**book** 3:20 38:15,16
38:18 39:14,17
42:2,7 63:7,8,9
71:5,25
**books** 63:5,6,14,16
64:2,7,8,9,10,16,20
70:21
**bother** 61:3
**boundary** 16:18
20:3
**brad** 1:8 76:3
**breakdown** 62:9
**brian** 2:7 77:3
**briefly** 68:14
**bring** 13:10 25:5
27:12,25 64:4 71:1
**bringing** 62:19
**broken** 7:18
**brought** 10:18 25:4
29:4 51:7 61:20
63:4 72:5
**bundling** 71:8
**business** 9:1
**buy** 64:8,8

**c**

**c** 2:1 5:1 77:2
**calculate** 19:14
26:3
**calculated** 16:11
55:18
**calculation** 36:7
**calculations** 55:22
**call** 5:18 21:18 23:5
50:3 56:15
**called** 10:9 22:23
23:7 38:5 41:16
72:2
**calling** 23:11
**capacity** 68:23
**car** 67:5

**care** 27:21 28:23
 70:11,13
**cares** 66:25
**carrier** 57:25
**carte** 41:16
**case** 1:3 9:5 10:1
 11:19 20:5 23:11
 26:13,16,24 27:5,8
 31:9 48:13 54:1
 59:4 62:12,13
 64:14 68:3,14,21
 76:4
**cases** 7:2,13,25 9:1
 47:19 62:20,24
 63:2 68:8
**catching** 67:9
**cause** 62:19
**cc** 77:20
**center** 16:21 42:13
 42:22 51:15 55:2
**centers** 36:10,13
**certain** 6:10,11
 59:20
**certainly** 21:22
 57:3,10 64:15
**certificate** 3:4,5
 74:1 75:1
**certifications** 6:12
 6:14 65:2
**certified** 5:24,25
**certify** 74:6 75:5,11
**cervical** 24:24
**ceus** 6:12
**chance** 21:8
**change** 10:4
**changes** 76:2
**charge** 8:2,6 9:3,11
 9:14,17 15:19
 17:25 21:16 22:9
 22:21,22 23:18
 24:3 30:25 31:5

 32:20 34:5,8,8
 42:16,17 46:20
 49:6 55:16 57:7
 65:10 66:11,17
 67:8,11,24 69:19
**charged** 22:19
 23:14 32:13 43:1,4
 45:2,21,22 47:11
 49:8 51:19 53:17
 55:7 65:7,9 67:19
**charges** 14:1,5,5,10
 14:11,12,14,20,22
 14:22,23,24,25
 15:1,2,3,17,18,24
 15:25 16:1,2,20,23
 16:24 17:21 18:17
 22:14,25,25,25
 23:2 32:23 35:13
 36:22 41:3,20 43:7
 43:15,17,18 44:11
 44:11,21,22 45:20
 45:23,23 47:4
 48:16 55:18,20
 57:12,14 58:9
 62:11 66:15 67:14
 67:16,20,25,25
 71:7,10
**charging** 43:2
**chiropractic** 14:20
 45:1,25 63:8,15
**chiropractor** 45:11
 45:14
**circumstance** 52:20
**circumstances**
 23:10,10
**city** 19:16 22:14
 23:24 66:10
**civil** 3:10 77:25,25
**claim** 22:4
**claims** 7:10 20:13
 20:15 21:25 22:1,3

**clearly** 31:9
**client** 8:3 17:3 21:7
 50:6 77:10
**client's** 13:1
**clients** 47:20 67:8
**close** 68:8
**cms** 35:17 36:13
 37:21 38:3
**cms.gov** 36:9
**cmt** 46:2,4
**code** 15:12,21
 20:20 30:15 33:1,4
 38:15,15 39:21
 45:5,9 46:4 52:1
 53:21 55:13,23
 67:16,19,20,25
**coded** 43:19 44:21
 56:25
**coder** 5:24 53:10
 72:2
**coders** 6:1
**codes** 16:10 24:6
 32:24 33:14 38:16
 40:12,15 41:3,23
 46:11,11,12 56:23
 57:12 67:21 71:6
 71:21,22,24
**coding** 5:19,20 6:2
 6:4,6,16,22 7:11
 15:15 20:11,20,24
 38:4,6,6 46:11,16
 61:16 62:15 64:5
 70:25 71:4
**collection** 61:3
**college** 6:3
**collusion** 18:10
**colonial** 77:11
**come** 25:1 28:11,13
 46:18,23 62:10
 67:22 72:21,24

**coming** 10:3 12:18
 29:9
**commission** 74:20
 74:20 75:24,24
**committed** 21:14
**communication**
 12:12
**community** 6:3
 22:19 23:3 35:8
 50:17 66:25 67:2
**companies** 7:3
 17:22 18:12 19:7
 56:24
**company** 17:14,17
 50:11 56:17,17,19
 57:13,21,24,24
**company's** 57:3
**compare** 22:25
 24:6
**compared** 49:8
**compares** 32:23
**comparing** 67:17
 67:18
**comparison** 68:1
**complete** 6:18 75:9
**completed** 77:13
**completely** 32:8
**completeness** 26:18
**complexity** 30:17
**component** 24:16
 24:17,18 38:23
 39:7,8,17 46:4
 50:12 67:14
**components** 24:14
 24:21 41:15
**composite** 26:19
 64:23
**comprehensive**
 30:16,17 45:6,7
**comprised** 24:14,16
 24:20

[concerning - deposition]                                                                 Page 82

**concerning** 40:19
40:24 68:11,21
**concluded** 73:4
**conclusion** 21:2
23:20 50:20 56:12
**conclusions** 46:18
47:17
**confines** 27:17
**conjure** 48:4
**connected** 75:13,13
**consider** 65:23
**considered** 18:9
23:6 25:12 41:14
46:4,5 77:14
**considers** 61:15
**consistency** 19:20
54:19
**consists** 10:17
**consultant** 9:4
**consulting** 7:2
**contacted** 49:3
**contacting** 66:2
**contained** 25:8
**containing** 33:13
**contents** 29:8
**contingent** 53:24
**continue** 28:24 46:7
**continuing** 6:11
**contractual** 17:16
50:10
**contrast** 42:8
**convenient** 12:10
**conversion** 24:25
39:6
**copier** 28:21
**copies** 26:6 27:19
27:21 28:1,8,9,16
28:17 69:14,16,24
70:7
**copy** 11:18 12:1,2
13:10 28:3,18

**concerning** 61:18 64:16 69:9
72:18 77:8
**correct** 11:6,11
13:15 16:10 20:20
32:24 33:1 36:15
43:8,16 53:21
55:23 56:3,22 60:1
60:1 62:11 65:8
66:9
**correction** 76:6
**corrections** 77:10
**correctly** 36:8
43:19
**costs** 9:19
**counsel** 3:13 4:3
11:19 12:13 75:12
75:13
**count** 16:13 68:7
**country** 19:11 20:2
37:9
**counts** 1:4 13:22
16:4 17:13,17
20:14 21:4,25
22:15,20 23:14
31:11,17 33:22
40:25 46:19 47:9
47:25 48:22 50:10
51:16,19 53:1 54:7
56:2,14 58:1 60:22
76:3
**county** 15:23 74:3
75:2
**couple** 72:7
**course** 6:13 29:5
65:3
**courses** 6:23
**coursework** 65:1,4
65:5,6
**court** 1:1,18 5:3
10:6 29:13,25
74:19 75:23 77:18

**cover** 64:17
**covers** 3:20
**cpb** 1:11,14 3:3 5:7
5:25 6:7 74:6 75:7
76:5 77:2,6,9
**cpc** 1:11,14 3:3 5:7
5:24 6:7 74:6 75:7
76:5 77:2,6,9
**cpr** 10:17
**cpt** 15:11 24:6
38:15,16 39:21
46:4 67:16,21,25
71:6,20,22,24
**create** 23:12 34:22
**cross** 17:23
**current** 38:5,16,17
62:2
**customary** 14:17
17:21 18:19,22
22:6,10 23:20
37:11 43:16 44:15
49:17 50:14 62:11
66:24 67:13 71:7
**customer** 7:6
**cv** 1:3 3:16 61:18
72:7 76:4

**d**

**d** 2:7 5:1 77:3
**damages** 62:18
**damn** 31:8,13,16
31:17
**daniels** 1:7 76:3
**data** 35:11
**databases** 22:22
**date** 1:12 10:19
16:21,23 32:1,7
33:11 43:13 45:24
46:6 76:4 77:24
**dated** 11:3 75:16
76:23

**dates** 44:2 45:18
55:12,13 57:14
**daubert** 10:10
**day** 74:8 75:16
**days** 77:13
**deal** 6:21 70:3
**dear** 77:7
**decision** 30:17 45:7
**declare** 76:22
**defeating** 18:7
**defendants** 1:9 2:11
5:18 62:17
**defense** 62:25 63:2
**defer** 18:21
**define** 41:12
**defining** 18:19
**definition** 18:21,22
22:10,11 23:20
24:2,5 37:10 40:7
41:13 49:17 50:13
66:23 67:13,23
**definitions** 37:19
37:20,20
**degree** 5:23
**degrees** 10:15
**demand** 62:24
**denied** 7:10
**department** 23:6
25:15 38:2 60:11
**depends** 8:8 12:8
**depo** 27:12 28:12
28:19 65:11 68:13
**deponent** 4:4 76:5
77:24
**deposition** 1:11
3:10,17 4:5 9:7,9,9
11:13 13:12 26:22
29:14,17,22,23
47:22 55:1 65:8,10
65:13 72:24 73:4
75:6 77:6,8,10,22

**depositions** 9:8
17:11 51:3
**describe** 20:18
**described** 40:14
**description** 3:8
15:10
**descriptions** 38:17
**designations** 5:25
6:7
**destroyed** 48:9
**details** 13:19
**determination**
33:10 53:7,10
54:11,22
**determine** 17:23
18:16 23:13 25:25
35:11 37:5 39:3,6
39:17 52:13 60:3
62:14 65:14 67:17
71:6,10
**determining** 31:20
**device** 38:9
**diagnosis** 26:14
27:7 52:12
**diagnostics** 14:22
46:9 48:20 49:15
50:3 51:21
**difference** 40:2
49:6 67:10
**different** 8:8 16:9
39:1
**differentiate** 67:17
**differently** 40:4
**difficulty** 54:13
**dime** 60:24 61:3,7
**directing** 72:1,3
**directly** 64:13
**director** 6:5
**disc** 3:23,24 17:2
26:24 69:1,9,10,12
69:14,23 70:7,10

**discretion** 13:1
**discuss** 20:18 23:9
25:22 37:21
**discussed** 70:19
72:23
**disease** 6:17
**display** 26:3
**dispose** 68:8
**disputes** 20:2
**disqualified** 32:2
**district** 1:1,1
**division** 1:2
**doctor** 21:15 31:5
31:18 33:1 42:11
42:14 45:2 47:6
48:10,10,14 53:1
53:17 57:6 59:9,12
59:13,16,18,21,23
61:12
**doctor's** 46:20
**doctors** 7:4 22:18
23:5,9,17 25:16
39:2 46:24 47:10
49:22 56:5,10
60:22 67:1
**document** 11:24
27:2 30:18 43:10
58:14 59:4,10
60:19,23 61:8,13
76:22
**documentation**
14:16 15:12,16
31:1 32:4 33:3,6
34:19,23 41:3,9
43:20,21 45:4,10
48:15 49:15,23,24
51:25 53:12,15
57:5,11 58:10,16
58:21,25 59:2,13
59:16,22,23

**documented** 31:18
32:11 48:18 55:10
57:9,22 58:8,23
60:9,18
**documenting** 58:22
**documents** 16:25
17:6 25:12,20,21
26:9,21 49:25
65:23
**doing** 28:10 29:10
34:12 40:9 42:19
**dollars** 67:1
**domain** 18:15
**downside** 57:8 60:8
**dozens** 50:2 51:2
**dr** 40:20,24 41:17
43:15 44:10
**drg** 26:14
**drive** 3:12 25:6,9
25:10,25 26:10
27:1 28:1,2,4 29:24
30:6 38:9 54:17
60:10 61:19 66:4
77:11
**driven** 36:2,20,24
37:1,2
**driving** 54:15
**drop** 52:1
**duly** 5:8 74:7
**dying** 31:8,13,16,17

**e**

**e** 2:1,1 5:1,1,16,16
12:3,13 68:20,23
68:23 77:25,25
**earlier** 44:10
**earned** 5:24
**easier** 30:21 69:21
71:4
**easily** 23:22
**east** 77:11

**ebbs** 7:20
**edits** 71:8
**education** 6:12
**educational** 5:22
**either** 7:3,10 16:4
36:21 57:6,15 59:4
59:22 68:2
**electric** 40:8,13
**electrical** 41:6
**electronic** 12:25
**electronically**
12:21
**eligible** 45:11,11
**emergency** 15:2,5
15:11,17 32:10
51:23 53:13
**employee** 75:11
**enclosed** 77:8,10
**encoder** 38:7 70:25
71:3 72:2
**ended** 62:2
**endorsed** 19:4
**enforcement** 23:8
25:15
**engaged** 20:15,15
21:5
**enter** 76:2
**entire** 37:17
**entirely** 33:12
**entirety** 15:5
**entities** 20:22 22:2
**entity** 19:8,9,10
37:9
**entry** 40:10
**equation** 57:20,23
58:7
**er** 52:18
**errata** 3:5 72:18
76:1 77:10,15
**esquire** 2:2,7 77:3
77:20

[estimate - forward]                                                    Page 84

**estimate**  7:21 10:4
  62:25 63:1
**evaluation**  43:9,11
  46:3
**exact**  68:9
**exactly**  50:6
**exam**  6:24 30:17
  45:7
**examination**  3:4
  5:10 6:24
**examined**  5:8
**example**  23:25
  32:10 48:20 58:19
**exams**  6:18 65:4
**exceed**  44:22
**excess**  13:24 14:8
  23:14
**excluded**  10:5
**exclusive**  19:5
  55:20
**exhibit**  3:8 10:23
  10:24 11:18,20,21
  11:25 13:12 26:20
  27:9 29:23,24 30:8
  61:22,23 62:6
  63:22,23 64:23
  69:3,4,24,25 70:1
**exhibits**  3:7
**exist**  25:18 48:6,8
  48:10
**existing**  24:22
**exists**  18:4
**expect**  19:1,14 31:3
  48:12 52:22
**expected**  26:4
  38:11 50:7
**expense**  24:17
**expenses**  9:23 16:4
  44:15 56:2 58:1,3
**experience**  50:1
  51:2 54:14

**expert**  3:15 5:19
  38:6
**expertise**  5:19
**expires**  74:20 75:24
**explain**  30:12
**explained**  51:6 60:4
**explaining**  25:20
**explains**  25:16,18
  54:11
**explanation**  63:17
**exposure**  6:22
**extent**  22:5

**f**

**face**  30:19,19 31:19
  31:19
**facet**  7:8 41:18,20
  41:21 43:4
**facility**  15:13 42:21
  52:20,23
**fact**  15:13 19:4
  44:6 51:13 61:14
**factor**  17:20 23:2
  24:25 27:8 31:20
  39:6 66:16
**facts**  76:22
**fair**  8:22,24 13:20
  33:9 36:24 39:22
**fairly**  62:13
**fall**  22:3 39:4 57:2
**falls**  8:4
**false**  20:13,15
  21:25 22:1,3 23:19
  23:19
**far**  34:15 65:3 66:1
**farah**  2:2,2
**farahandfarah.com**
  2:5
**february**  75:16
**federal**  37:11 38:1
  77:14,25

**fee**  3:19 8:10 9:11
  9:16,22 20:1 22:24
  35:16 38:7 42:21
  63:20 66:14,20
**feel**  13:23 15:4,15
  40:23 61:10 73:1
**fees**  23:9 25:17
  53:24 54:4
**felt**  14:9,14 15:4
**field**  10:15
**fight**  28:25
**fighting**  29:5,18
**figure**  34:20 44:12
  50:6 56:22
**figures**  36:23,25
  44:14 48:1
**file**  11:15 69:8
  70:15 72:4,6
**files**  65:14,16,21
**finally**  16:1
**finance**  5:23
**financially**  75:14
**find**  16:22 22:18
  23:22 37:14,19,20
  37:20 55:6 60:10
  64:11 77:8
**finder**  44:6
**finding**  45:17 52:3
**findings**  13:18,19
  30:11 56:11,12,12
  71:12,17
**fine**  29:21 46:11
  70:12
**finished**  21:10
**firm**  65:7,9 67:7
  68:3,9
**first**  5:8 7:6 10:17
  17:4 18:18 20:9,17
  37:25 50:13 68:14
**five**  8:17 55:11,12

**fix**  57:3 60:7
**fixing**  18:9 23:6
**flag**  52:19,23
**flat**  9:11,15
**flip**  71:5
**floor**  2:3
**florida**  1:1,16 2:4,9
  18:20,20 19:24
  74:3,5,19 75:2,23
  77:5,11,14,25
**flows**  7:20
**folder**  3:11 26:7,9
  26:18 27:2,3 29:8
  30:1,5 39:11 48:17
  60:10,12 69:7 72:6
**folders**  65:14,16
**follow**  31:7 45:22
  55:15
**following**  26:23
  53:21 69:25
**follows**  5:9 20:20
**footnote**  35:15,23
  36:9 52:2
**footnoted**  35:14,21
  64:3 70:24
**force**  54:15
**foregoing**  75:6,8
  76:22
**foremost**  37:25
**form**  8:11 18:9
  32:14 40:17 46:25
  47:14 48:2,3,25
  57:17 58:5,17
  59:25 60:25 61:5,9
  66:13
**formal**  10:12,17
**formula**  34:14,15
**formulate**  51:3
**forth**  68:20
**forward**  3:22,23,25

[forwarded - includes]                                                          Page 85

**forwarded** 77:15
77:15
**found** 22:11 30:22
31:4 38:2,3,4,6,7
52:4 71:8
**foundation** 37:4
**four** 55:11
**fragmented** 41:16
**frankly** 20:11
21:15
**fraud** 20:12,16,21
20:24 21:1,5,14,14
21:21
**fraudulent** 61:16
**french** 43:3
**frequency** 19:20
54:20
**frequently** 23:23
35:9 37:8
**fries** 43:3
**front** 28:21 30:2
33:7 69:7
**full** 51:11
**function** 53:15
**further** 75:11
**fusion** 24:24
**future** 12:24 55:3

**g**

**g** 5:1
**gather** 66:3
**general** 18:6 20:23
27:5 61:15
**generally** 41:11
45:19
**geographic** 22:8
23:2,16 66:16
**getting** 70:10
**gg** 74:20 75:24
**give** 5:4,21 10:4
13:2 32:4 62:25
70:11

**given** 18:24
**gleaned** 52:6
**go** 7:24 9:18 32:17
33:8 34:19,23
35:15 45:19 46:8
46:25 47:10,14,18
48:21,25 52:12
54:23 55:5 58:5,17
60:22 64:10,19
65:19,21 66:13
**goes** 30:13 40:19
41:8 54:21
**going** 14:3 21:24
23:13 24:9 26:19
28:20,21 30:20
33:21 34:11 39:19
42:24,24 47:17
**good** 18:18 24:12
44:19 50:17
**government** 37:11
**grammatical** 40:7
**great** 6:21
**greater** 31:18
**grossly** 47:5
**group** 15:2,17
**groups** 26:14 27:7
**guess** 13:4 34:15
51:9,12 52:19
72:20
**guide** 38:13,14,14
**guideline** 54:8
**guidelines** 15:16
20:11,21 54:7
60:12 64:6
**guides** 25:24 38:8
38:11 54:16

**h**

**half** 28:16
**hand** 11:24 69:12
69:22 74:8

**handed** 11:2
**hang** 21:10
**happens** 60:5
**happy** 43:1,4
**hard** 9:19 10:2 26:6
28:9 69:14,16,24
70:7
**hardcopies** 3:24
71:11,12 72:8,9,11
**hcc** 6:6
**hcpcs** 41:23
**head** 45:13
**health** 7:3 14:24
38:2 50:11 56:16
56:17,19,23 57:3
57:13,24 60:11
**healthcare** 19:4,6
19:10 20:1,3,12,19
22:12 23:8 24:13
24:14 37:4,9 63:13
**healthcare.gov**
22:12
**hearing** 10:10
**held** 38:13
**help** 7:7 71:6
**helped** 8:12
**hesitate** 40:16
**hey** 60:23
**hidden** 1:15
**high** 7:23 30:17,18
33:17 35:3,3,4 36:2
36:6,21 39:18 44:1
44:5,13,17,19,22
44:25 45:5,8 46:15
48:21 52:1 54:19
55:24 56:9
**higher** 42:12 52:21
55:9
**highest** 19:19 30:15
**hillsborough** 6:2
74:3 75:2

**history** 3:17 30:16
45:7
**home** 12:18 67:4
**homes** 67:4
**hospital** 14:24
15:13 26:15,16
52:17 53:16
**hotel** 9:20
**hour** 8:2,16 9:4,8,9
9:14 67:8
**hourly** 8:10
**hours** 28:15 65:10
66:5,7,7
**human** 38:3 60:11
**hypothetically**
58:13

**i**

**identifiable** 43:11
**identification** 10:25
11:22 30:9 61:24
62:7 63:24 64:24
69:5 70:2
**identified** 5:17
**identify** 20:10 22:6
**illegal** 18:9 25:19
**immediately** 26:22
**implies** 67:23
**importance** 60:15
**improper** 7:11
20:24 39:21 57:16
58:16,21,25 59:2
61:15
**improperly** 42:25
44:21 57:22
**incisional** 40:10
**inclined** 44:8
**include** 9:19
**included** 9:15 33:3
42:25 43:3
**includes** 9:12

[inclusion - list]                                                                                                        Page 86

**inclusion**  77:16
**inclusive**  41:15
  75:9
**income**  8:25
**incorrect**  47:4 57:7
**incorrectly**  56:25
**increased**  42:14
**incur**  9:20
**incurred**  11:14
  42:22 56:2
**index**  3:1,7 73:3
**individual**  33:21
**individuals**  7:7
**industry**  37:5 67:3
**inflammatory**
  20:12,17
**inflates**  21:19
**information**  19:12
  22:22 35:14,18
  36:17 37:7 38:19
  38:21 60:14 66:17
**informed**  10:3
**inherent**  24:21 39:1
  39:5
**initial**  17:8 20:9
  24:24 45:1 55:21
**injectable**  42:1
**injection**  24:20
  41:21 42:1 43:1,5
**injections**  41:18,20
  43:6 63:16
**injuries**  31:24
  62:17
**injury**  7:13
**inpatient**  26:15,16
**inspector**  20:23
  61:15
**instance**  15:15
  31:21 57:6
**instruction**  63:18

**insurance**  7:3
  17:14,17,22 18:11
  19:7 49:11,25 50:7
  50:8,11,15,17
  51:14 56:16,17,19
  56:24 57:3,13,21
  57:24
**intend**  21:3,6,20
  22:4 43:25
**intense**  59:6
**intensity**  52:21
**intensive**  59:6
**intention**  21:23
**interested**  75:14
**interesting**  52:17
  56:21
**internal**  45:13
**interpreted**  52:6
**interrupt**  21:11
**invited**  68:18
**invoice**  11:3
**invoices**  3:9
**involve**  53:14
**involving**  45:13
  63:18
**issue**  12:19 46:11
  46:14,16
**issued**  54:1
**itemized**  67:21
**items**  27:12 44:21
  45:6 65:15 66:3

**j**

**j**  1:3 76:4
**j1040**  41:25
**jacksonville**  1:2 2:4
  9:22 16:21 22:14
  22:19 23:3,18,23
  66:2,10,11,17
**january**  1:12 74:9
  76:4 77:6,9

**jax**  16:13 55:2,20
  55:22
**jeremy**  1:11,14 3:3
  5:7,14 29:3 74:6
  75:7 76:5 77:2,6,9
**job**  57:3 60:2
**jurors**  5:21
**justice**  23:7 25:15
**justified**  31:22
**justify**  31:8 42:23

**k**

**keep**  6:12 27:5
  64:20 68:22 69:21
**keeping**  37:10
**kept**  49:5
**kind**  7:2 8:12 9:6
  20:24 23:4,12,19
  46:1 47:15,21
  50:22 61:15 67:9
  68:1
**knee**  45:16,16
  46:12
**know**  10:2 21:21
  22:2 23:17 34:15
  39:12,16 41:8
  44:13,18 45:13
  47:10 49:3 54:2
  56:16,25 62:9,22
  64:5 66:2 68:6,9
**knowledge**  6:16,19
  17:10
**known**  48:11

**l**

**l**  4:1
**la**  41:16
**language**  20:12
**large**  8:25
**law**  10:6 65:7,9
  67:7 68:3

**lawsuit**  5:18 62:18
**lawyer**  47:16
**leave**  13:1
**leaving**  16:18
**ledgers**  69:11
**lee**  1:8 76:3
**left**  66:8
**legal**  47:16 61:11
  61:11 77:11,19
**length**  31:3
**lesser**  19:22 35:4
  36:5
**lester**  1:4 16:3 76:3
**letter**  3:6,21 48:14
  68:24,25,25 77:1
  77:13
**letters**  53:25 70:18
**level**  15:11,12,14
  23:1 24:22,24
  30:13,13,15 31:1,5
  31:6,8,12,15,21
  32:2 33:10 34:16
  34:16 45:2,9,12,15
  45:22 52:3,4,10,13
  52:16,17,18,21
  53:1,3,4,13,13,16
  53:17,17 55:7,9,14
  55:17,24 58:14,15
  59:1,12,13,14,15
  59:21,22,22,23
  60:3,9,19,20 61:13
  61:14
**liability**  24:17
**lieu**  12:22
**limited**  10:5 23:10
  68:23
**line**  31:11 76:6
**list**  3:17 38:10
  54:16,18 62:1,3
  67:4

**[listed - near]**                                                  Page 87

**listed** 17:8 23:1
32:22 34:25 35:21
40:12 41:13,23
45:6 53:19 54:12
54:18 55:12 71:2
**listing** 54:8
**lists** 35:16 38:8
66:15 72:7
**litigated** 7:2 9:1
**litigation** 7:15,19
8:22,23 48:13
62:21
**little** 49:7 66:6
**local** 66:9
**locality** 19:16,17
23:25 66:18 67:15
**localize** 23:3
**localized** 23:24
**location** 12:11
**long** 59:19 68:16
**look** 16:9 20:7 33:8
42:2 48:20 50:5,9
52:11 69:13
**looked** 52:11 65:14
**looking** 26:13 37:23
50:8 55:1 69:21
**looks** 39:20 52:1
**loss** 53:14
**lot** 8:7,9,24 65:21
65:24,25
**lowest** 8:21
**lumbar** 41:18,20,21
43:4 46:12

**m**

**m** 5:16
**magic** 47:25 48:4
**mail** 12:3,13
**mails** 68:20,23,23
**main** 7:5 8:11
**maintain** 6:11

**major** 17:23
**majority** 7:25 8:25
**making** 20:15
21:20 30:17 47:16
54:6 68:1
**malpractice** 24:18
**management** 14:4
30:12 33:5 39:20
43:9,11 46:3
**mandatory** 6:15
**manila** 72:6
**manipulative** 46:1
46:1
**manuals** 25:11
65:22
**manufactures** 38:9
**march** 30:11
**mark** 27:3,9,10,22
28:3,16
**marked** 3:8 10:22
10:24 11:3,17,20
11:21,25 13:12
26:19 29:22 30:9
61:21,23 62:5,6
63:21,23 64:23
69:2,4,23,24 70:1
**marking** 29:7
**match** 52:19
**material** 42:8 63:17
**materials** 6:24 25:3
**matter** 5:4 9:21
20:19,19 21:4
38:22 39:15 60:6
60:16 68:12
**maximizes** 21:19
**mbb** 16:1
**meadows** 14:25
**meal** 43:2,4
**mean** 21:1 33:23
50:4 64:11 71:24

**meant** 31:6
**measured** 24:22
**medical** 5:20,20 6:2
6:4,4,6,6,16,17,22
6:22 7:3,8,9,12
8:14,16 10:12,14
10:15,16,17 13:22
16:4 17:7,7 18:12
18:23 20:14 21:4
21:17,25 22:7,9,14
22:15,22 23:14,21
24:4 25:21 30:17
31:4,17 33:22
35:12 37:21 38:4
39:2 40:19,22,24
44:15 45:7 46:19
47:25 50:22 51:15
52:5,6,10,12,25
53:2,4,8,10,18 54:5
55:7 56:2 57:22
58:1,2,22,23 59:17
59:19 60:22 61:8
62:15,15 63:14
66:12 67:10 69:17
72:22
**medicare** 19:11,12
19:23 35:6,7,8
36:10,13,13,15,19
36:21,22,24 37:6,8
38:10 49:12
**meet** 12:10 13:6
39:2 68:16
**meeting** 12:19
68:17
**meets** 53:12
**mention** 50:14
**mentioned** 50:8
64:2
**merely** 51:7
**met** 68:11,14,18

**methodology** 19:3,6
19:9,13 25:21,25
26:2 35:20 37:2,3,7
37:13 39:8 51:5
**middle** 1:1
**million** 67:1
**mind** 18:24
**mini** 73:3
**minutes** 30:19
31:19 68:17
**miscellaneous**
42:10
**mistaken** 56:9
57:18
**misunderstood**
32:18
**mix** 7:15
**modalities** 45:24
**mode** 35:10
**moderate** 45:7,8
**money** 8:9 42:20,24
**morning** 70:23
**move** 28:24 29:6,16
**moving** 15:23
**mri** 15:1 46:12
49:16
**mris** 46:16 49:11
51:11,13,20
**multiple** 45:18
**multiply** 24:25 39:5
**mutually** 12:10

**n**

**n** 2:1,8 4:1 5:1
**name** 5:12,14,15
**nassau** 15:23
**national** 18:21
22:24 23:1 38:1,7
66:14,20
**nature** 45:12
**near** 31:8,13,16,17
49:11,12

[necessarily - partake]                                        Page 88

**necessarily** 7:14
  10:7 21:21 26:11
  39:16 46:11 51:17
  54:10 58:24,24
  59:2 69:20 71:1,9
**necessary** 6:18
  42:17 72:19
**need** 12:13 13:8
  27:11 29:15 31:6
  39:12 69:20 73:1
**needed** 12:6,23
  42:17
**needle** 42:10
**needles** 40:9
**negotiate** 47:18
**neighborhood** 67:5
**nerve** 40:3,4,8 41:6
  43:6
**nerves** 40:11
**neurology** 63:9
**neurosurgery**
  63:10
**never** 31:12 59:22
  59:23 68:18
**nice** 69:11
**noon** 26:23 27:17
**normal** 40:16
**north** 77:4
**nos** 30:8 70:1
**notary** 1:18 74:5,19
  74:20 75:5,23,24
**notated** 34:9
**notations** 34:7
**note** 77:10
**notes** 75:10
**notification** 77:1
**number** 6:11 35:15
  35:24 50:5 52:2,13
  68:9
**numbers** 23:24
  36:19 44:10,16

**numeral** 52:2,13
**nutshell** 55:8

**o**

**o** 4:1 5:1 77:2
**oath** 3:4 74:1
**object** 32:14 46:25
  47:14 48:2,25
  57:17 58:5,17
  59:25 60:25 61:5,9
  66:13
**obligates** 47:3
**obliges** 47:3
**obtain** 6:7,14
**occur** 19:18
**occurs** 19:20 35:9
  37:8 54:19
**october** 3:15 11:5
  11:10 16:15 30:7
**offer** 21:3,24 43:25
  44:4
**offered** 6:8
**office** 1:14 20:23
  24:19,23 25:5
  30:13 32:20 33:5
  33:21 34:19 38:25
  39:19 42:11,19
  43:8 45:1,21,22
  46:3 55:15,17
  58:14,15 59:10,11
  59:24 60:6 61:2,14
  68:21 71:2 72:9
**official** 74:8
**offs** 50:10,15,17
**oh** 57:4
**okay** 8:6 13:21 14:2
  14:19 16:7 21:10
  21:12 25:8 26:9
  29:20 31:21 46:8
  56:8 67:19 69:13
**once** 8:13 77:15

**one's** 6:12 67:4
**ones** 17:23 43:20
  43:20
**online** 71:4,25 72:2
**open** 40:10
**operates** 71:24
**opinion** 21:3 23:17
  25:13 39:15,24
  43:15 54:4 56:20
  56:23
**opinions** 21:9,24
  38:21 40:19,23
  41:2 61:12 62:12
  64:5 65:24 68:12
  68:15
**opposed** 69:17 71:7
**optum** 22:24 63:8,9
  63:12,13 64:10,11
  64:14 70:25 71:3
**optum's** 38:7
**orange** 2:8 77:4,11
  77:19
**order** 6:13,18
  23:12 26:3 31:8
  32:4 34:24 39:6
  43:8
**ordering** 77:15,15
**organizations** 6:24
  20:10
**original** 68:25
  77:14
**orlando** 2:9 77:5,11
**outcome** 75:15
**output** 37:22 38:24
**outset** 54:25
**overall** 44:14 53:12
**overcharge** 13:18
  15:5 30:20,23,24
**overcharged** 51:15
  51:18

**overhead** 42:15
**owe** 60:23 61:2,7
**owes** 46:19,24 47:7
**owing** 48:24
**owns** 71:24

**p**

**p** 2:1,1 4:1 5:1
**p.a.** 2:2
**p.m.** 1:13 73:4
**pa** 2:7 77:3
**page** 3:3 15:10,20
  20:10 32:22,22
  33:13 34:25 35:15
  35:22 41:14,23
  43:14 45:19 46:7
  51:6,24 52:15
  53:20,21,24 55:5
  55:19 76:6 77:10
**pages** 17:4 65:19
  71:5 75:8
**paid** 11:12 18:23
  22:7 23:21,22,22
  24:2 37:12 48:16
  49:11,16,18,19,25
  50:16 51:14 56:17
  56:17,24 57:7,8,11
  57:13,25 59:9,14
  59:15,19,24 60:2,5
  60:17,20 61:14
  66:24 67:19,24
**pain** 14:4 30:12
  33:5 39:20 55:2
**panels** 39:2,2
**paper** 11:3 47:2
**paragraph** 24:9
  51:24
**parkway** 1:15
**part** 24:1 37:16
  54:15
**partake** 25:19

particular  15:14,18
  15:22 19:15,19,24
  19:25 22:25 25:1
  27:8 30:25 32:25
  34:8 35:8 37:2,25
  38:12,18 39:17
  40:14 45:25 54:8
parties  4:4 75:12
  75:13 77:16
party  64:12 77:15
passing  6:10
patient  7:7,20 8:6
  8:23 15:11 19:1
  21:16 24:23 30:19
  31:7,19 40:13,20
  41:4,6 43:4 45:16
  45:21,25 48:13
  49:10 50:1 51:14
  52:16 53:2 58:10
  59:5 63:15
patient's  21:19
  30:25 31:24 58:11
  70:9
patients  7:19 8:7
  8:12 50:2
pay  19:1,15 28:20
  28:21,24 47:3,20
  49:2,4,10 50:1,2,4
  50:5,7 51:14 57:21
  58:2,9 67:6,8
payers  24:14
paying  8:7 27:19
  27:21 47:11 49:13
  58:11
payment  8:11
  15:22 18:25 19:3,5
  19:8,14,19,23 24:8
  25:1 26:1,4 33:2,16
  33:17 34:1,9,16,21
  35:1,3,3,4,5,6,7,8,9
  35:9,12,20 36:1,2,3

36:6,6,15,16 37:2,6
  37:8 38:10,12 39:6
  42:12,14,20 43:1
  43:18,24 44:1,1,2,5
  44:5,13,13,19,22
  44:25 46:15 48:11
  48:12,21 49:7,9,12
  49:13 51:10,18
  53:22 54:18,19,20
  55:22 56:8,9,13
  57:1,2 67:2,11,18
  67:24
payments  16:12
  19:16,18 33:13
  36:11 37:5 39:18
  55:24 56:22 57:16
payor's  60:2
pays  48:22 51:8
peer  19:13 37:3
penalties  76:22
people  27:18 67:6,9
percent  7:23,23,25
  8:1,18,19,20 19:22
  35:5,7 36:22 63:1
percentage  6:10
  7:1,17,18 8:10,21
  62:16,22
percutaneous  40:3
  40:4,8 41:5
percutaneously
  40:9
perform  50:18
performed  41:5
  42:13 43:13,23
  45:24
performs  42:11
perjury  76:22
person  50:18 62:23
personal  7:13
  12:22 50:1 51:1
  62:17

personally  74:6
perspective  32:2
phone  50:4
photo  64:18
photos  3:20
physical  12:7,15,17
  12:25 72:4
physician  24:16
  30:18 35:16 36:11
  36:22 45:8 52:18
  52:21,24 53:24
  54:9 67:14,15
physician's  42:25
physicians  51:23
  54:7 66:11
physiological  53:15
physiology  6:16
piece  47:2
pieces  11:2
pip  19:25 57:24,25
place  1:14 19:17
places  37:25
plaintiff  1:5,17 2:6
  62:25
plaintiff's  3:9,10,11
  3:12,14,15,16,17
  3:19,20,21,23,24
  10:24 11:18,20,21
  11:25 26:19 27:9
  29:23,23 30:8
  61:23 62:6 63:23
  64:23 69:4 70:1
plaintiffs  62:18
please  5:12,13,15
  5:22 10:21 27:10
  69:13 73:3 77:8,10
plumber  8:12
plumbing  8:13
plus  9:22 44:22
podiatrist  45:15

point  40:10
policy  23:8 25:16
pollock  1:7 76:3
poorly  49:5
portion  15:13
position  50:18
  54:22
positions  6:21
powerpoint  72:12
practice  7:1,5,9,17
  7:19,22,23 8:23
  24:16 65:4
practices  8:14,15
  8:16 60:13 67:15
practicum  6:3
pre  7:15 62:22
prefer  12:18
premise  23:19
  50:24 51:1,2,3
prep  9:25
preparation  9:13
prepare  16:25
preparing  38:21
  39:15
preps  6:24
presentations
  72:11,12
presented  41:10
previously  32:21
price  18:9 23:6
prices  67:4,5
primarily  7:5 63:15
  71:8
print  69:10,10,16
  69:20 71:11,12,17
printed  69:18
prior  43:20 68:13
pro  71:1,3
probably  21:6
  37:23 50:3 63:1
  69:18

[problem - records]                                                                                    Page 90

**problem** 27:23,24
  30:18 45:8
**problems** 47:12,15
**procedural** 38:5,16
  38:17
**procedure** 18:23
  19:15 20:4 24:15
  24:19 25:2 33:15
  37:12,24 38:25
  39:4 41:15 42:11
  42:12,16,16,18
  43:10 50:16 60:12
  61:8 66:25 67:20
  67:21 77:25,25
**procedures** 18:25
  24:8 26:5 32:25
  38:12,18 39:3
  56:23,25
**proceed** 9:21
**proceedings** 3:1
**process** 12:10,18
  12:19 13:6
**processes** 6:17
**produced** 70:22
**professional** 3:19
  5:24,25 6:1 24:17
  25:22 51:1 72:12
**professionals** 39:2
**program** 6:5 65:5
  71:18,20,23,25
  72:1
**programs** 6:5,6
**promote** 25:23
**prong** 7:12
**proof** 60:14
**proper** 20:20 33:10
  71:22
**properly** 58:22,23
  59:9,10 60:23 61:8
**propose** 56:5

**protection** 48:14
  53:25
**provide** 32:6,19
  35:18 59:1,3 61:11
  63:14,16 71:20
**provided** 13:23
  15:24 22:15 40:12
  40:20,25 43:12
  53:25 54:3 56:14
  59:7 60:15 62:2
  72:22
**provider** 13:18
  14:19 20:19 34:6
  43:10 48:19 58:25
  63:14
**providers** 7:9 13:22
  13:25 16:11 17:8
  17:12 18:13,24
  20:15 21:4,25 22:8
  22:15 23:14 24:3
  47:19 49:6 55:21
  56:14 66:2 67:11
**provides** 71:23
**providing** 7:2 22:4
  42:14 54:5
**public** 1:18 18:6,15
  74:5,19 75:5,23
**publication** 23:1
  50:23,24,25
**publications** 25:11
  65:22
**publicly** 18:5 19:12
  36:16 37:6
**publish** 18:8,14
  19:7,8
**published** 18:6
  22:23 23:7 37:25
  38:1
**publisher** 64:13
**purchased** 64:13

**purchases** 19:10
  37:8
**put** 12:9 25:6 27:25
  48:10 66:3
**putting** 14:3

**q**

**qualifications**
  40:18,22
**qualified** 54:22
**qualify** 31:12 40:23
**question** 18:2,4,18
  21:7 24:12 40:21
  44:19,23 56:21
  61:11 71:16
**questionable** 14:1,5
  14:11,15,21 15:6,6
  15:8 16:4,22 30:21
**questions** 7:7 27:6
  28:12 64:20 72:16
**quickly** 42:3
**quite** 20:11 51:10
**quote** 22:7 31:12

**r**

**r** 2:1 5:1,16,16
**radiology** 16:1
**range** 15:22 34:16
  43:24 44:2 53:22
  54:16 55:17 57:2
**rare** 52:20
**rate** 17:22 19:11,12
  23:15,15 24:25
  36:23 39:5 49:4
  50:4,6 56:20
**rates** 17:24 18:5,8
  18:12 19:8,9
**ray** 24:19
**rbrvs** 19:21 25:21
  25:22,23 26:2
  65:25

**read** 3:6 16:14
  21:15 51:3 53:8
  72:17 76:22 77:10
**reading** 4:4 77:22
**real** 46:14
**reality** 49:8
**really** 46:10 68:15
  69:19 71:23
**realm** 48:11
**reason** 13:23 42:13
  76:6
**reasonable** 14:9,17
  15:21 16:19 17:25
  18:17,19,22 20:3
  22:7 23:21 26:1,4
  32:7,20,23 37:5,11
  38:12 43:16,18,23
  44:2 46:15 47:5
  49:18 50:14 51:18
  53:22 54:12 55:16
  55:18 56:13,20
  58:2 66:24 71:10
  77:14
**reasonableness**
  62:14
**reasons** 30:22
  43:22
**recall** 11:25
**receipt** 3:22,23,25
  77:13
**receive** 48:11
**received** 12:3,21
  45:25 63:15 77:15
**record** 5:12 11:3
  29:7 31:4 53:2
  58:23 64:22,24
  72:21 75:9
**records** 7:13 17:2,3
  17:7,12,13,19
  20:22 21:2,17
  31:17 33:7 49:25

[records - screen]                                                                                      Page 91

52:5,6,10,11,16,25 53:5,8,9,11,18 54:2 55:7 59:17,19 60:16 69:9 70:9
**recovery** 8:11
**red** 52:19,22
**reduce** 46:24 48:1
**reduced** 50:23
**refer** 28:12
**reference** 25:12 27:6 63:13,14,17 65:23
**referenced** 52:7
**references** 38:4
**refusing** 27:3,10
**regard** 77:14
**regarding** 46:18 66:11
**regardless** 8:3 9:17
**region** 23:24
**register** 38:2
**registered** 31:12
**regular** 12:25
**regularly** 31:7 55:14
**reimbursed** 56:19
**reimbursement** 17:24 18:8,12 19:6 25:24 36:23 38:8 38:11 54:16
**reimer** 1:11,14 3:3 5:7,14,17 11:2,24 21:8 30:2 54:24 61:18 62:1 63:3 70:6,21 72:17 74:6 75:7 76:5 77:2,6,9
**reimer's** 29:8
**related** 26:14 27:7 64:5
**relates** 66:10

**relative** 19:2,21 24:10,11,12,22,25 26:2 36:17 37:1,14 37:18,22 38:19,20 38:23,24 39:7,9 65:18 75:11,12
**relatively** 7:24 23:22
**relied** 26:25 70:22
**rely** 50:24,25 51:1 51:2
**render** 40:18,23 62:12
**rendered** 15:17 22:19 23:16 41:4 57:12 62:12
**rendering** 38:21
**rephrase** 71:15
**report** 3:14,15 13:11,11,14 14:4 16:6,9 17:4,8 20:9 21:14 23:24 30:6 32:22 41:14,24 43:14 46:23 47:24 48:4,7 51:6,24 55:21 61:3 67:14 69:9 70:25 71:13 71:21 75:6
**reported** 1:18
**reporter** 1:18 3:5 5:3 29:13,25 74:19 75:1,4,23 77:18
**reports** 9:6 17:1,20 57:15
**represent** 44:2
**requested** 9:6 75:8
**requesting** 60:16
**requests** 25:11
**required** 54:14 59:1

**requirement** 53:12
**requirements** 45:9
**requires** 30:16
**research** 22:13,17 22:18
**reserve** 72:17,21,23
**reserved** 4:5
**reside** 12:15,17
**resource** 19:2,21 24:10,11,12 36:17 36:25 37:14,18,22 38:24 39:9 59:6 63:13,17
**resources** 15:2,5,17
**respect** 11:14 22:14 50:10 72:24
**respective** 4:4
**respond** 65:12
**responding** 65:11
**rest** 43:23 51:8
**result** 56:12
**retained** 3:12 61:11 62:10,14
**retention** 3:21 68:25
**return** 77:11
**reverse** 52:22
**review** 9:5,5 12:4 17:6,21 18:2 32:3 32:23 34:23 75:7 77:11,13
**reviewed** 16:21,23 16:25 17:2,2,13,25 19:13 21:1 37:3 39:1 55:21 56:1
**reviewing** 7:12 20:22
**richard** 2:2 77:20
**right** 10:18 13:10 20:7 26:13 28:23 29:4,4,14 31:15

32:10 47:9 60:3 63:6 65:7 72:17,21 72:23
**river** 1:15
**rolled** 46:2
**roman** 52:2,12
**room** 15:11 32:11 51:23 53:13
**root** 36:20
**roundabout** 25:17
**rstaggard** 2:5
**rule** 21:21 77:25,25
**rules** 77:14
**rvus** 37:24 38:8,10 39:17

**s**

**s** 2:1 4:1,1 5:1
**s0020** 42:6
**satisfy** 49:2 51:10
**save** 42:20
**saving** 42:23
**saying** 8:2 51:17,18 67:7
**says** 24:5 52:23,24
**scale** 19:3,21 24:10 24:11,13 36:18 37:1,15,18,23 38:24 39:9
**scenario** 16:12 60:4 60:5,19
**schedule** 3:19 12:4 25:10 26:22 35:16 63:21 65:11,12
**scheduled** 31:7 55:15 68:17
**school** 10:14,16
**science** 50:18
**scientific** 37:4
**score** 6:10
**screen** 69:21

[se - stenographic]

se  46:16
seal  74:8
second  7:8 21:10
  24:1 57:23
secret  49:5
see  10:21 31:16
  32:1 34:22,24,25
  44:20 47:24 49:14
  50:9 52:11 55:25
  63:20
seeing  21:15
self  6:23 18:7 49:4
  49:10 50:1,2,4,5
  51:14 65:6
seller  64:12
send  72:18
sending  60:13
sent  17:3,10 66:7
separate  42:21
separately  41:15
  43:2,11 54:3
september  3:14
  11:4,4,5,8 20:8,8
  30:6
serve  7:6,9 12:6,7
  12:14,16,23 13:3,5
  13:8
served  6:3 11:19,25
  12:2,20
server  12:10 13:6
servers  12:18,19
service  12:23,25,25
  15:22 18:23 19:15
  20:3 22:8,9 23:21
  24:15 25:2 32:7
  33:14 37:12 38:25
  40:14 43:11,13
  44:3 45:18,25 46:6
  50:16 55:7,9,12
  57:14 66:25

services  3:19 9:4
  18:25 22:15,19
  23:16,18,23 24:2,4
  24:8 26:4 32:25
  36:10,14 38:3,18
  39:3 46:6 49:19,20
  51:19 53:23 54:5
  54:13 56:13 59:1,3
  60:11,15 63:8
  66:12,15 67:7
set  23:10
settle  68:8
severe  53:13 59:6
severity  30:15,18
  31:24 45:5,8 52:1
  55:13
shape  48:3
sheet  3:5 72:18
  76:1 77:10
shield  17:23
shorthand  75:4
show  11:19 15:20
shows  43:18,22
  55:20
shredded  48:8
sign  3:6 72:17
  77:11
signature  74:18
  75:22 77:10,24
signed  76:23
significant  43:10
signing  4:5 77:22
silver  14:20 45:1,2
similar  21:2 22:9
  24:4 50:18,19,20
  65:5 67:6
simply  20:18
sincerely  77:17
single  31:4
sir  64:20

sit  6:9 17:18 21:22
  47:17
situation  59:8
situations  25:16
skill  54:13
slightly  16:9
small  60:16 69:19
smaller  7:24
societies  25:22
  37:21 72:13
soda  43:3
software  38:6
  70:25 71:4,25 72:1
solution  28:14
somebody  21:1,17
  21:18 47:1 58:13
  58:13
sorry  16:16 20:8
  46:1
source  35:16,19,21
  36:9,11,21 52:7,12
  54:6 66:10,20
sources  17:22
  18:16 35:17 37:19
  64:4 70:21,24 71:2
speaking  35:10
  41:11 45:19
specialized  40:16
specialties  39:4
specific  24:8 32:5
  64:7 66:18 67:20
specifically  19:5
  20:25 26:15 32:3
  39:10,14 64:1,3
spell  5:15
spend  29:5
spending  29:18
spent  7:25 30:19
  31:19 65:11
spine  16:13,21 55:2
  55:20,22

spite  48:6
spoke  68:14,18
spoken  68:12
staggard  2:2 3:4
  5:11 10:22 11:1,17
  11:23 13:9 27:22
  28:3,15 29:7,21
  30:1,5,10 32:16
  39:13 47:8,23 48:5
  49:21 57:19 58:12
  58:20 60:21 61:1,6
  61:17,21,25 62:5,8
  63:6,11,20,25
  64:21,25 66:19
  69:2,6,23 70:5,14
  72:15,20 73:3
  77:20
standard  9:8 40:15
standards  32:24
standing  28:20
standpoint  40:23
start  20:9
starts  38:25
state  5:12 13:25
  18:20 58:18 74:3,5
  74:19 75:2,23
stated  19:5 76:22
statement  25:15
  36:24 39:22 50:21
  50:22
statements  23:8
states  1:1 22:11
  24:2
statistically  35:10
statute  19:25,25
  77:14
statutory  18:20
stays  26:15,16
stenograph  75:4
stenographic  75:9

**[stenographically - tongue]**                                        Page 93

stenographically 75:6
step 18:18
sticker 67:5
stimulate 40:10
stimulation 40:3,5 40:8,13 41:6
stipulated 4:3
stokes 2:7 10:2 13:7 27:13,20 28:7 28:13,18,23 29:3 29:11,16 30:4 32:14 39:11 46:25 47:14 48:2,25 57:17 58:5,17 59:25 60:25 61:5,9 63:5 64:19 66:13 68:2,11 70:3,13 72:16 73:1 77:3,7
stop 28:9
storey 2:7 77:3
street 2:3
study 6:13,23 65:6
stuff 29:1 65:25
submits 59:12,16 59:17,18,21,22
submitted 15:2 22:2 32:23 44:11
submitting 60:16
subpoena 3:10 11:18 12:1,2,6,7,14 12:16,23,24 30:4 68:24
substance 29:17 42:1
successfully 6:18
sued 62:17,22,23
sufficient 60:14
suggest 48:1
suggested 77:13

suggesting 59:8
suing 61:3
suit 7:15 62:22
suite 1:15 2:8 77:4
summarize 13:17
supplies 41:19,22 42:15,17,25
supply 42:2,7,10
support 15:12 25:13 31:1 45:5,10 48:15 49:23 51:25 53:15 55:8 57:11 65:24
supported 43:19,21 53:18 58:9 59:17 59:18
supports 15:16 41:3 57:5 59:13
sure 5:23 18:14 20:17 40:21 41:2 52:8 65:17 68:9
surgery 24:15 42:13,22
surgical 24:19
survey 23:5,12
surveys 25:18
swear 5:3
sworn 5:8 74:7
system 8:24 24:13
systems 45:13

**t**

t 4:1,1 74:19 75:23
table 32:22 33:1 43:17,20,22 55:19 55:20
take 6:13 24:24 27:13,20 28:23 57:20,20,22 58:6 64:18,21 65:1,1,4 66:2 69:13 70:11 70:13 72:24

taken 1:12,17 66:6 77:9
talk 25:17
talked 54:25 55:6 66:1
talking 33:16 63:5
talks 65:25 66:1
tampa 1:16 6:2
taught 6:1 65:5
telephone 68:12
tell 22:13 47:17
telling 61:12
ten 27:17 68:17
tend 44:4
term 15:7 30:20,24 58:16
terminology 38:16 38:17
terms 10:13,14 14:3 51:4 57:23 65:4
test 6:9,9
testified 5:8 32:15
testify 3:10 10:9
testimony 5:4 9:10 9:11,12,22 10:5 22:5 31:10,14 39:24 44:1,4 48:23 49:1 57:15 62:1,3
tests 6:8 65:1
textbooks 25:11 65:22
thank 72:15
thick 38:13
thing 7:6 37:17 41:1 46:10 51:20 52:23
things 6:25 8:8 9:20 25:6,14,18 26:12,24,25 27:4,7 27:11,25 54:11

60:5 62:20 64:4 65:24 66:1
think 8:17 28:7 44:18 47:9 49:5,24 49:25 50:2 54:25 60:3 61:22 67:9,23 68:15,23
third 7:12 11:5 64:12
thompson 2:7 77:3
thousand 16:16
three 7:5,18 11:2 24:14,20 30:1 55:11 63:4 65:10 66:5,7,7
throw 20:11
thumb 3:12 25:6,8 25:10,25 26:10 27:1 28:1,2,4 29:24 30:5 38:9 54:17 60:10 61:19 66:3
time 1:13 7:25 8:1 8:18,21 9:7,13,14 9:25 28:16,17,22 28:22 29:5,18 31:19,23 42:20 43:9 45:8 54:13 59:20 65:11 66:3 68:14
timed 6:9
times 8:20 36:6 68:5
today 10:4 11:13 17:18 21:22 25:4 26:1 66:1 72:5,23
today's 65:8,9
toe 45:13
told 54:24 55:1 56:1
tongue 46:2

**top**  45:19
**total**  14:6,8,10,20
  14:21,22,23,24,25
  15:1,1,2,3,24 16:1
  16:12,13,17,20,24
  32:21 33:13 44:10
  44:11,20,21,22
  55:20 56:2
**totaling**  16:23
**totals**  33:3 53:19
**touch**  12:9
**track**  7:14 10:8
  62:20,24
**training**  10:12,17
**transcript**  75:7
  76:2 77:12,13,15
  77:16,22
**transpired**  31:2
**transportation**
  15:24
**travel**  9:13,14
**tray**  42:5,5
**treating**  48:14 54:7
**treatises**  25:11
  65:22
**treatment**  19:17
  23:25 31:11 40:3
  40:19,24 45:24
  46:1 59:5,6 63:15
  63:18,19
**treatments**  39:25
  56:18
**trial**  9:10,11,12,15
  9:21
**trials**  21:3
**tried**  8:8,10
**true**  52:22 75:9
  76:22
**trust**  23:8 25:15
**truth**  5:5,5,5

**try**  13:4 25:19
  28:13
**twice**  41:1
**two**  28:15 33:19
  36:5 40:15 46:5,12
  55:11 57:7 60:5
  62:20 63:3,16 64:2
  64:7
**type**  8:3 47:12
**typical**  62:13
**typically**  8:9,20
  9:12,25 12:9,19
  17:20 23:22 43:22
  45:11 49:18,19
  50:16 52:22 53:14
  59:20 62:10 64:13
  68:22

**u**

**u**  4:1
**ucr**  23:15,15 24:2
**uhc**  17:23
**unbundled**  41:18
  41:20,22 43:7
  45:20,20 48:15
**unbundling**  41:11
  41:13,14 42:18,23
  43:22 44:14 45:18
  45:18 46:5
**understand**  9:3
  13:14 29:3 36:8
  40:21 52:8 70:8
**understanding**
  54:24
**understands**  60:13
  60:15,17
**unfair**  33:12
**uniqueness**  54:13
**unit**  20:13 38:19,20
**united**  1:1 22:11
**units**  6:12 24:22,23
  25:1 26:3 38:23

39:7
**universe**  48:12
**unjustly**  21:19
**unreasonable**  14:1
  14:4,10,11,15,18
  14:21,23,25 15:1,3
  15:6,8,19,25 16:2,5
  16:17,18,22,24
  30:22 32:12 44:11
  44:20
**unrelated**  43:12
**upcoded**  15:18
  30:25 48:15 59:5
  60:6,7
**upcoding**  43:22
  55:5 58:19,25
**upcoming**  55:2
**upper**  16:18 20:3
**upside**  60:8
**use**  12:7 17:22,24
  18:7,16 25:22,23
  30:20,24 35:17
  38:6,20 40:16 44:6
  44:16,17 45:5
  51:25 64:1 65:25
  67:13 71:9
**uses**  36:16
**usual**  14:16 17:21
  18:19,22 22:6,10
  23:20 37:10 43:16
  44:15 49:17 50:14
  62:11 66:23 67:13
  71:7
**usually**  22:9 24:3
  69:10
**utilize**  19:2 35:11
  38:9 39:14 66:20
  70:25 71:15
**utilized**  24:13 37:5
  37:13 39:21 71:21

**utilizes**  20:20
**utilizing**  19:9,11,13
  19:21 25:25 36:17
  40:14 44:19

**v**

**validity**  48:9
**valuable**  28:22
**value**  19:2,21 24:10
  24:11,12,21,22
  25:1 26:2 36:17
  37:1,15,18,23
  38:19,20,23,24
  39:1,3,5,7,9 67:3,5
**various**  6:23 16:11
  25:21 26:4 32:25
  38:4,9,18 40:11
  43:21 63:14 65:3
**vehicles**  67:6
**veritext**  77:11
**versus**  7:2 52:4
  62:18
**victoria**  1:18 74:5
  74:19 75:4,23
  77:18
**video**  9:9
**viewing**  45:15
**views**  20:23
**violated**  54:7,10
**virtually**  24:13
**visit**  15:11,13,14,21
  24:19,23 30:13,14
  30:15 31:1,3,9,20
  32:4,20 33:5,7,21
  34:20 38:25 39:19
  43:8 45:2,5,21,22
  46:3 51:25 52:17
  52:18 53:13,14
  55:17 58:14,15
  59:10,11,12,14,15
  59:24 60:6,9 61:13
  61:14

[visits - years]                                                                    Page 95

| | |
|---|---|
| **visits** 31:6,7 55:15 55:17,24 61:2 | **winthrop** 2:7 68:3 77:3 |
| **voluminous** 65:16 65:18 | **wipe** 32:8 |
| **vs** 1:6 76:3 | **wiped** 32:11 |
| | **wise** 7:1,18 |

**w**

| | |
|---|---|
| **wait** 27:16 | **witness** 3:3 5:6 27:15,24 28:5,8,20 29:1,9,14,20 32:15 47:1,15 48:3 49:1 57:18 58:6,18 60:1 61:10 63:7 66:14 70:4,10 74:8 77:1 |
| **waiting** 27:17 28:11 | |
| **waive** 47:25 77:11 77:22 | |
| **waiver** 77:21 | |
| **walk** 47:12 48:23 51:8 | **word** 40:6,7 73:3 |
| **wand** 47:25 | **words** 52:9 53:4 |
| **want** 27:16,22 28:8 29:5,22 64:16 69:21 | **work** 7:3,9,21 13:7 24:16 27:18 29:11 29:13,16,18 45:12 62:16 63:1 65:3 |
| **wanted** 16:8 | **worked** 6:21 68:2 |
| **wants** 31:5 | **working** 50:2 |
| **way** 16:10 20:9 21:18 22:17,17 25:17 32:9 46:17 48:3 59:4 71:1 | **works** 58:7 |
| | **worry** 27:20 48:24 |
| | **worth** 24:23 |
| | **write** 34:13 50:10 50:15,17 76:2 |
| **we've** 28:15 55:5 | **writes** 47:6 |
| **website** 22:12 35:17 36:21 37:21 38:3 | **writing** 47:2 |
| | **written** 9:6 17:4 52:15 72:8 |
| **weeds** 14:7 | **x** |
| **went** 44:10 68:20 | **x** 24:19 67:19 |
| **west** 2:3 | **y** |
| **whatever's** 26:18 | **yeah** 52:10 |
| **whichever** 36:23 | **years** 7:21 72:13 |
| **white** 1:18 74:5,19 75:4,23 77:18 | |
| **willens** 40:20,24 41:17 43:15 44:10 | |
| **william** 1:8 76:3 | |
| **willing** 12:24 | |
| **windows** 59:20 | |

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# PLAINTIFF'S
# EXHIBIT "B"

MEDICALCODINGREVIEW.COM

September 12, 2019

Brian D. Stokes, Esquire
Alvarez, Winthrop, Thompson & Storey, P.A.
390 N Orange Ave Suite, Suite 600
Orlando, FL 32801

**Claimant:** **Lester Counts**
**DOL:** **2/12/18**

Dear Mr. Stokes:

Per your request, I have reviewed various records to perform an analysis of the medical coding and billing issues in this matter, as well as to determine the reasonableness of the charges. These findings are based upon my review of the following:

## Records Submitted for Review

Advanced Pain Management
Silver Chiropractic
Advanced Diagnostics
Baptist Health
Baymeadows MRI
Emergency Resources Group
Nassau County BOCC
MBB Radiology




P.O. BOX 47537, TAMPA, FL 33647
P: 813.475.4114 • F: 813.280.6180 • JREIMER@MEDICALCODINGREVIEW.COM

2

## Billing / Coding Guidelines

The findings in this report are based on coding and billing guidelines from the American Medical Association (AMA), The World Health Organization (WHO), the US Department of Health and Human Services (HHS), The Office of the Inspector General (OIG), the Federal Bureau of Investigations (FBI), The Florida Agency for Health Care Administration (AHCA), as well as my own personal and professional experience in the Healthcare Industry, and as a Medical Coding and Billing Instructor.

The False Claims Act (FCA) identifies areas of fraud in healthcare billing.  In addition to the obvious case of submitting claims for services that were not provided, the FCA also specifically names upcoding (the selection of a code to maximize reimbursement when such code is not the most appropriate descriptor of the service) and unbundling (billing separately for the components of an all inclusive procedure) as fraudulent coding activities. [i]  The Office of the Inspector General (OIG) views any type of improper coding as fraud. [ii]

The Health Care Fraud Unit of the FBI investigates areas of healthcare including: billing for services not rendered, billing for a higher reimbursable service than performed (upcoding), performing unnecessary services, kickbacks, and the unbundling of tests and services to generate higher fees. [iii]

## Usual, Customary, and Reasonable (UCR) Comparisons

Usual, customary, and reasonable (UCR) is: *"The amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service."* [iv]

The resource-based relative value scale (RBRVS) is used to determine UCR benchmarks.[v] RBRVS standards are used to calculate an average and a high payment in the locality of treatment where the services and procedures were performed.

RBRVS benchmarks are used by Florida statutes, as well as Florida's Agency for Health Care Administration (AHCA) in determining reasonable fees.  This methodology is consistent with the national UCR definition, as well applicable Florida law, which defines reasonable charges:

> *With respect to a determination of whether a charge for a particular service, treatment, or otherwise is reasonable, consideration may be given to evidence of usual and customary charges and payments accepted by the provider involved in the dispute, and reimbursement levels in the community and various federal and state medical fee schedules applicable to automobile and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service, treatment, or supply.*[vi]

This methodology is endorsed the AMA, as well as the US Dept of Health and Human Services and is peer-reviewed annually.  RBRVS is the physician payment system used by payers in the healthcare industry, including the Centers for Medicare Services (CMS).[vii]  Claims that this methodology does not apply to self-pay or uninsured patients simply are not true.

Certain coding and billing violations listed below are more significant than others.    Detailed explanations of these issues are listed below.

3

**Advanced Pain Management**
**Physical Therapy, Injections (4/23/18 – 6/27/18)**
**Total Charges Submitted: $14,100**
**Total Unreasonable Charges: $7,933**

The following red flags have been identified:

- **5/21/18: Office Visit**

  o **Upcoding- CPT Code 99215**

    The bill from this provider lists charges for a Level 5 established patient office visit (CPT Code 99215) on this date of service. This is the highest level established patient evaluation and management (E/M) code available and typically reserved for the most critical patients. For a Level 5 established patient (E/M) visit, there are several criteria that must be met or exceeded:

    - Comprehensive History
    - Comprehensive Exam
    - High Complexity Medical Decision
    - High Severity Problem
    - Physician Time: 40 minutes

    The medical records from this visit do not support the use of this highest severity code.

    **Charges in the amount of $460 have been upcoded and are not supported by the documentation.**

- **5/23/18: Office Visit**

  o **Upcoding- CPT Code 64999**

    The billing ledger contains charges for CPT Code 64999 (Unlisted procedure, nervous system) on this date of service. This code was used to represent percutaneous electrical nerve stimulation (PENS), or electric acupuncture treatment.[viii] This is not the correct code for this procedure. The correct codes for the treatment on this date of service are:

    - CPT Code 97813- Acupuncture, 1 or more needles; with electrical stimulation, initial 15 minutes of personal one-on-one contact with the patient

    - CPT Code 97814- Acupuncture, 1 or more needles; with electrical stimulation, each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure)

4

**Charges in the amount of $650 have been upcoded and are not supported by the documentation.**

o **Charges above Usual, Customary, and Reasonable (UCR) Benchmarks**

The charges for PENS treatment are greater than usual and customary levels. The table below compares these charges to reasonable benchmark standards based on the correct codes for this procedure. [ix]

| Date | CPT Code | Billed Amount | Average Payment | High Payment |
|------|----------|---------------|-----------------|--------------|
| 5/23/2018 | 64999* | $650 | $72 | $144 |
| 5/23/2018 | L8680** | $650 | - | - |
| **TOTAL** | | **$1,300** | **$72** | **$144** |

\* Payment based on CPT Codes 97813 & 97814

\*\* Unbundled- not eligible for separate payment

- **6/21/18: Lumbar Facet Joint Injections**

  o **Unbundling- Supplies**

  The billing ledger lists charges for the supplies used for the facet joint injections performed on this date of service (HCPCS Codes J1040, A4550, S0020, and A4212). It is considered unbundling to charge separately for these supplies as they have already been factored into the physician's increased payment for injections performed in the office setting versus a surgical center.

  Surgical procedures are part of a global package which includes among other things, supplies and other miscellaneous services.[x]  Global surgery applies in any setting, including a physician's office.  The global surgical package includes all necessary services normally furnished before, during, and after a procedure.

  **Charges in the amount of $295 ($250, $25, $10, $10) have been unbundled and are not eligible for separate reimbursement.**

- **6/21/18: Nerve Block Injections**

  o **Unbundling- CPT Code 99214**

  The bill from this provider contains charges for a Level 4 established patient office visit (CPT Code 99214) on this date of service.  These are in addition to the charges for nerve block and trigger point injections also performed on this date of service.

  In order to bill for an office visit along with other procedures, the provider must document that a significant, separately identifiable evaluation and management service was provided unrelated to the other services/procedures on the same date of service.

5

The records from this visit do not document that significant and separately identifiable E/M was provided to the patient outside of what would otherwise be provided with the various injections the patient also received on this same date of service.

**Charges in the amount of $340 have been unbundled and are not eligible for separate reimbursement.**

- **All Dates of Service**

  - **Charges above Usual, Customary, and Reasonable (UCR) Benchmarks**

    The charges for all remaining treatment with this provider are greater than usual and customary levels. The table below compares these charges to reasonable benchmark standards. [xi]

| Date | CPT Code | Billed Amount | Average Payment | High Payment |
|------|----------|---------------|-----------------|--------------|
| 4/23/2018 | 99204 | $525 | $167 | $334 |
| 4/23/2018 | L0631 | $2,430 | $1,002 | $1,002 |
| 4/23/2018 | E0730 | $1,215 | $245 | $245 |
| 4/23/2018 | 64445 | $440 | $139 | $278 |
| 4/23/2018 | 76942 | $400 | $60 | $120 |
| 4/23/2018 | 20553 | $205 | $32 | $64 |
| 4/23/2018 | 98927 | $190 | $61 | $122 |
| 5/21/2018 | 64445 | $440 | $139 | $278 |
| 5/21/2018 | 76942 | $400 | $60 | $120 |
| 5/21/2018 | 20553 | $205 | $32 | $64 |
| 5/21/2018 | 98927 | $190 | $61 | $122 |
| 5/30/2018 | 97162 | $260 | $84 | $168 |
| 5/30/2018 | 97110 | $210 | $62 | $124 |
| 5/30/2018 | 97140 | $95 | $28 | $56 |
| 6/5/2018 | 97110 | $105 | $31 | $62 |
| 6/5/2018 | 97140 | $95 | $28 | $56 |
| 6/5/2018 | 97014 | $45 | $15 | $30 |
| 6/8/2018 | 97110 | $210 | $62 | $124 |
| 6/8/2018 | 97140 | $95 | $28 | $56 |
| 6/8/2018 | 97014 | $45 | $15 | $30 |
| 6/11/2018 | 97110 | $210 | $62 | $124 |
| 6/11/2018 | 97140 | $95 | $28 | $56 |
| 6/11/2018 | 97014 | $45 | $15 | $30 |
| 6/15/2018 | 97110 | $105 | $31 | $62 |
| 6/15/2018 | 97140 | $95 | $28 | $56 |
| 6/15/2018 | 97014 | $45 | $15 | $30 |
| 6/18/2018 | 97110 | $210 | $62 | $124 |
| 6/18/2018 | 97140 | $95 | $28 | $56 |
| 6/18/2018 | 97014 | $45 | $15 | $30 |

6

| | | | | |
|---|---|---|---|---|
| 6/21/2018 | 64493 | $560 | $258 | $516 |
| 6/21/2018 | 64494 | $290 | $131 | $261 |
| 6/21/2018 | 64495 | $290 | $131 | $261 |
| 6/22/2018 | 97140 | $190 | $56 | $112 |
| 6/22/2018 | 97110 | $105 | $31 | $62 |
| 6/22/2018 | 97014 | $45 | $15 | $30 |
| 6/27/2018 | 64421 | $440 | $152 | $304 |
| 6/27/2018 | 76942 | $400 | $60 | $120 |
| 6/27/2018 | 20553 | $205 | $32 | $64 |
| 6/27/2018 | 98927 | $190 | $61 | $122 |
| 6/27/2018 | 97110 | $105 | $31 | $62 |
| 6/27/2018 | 97140 | $95 | $28 | $56 |
| 6/27/2018 | 97014 | $45 | $15 | $30 |
| **TOTAL** | | **$11,705** | **$3,635** | **$6,023** |

**Silver Chiropractic**
**Chiropractic Treatment (2/4/18 – 5/16/18)**
**Total Charges Submitted: $7,531**
**Total Unreasonable Charges: $4,608**

The following red flags have been identified:

- **2/14/18: Initial Office Visit**

  - **Upcoding- CPT Code 99204**

    The bill contains charges for a Level 4 new patient office visit (CPT Code 99204) on this date of service. The medical documentation must support the patient's condition and treatment meets the requirements for use of this code. For a Level 4 new patient evaluation and management (E/M) visit there are several criteria that must be met or exceeded:

    - Comprehensive History
    - Comprehensive Exam
    - Moderate Medical Decision
    - Moderate to High Severity Problem
    - Physician Time: 45 minutes

    The documentation from this visit does not support the use of this high severity code.

    **Charges in the amount of $332 have been upcoded and are not supported by the medical records.**

- **2/28/18: Chiropractic Treatment**

 o **Unbundling- CPT Code 99213**

The bill from this provider contains charges for a Level 3 follow up office visit (CPT Code 99213) on this date of service. In order to bill for an office visit along with other procedures, the provider must document that a significant, separately identifiable evaluation and management service was provided unrelated to the other services/procedures on the same date of service.

The records from this visit do not document that significant and separately identifiable E/M was provided to the patient outside of what would otherwise be provided with the various treatment modalities the patient also received on this same date of service.

Additionally, per the National Correct Coding Initiative (NCCI) edits, CPT Code 99213 is a component of Chiropractic Manipulative Treatment (CMT- CPT Code 98940). [xii] It is considered unbundling to bill separately for these services during the same visit.

**Charges in the amount of $145 have been unbundled and are not eligible for separate reimbursement.**

- **Multiple Dates of Service:**

 o **Unbundling- CPT Code 97010**

CPT code 97010 (Moist heat/cold packs) is a bundled service code and considered an integral part of therapeutic procedures performed during the same visit. Payment is included in the allowance for other therapy services/procedures performed. Billing separately for the application of hot/cold packs is considered unbundling and has been specifically addressed by the National Correct Coding Initiative.[xiii]

**Charges in the amount of $532 ($38 x 14 units) have been unbundled and are not eligible for separate payment.**

 o **Unbundling CPT Code 97039**

The bill from this provider lists charges for CPT Code 97039 (Unlisted modality) throughout the patient's course of treatment. This code was used to describe "hydromassage" on these dates of service.

Per the National Correct Coding Initiative (NCCI) edits NCCI edits, massage is a component of Chiropractic Manipulative Therapy (CPT Code 98940). [xiv] It is considered unbundling to bill separately for these treatments when performed on the same dates of service.

**Charges in the amount of $480 ($60 x 8 units) have been unbundled and are non-compensable.**

 o **Unbundling- CPT Code 97112**

8

The bill lists charges for CPT Code 97112 (Neuromuscular re-education of movement, balance, coordination, kinesthetic sense, posture, and/or proprioception for sitting and/or standing activities) on 3/26/2018, 4/9/2018, and 4/11/2018.

Per The National Correct Coding Initiative (NCCI) edits, CPT Code 97112 is a component of chiropractic manipulative treatment (CPT Code 98940). [xv] It is considered unbundling to bill separately for these procedures during the same treatment session.

**Charges in the amount of $234 ($78 x 3 units) have been unbundled and are not eligible for separate payment.**

o **Upcoding CPT Code 97530**

The bill from this provider lists charges for CPT Code 97530 (Therapeutic activities, direct (one-on-one) patient contact (use of dynamic activities to improve functional performance), each 15 minutes) throughout the patient's course of treatment.

The documentation submitted for review does not support the use of this code for treatments performed on these dates of service. Furthermore, CPT Code 97530 is billable in fifteen (15) minute increments. There was no time documentation to support these charges in the patient's medical records.

**Charges in the amount of $1,725 ($69 x 25 units) have been upcoded and are not supported by the medical records.**

**Advanced Diagnostics**
**Knee and Lumbar MRI (2/23/18, 3/14/18)**
**Total Charges Submitted: $2,592**
**Total Unreasonable Charges: $1,680**

The following red flags have been identified:

• **All Dates of Service**

o **Charges above Usual, Customary, and Reasonable (UCR) Benchmarks**

The charges for these MRI are greater than usual and customary levels. The table below compares these charges to reasonable benchmark standards. [xvi]

| Date | CPT Code | Billed Amount | Average Payment | High Payment |
|---|---|---|---|---|
| 2/23/2018 | 73721 | $1,192 | $234 | $468 |
| 3/14/2018 | 72148 | $1,400 | $222 | $444 |
| **TOTAL** | | **$2,592** | **$456** | **$912** |

**Baptist Health Hospital**
**Emergency Room – Facility Charges (2/12/18)**
**Total Charges Submitted: $1,809**
**Total Unreasonable Charges: $911**

The following red flags have been identified:

- **2/12/18: Emergency Room**

  - **Charges above Usual, Customary, and Reasonable (UCR) Benchmarks**

    The charges for the emergency room are greater than usual and customary levels. The table below compares these charges to reasonable benchmark standards. [xvii]

| Date | CPT Code | Billed Amount | Average Payment | High Payment |
|---|---|---|---|---|
| 2/12/2018 | 72110 | $479 | $115 | $230 |
| 2/12/2018 | 73564 | $383 | $115 | $230 |
| 2/12/2018 | 99283 | $943 | $219 | $438 |
| 2/12/2018 | Rx | $4 | - | - |
| **TOTAL** | | **$1,805** | **$449** | **$898** |

* Unbundled- not eligible for separate payment

**Baymeadows MRI**
**Cervical MRI (5/20/18)**
**Total Charges Submitted: $1,300**
**Total Unreasonable Charges: $856**

The following red flags have been identified:

- **5/20/18: Cervical MRI**

  - **Charges above Usual, Customary, and Reasonable (UCR) Benchmarks**

    The charges for this cervical MRI are greater than usual and customary levels. The table below compares these charges to reasonable benchmark standards. [xviii]

| Date | CPT Code | Billed Amount | Average Payment | High Payment |
|---|---|---|---|---|
| 5/20/2018 | 72141 | $1,300 | $222 | $444 |

10

**Emergency Resources Group**
**Emergency Room – Physician Charges (2/12/18)**
**Total Charges Submitted: $717**
**Total Unreasonable Charges: $717**

The following red flags have been identified:

- **2/12/18: Emergency Room**

  o **Upcoding- CPT Code 99284**

    The emergency room physician billed for a Level 4 emergency room visit (CPT Code 99284) on this date of service. In order to bill for a Level 4 emergency department evaluation and management (E/M) visit, there are several criteria that must be met or exceeded:

    - Detailed History
    - Detailed Exam
    - Moderate Complexity Medical Decision
    - High Severity Problem(s)

    The documentation from this visit does not support the use of this high severity code. [xix] Per the hospital records from this visit, the patient was assessed as an Acuity Level 3 (Acuity ranges from 1-5, with 1 the most severe and 5 the least severe). Additionally, the hospital billed this same visit as a Level 3 emergency room visit.

    **Charges in the amount of $717 have been upcoded and are not supported by the documentation.**

  o **Charges above Usual, Customary, and Reasonable (UCR) Benchmarks**

    The physician charges for this emergency room visit are greater than usual and customary levels. The table below compares these charges to reasonable benchmark standards based on the correct code for this service. [xx]

| Date | CPT Code | Billed Amount | Average Payment | High Payment |
|------|----------|---------------|-----------------|--------------|
| 2/12/2018 | 99284* | $717 | $64 | $128 |

* Payment based on CPT Code 99283

**Nassau County BOCC**
**Ambulance Transport (2/12/18)**
**Total Charges Submitted: $625**
**Total Unreasonable Charges: $0**

No red flags have been identified.

11

**MBB Radiology**
**Emergency Room – Radiologist Charges (2/12/18)**
**Total Charges Submitted: $102**
**Total Unreasonable Charges: $48**

The following red flags have been identified:

- **2/12/18: Emergency Room**

  - **Charges above Usual, Customary, and Reasonable (UCR) Benchmarks**

    The emergency room radiologist charges are greater than usual and customary levels. The table below compares these charges to reasonable benchmark standards. [xxi]

| Date | CPT Code | Billed Amount | Average Payment | High Payment |
|---|---|---|---|---|
| 2/12/2018 | 72110 | $59 | $16 | $32 |
| 2/12/2018 | 73564 | $43 | $11 | $22 |
| **TOTAL** | | **$102** | **$27** | **$54** |

## ALL PROVIDERS

- **All Dates of Service**

  - **Charges above Usual, Customary, and Reasonable (UCR) Benchmarks**

    The table below compares all charges submitted for review to reasonable benchmark standards based on the correct codes for the various services and procedures.

| Date | CPT Code | Billed Amount | Average Payment | High Payment |
|---|---|---|---|---|
| ALL | ALL | $28,776 | $6,935 | $12,371 |

12 37 )

16,405

12

## Conclusion

A comprehensive review of the aforementioned medical records and bills has uncovered significant coding and billing issues. The bills from Advanced Pain Management and Silver Chiropractic contain the most unreasonable charges.

The bill from Advanced Pain Management contains unreasonable charges. The bill from this provider contains $2,400 of upcoded and unbundled charges. The provider's charges are over two (2) times greater than reasonable benchmark standards.

The charges from Silver Chiropractic are not UCR. The bill from this provider contains over $3,400 of upcoded and unbundled charges. The provider's charges are also over two (2) times greater than RBRVS benchmarks.

Billing and payment arrangements in this case raise additional red flags. Bills are being processed under letters of protection (LOP) which secure payments from the proceeds of the patient's settlement/verdict. Arrangements such as this may be a violation of the AMA's Code of Ethics: [xxii]

### Opinion 6.01 - Contingent Physician Fees

*"If a physician's fee for medical service is contingent on the successful outcome of a claim, such as a malpractice or worker's compensation claim, there is the ever-present danger that the physician may become less of a healer and more of an advocate or partisan in the proceedings. Accordingly, a physician's fee for medical services should be based on the value of the service provided by the physician to the patient and not on the uncertain outcome of a contingency that does not in any way relate to the value of the medical service."*

The AMA is clear about what it considers to be reasonable charges. The AMA's Code of Ethics states its position about the fees charged by medical providers: [xxiii]

### Opinion 6.05 - Fees for Medical Services

*"A physician should not charge or collect an illegal or excessive fee. For example, an illegal fee occurs when a physician accepts an assignment as full payment for services rendered to a Medicare patient and then bills the patient for an additional amount. A fee is excessive when after a review of the facts a person knowledgeable as to current charges made by physicians would be left with a definite and firm conviction that the fee is in excess of a reasonable fee.*

*Factors to be considered as guides in determining the reasonableness of a fee include the following:*

*(1) The difficulty and/or uniqueness of the services performed and the time, skill, and experience required*

*(2) The fee customarily charged in the locality for similar physician services*

*(3) The amount of the charges involved*

13

*(4) The quality of performance*

*(5) The experience, reputation, and ability of the physician in performing the kind of services involved"*

After reviewing the medical bills from these providers, I am left with a definite and firm conviction that the many of the charges submitted for review are in excess of reasonable fees. These opinions are made within a reasonable degree of certainty based on my education, training, and experience in the healthcare industry.

Thank you for allowing me to review these medical coding and billing records. Please let me know if I can be of any further assistance.

Very Truly Yours,

Jeremy Reimer, CPC, CPB
Medical Coding Review

---

i 31 U.S.C. § 3729(a)(1)(G)

ii https://oig.hhs.gov/authorities/docs/cpglab.pdf

iii http://www.fbi.gov/stats-services/publications/fcs_report2006/financial-crimes-report-to-the-public-fiscal-year-2006#Health

iv https://www.healthcare.gov/glossary/UCR-usual-customary-and-reasonable/

v https://www.ama-assn.org/practice-management/rbrvs-resource-based-relative-value-scale

vi http://www.leg.state.fl.us/Statutes/index.cfm?App_mode=Display_Statute&URL=0600-0699/0627/Sections/0627.736.html

vii https://www.ama-assn.org/rbrvs-overview

viii https://www.ncbi.nlm.nih.gov/pubmed/11471581

ix https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx

x http://www.cms.gov/transmittals/downloads/R1770B3.pdf

xi https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx

xii http://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/NCCI-Coding-Edits.html

xiii http://www.iwcc.il.gov/97010.pdf

xiv http://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/NCCI-Coding-Edits.html

xv http://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/NCCI-Coding-Edits.html

xvi https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx

xvii Optum Outpatient Billing Expert 2018

xviii https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx

xix http://www.ahrq.gov/professionals/systems/hospital/esi/esi1.html

xx https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx

xxi https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx

xxii http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion601.page?

xxiii http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion605.page



MEDICALCODINGREVIEW.COM

October 28, 2019

Brian D. Stokes, Esquire
Alvarez, Winthrop, Thompson & Storey, P.A.
390 N Orange Ave Suite, Suite 600
Orlando, FL 32801

**Claimant:**        **Lester Counts**
**DOL:**              **2/12/18**

# Expert Report Addendum

Dear Mr. Stokes:

Per your request, I have reviewed various records to perform an analysis of the medical coding and billing issues in this matter, as well as to determine the reasonableness of the charges. These findings are based upon my review of the following:

## Records Submitted for Review

Jax Spine & Pain Centers



2

## Billing / Coding Guidelines

The findings in this report are based on coding and billing guidelines from the American Medical Association (AMA), The World Health Organization (WHO), the US Department of Health and Human Services (HHS), The Office of the Inspector General (OIG), the Federal Bureau of Investigations (FBI), The Florida Agency for Health Care Administration (AHCA), as well as my own personal and professional experience in the Healthcare Industry, and as a Medical Coding and Billing Instructor.

The False Claims Act (FCA) identifies areas of fraud in healthcare billing. In addition to the obvious case of submitting claims for services that were not provided, the FCA also specifically names upcoding (the selection of a code to maximize reimbursement when such code is not the most appropriate descriptor of the service) and unbundling (billing separately for the components of an all inclusive procedure) as fraudulent coding activities. [i] The Office of the Inspector General (OIG) views any type of improper coding as fraud. [ii]

The Health Care Fraud Unit of the FBI investigates areas of healthcare including: billing for services not rendered, billing for a higher reimbursable service than performed (upcoding), performing unnecessary services, kickbacks, and the unbundling of tests and services to generate higher fees. [iii]

## Usual, Customary, and Reasonable (UCR) Comparisons

Usual, customary, and reasonable (UCR) is: *"The amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service."* [iv]

The resource-based relative value scale (RBRVS) is used to determine UCR benchmarks. [v] RBRVS standards are used to calculate an average and a high payment in the locality of treatment where the services and procedures were performed.

RBRVS benchmarks are used by Florida statutes, as well as Florida's Agency for Health Care Administration (AHCA) in determining reasonable fees. This methodology is consistent with the national UCR definition, as well applicable Florida law, which defines reasonable charges:

> *With respect to a determination of whether a charge for a particular service, treatment, or otherwise is reasonable, consideration may be given to evidence of usual and customary charges and payments accepted by the provider involved in the dispute, and reimbursement levels in the community and various federal and state medical fee schedules applicable to automobile and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service, treatment, or supply.* [vi]

This methodology is endorsed the AMA, as well as the US Dept of Health and Human Services and is peer-reviewed annually. RBRVS is the physician payment system used by payers in the healthcare industry, including the Centers for Medicare Services (CMS). [vii] Claims that this methodology does not apply to self-pay or uninsured patients simply are not true.

Certain coding and billing violations listed below are more significant than others. Detailed explanations of these issues are listed below.

3

**Jax Spine & Pain Centers**
**Lumbar Epidural and Facet Joint Injections (7/10/18 – 9/11/19)**
**Total Charges Submitted: $9,306**
**Total Unreasonable Charges: $3,931**

The following red flags have been identified:

- **Multiple Dates of Service**

  o **Upcoding- CPT Code 99214**

    The patient was charged for Level 4 established patient office visits (CPT Code 99214) on 8/14/2018, 2/14/2019, 4/30/2019, 7/19/2019, and 9/11/2019. In order to qualify for a Level 4 visit, the medical documentation must support that the patient's condition and treatment meet the requirements for use of this code. For a Level 4 visit, there are several criteria that must be met or exceeded:

    - Detailed History
    - Detailed Exam
    - Moderate Complexity Medical Decision
    - Moderate to High Severity Problem
    - Physician Time: 25 minutes

    The documentation from these visits does not support the use of this high severity code.

    **Charges in the amount of $1,086 ($214, $218 x 4) have been upcoded and are not supported by the documentation.**

  o **Unbundling- Supplies**

    The billing ledger lists charges for the supplies used for the lumbar epidural and facet joint injections performed throughout the patient's course of treatment with this provider (HCPCS Codes J1030 and J3490). It is considered unbundling to charge separately for these supplies as they have already been factored into the physician's increased payment for injections performed in the office setting versus a surgical center.

    Surgical procedures are part of a global package which includes among other things, supplies and other miscellaneous services.[viii] Global surgery applies in any setting, including a physician's office. The global surgical package includes all necessary services normally furnished before, during, and after a procedure.

    **Charges in the amount of $2,508 ($13, $14 x 5, $750 x 2, $925) have been unbundled and are not eligible for separate reimbursement.**

4

## ALL PROVIDERS

- **All Dates of Service**

    o **Charges above Usual, Customary, and Reasonable (UCR) Benchmarks**

    The table below compares all charges submitted for review to reasonable benchmark standards based on the correct codes for the various services and procedures.

| Date | CPT Code | Billed Amount | Average Payment | High Payment |
|------|----------|---------------|-----------------|--------------|
| ALL | ALL | $38,082 | $9,796 | $17,476 |

## Conclusion

A comprehensive review of the medical records and bills from Jax Spine & Pain Centers has uncovered significant coding and billing issues, as well as unreasonable charges.

The bill from Jax Spine & Pain Centers is not UCR. The bill from this provider contains over $3,500 of upcoded and unbundled charges. The provider's charges are almost two (2) times greater than reasonable benchmark standards. It is worth noting that depending on the date of service, this provider charged as much as $925 and as little as $14 for the supplies used in the patient's lumbar facet injection procedures.

The AMA is clear about what it considers to be reasonable charges. The AMA's Code of Ethics states its position about the fees charged by medical providers: [ix]

**Opinion 6.05 - Fees for Medical Services**

*"A physician should not charge or collect an illegal or excessive fee. For example, an illegal fee occurs when a physician accepts an assignment as full payment for services rendered to a Medicare patient and then bills the patient for an additional amount. A fee is excessive when after a review of the facts a person knowledgeable as to current charges made by physicians would be left with a definite and firm conviction that the fee is in excess of a reasonable fee.*

*Factors to be considered as guides in determining the reasonableness of a fee include the following:*

*(1) The difficulty and/or uniqueness of the services performed and the time, skill, and experience required*

*(2) The fee customarily charged in the locality for similar physician services*

5

*(3) The amount of the charges involved*

*(4) The quality of performance*

*(5) The experience, reputation, and ability of the physician in performing the kind of services involved"*

After reviewing the medical bills from this provider, I am left with a definite and firm conviction that the many of the charges submitted for review have been improperly unbundled and/or upcoded. These opinions are made within a reasonable degree of certainty based on my education, training, and experience in the healthcare industry.

Thank you for allowing me to review these medical coding and billing records. Please let me know if I can be of any further assistance.

Very Truly Yours,

Jeremy Reimer, CPC, CPB
Medical Coding Review

---

i 31 U.S.C. § 3729(a)(1)(G)

ii https://oig.hhs.gov/authorities/docs/cpglab.pdf

iii http://www.fbi.gov/stats-services/publications/fcs_report2006/financial-crimes-report-to-the-public-fiscal-year-2006#Health

iv https://www.healthcare.gov/glossary/UCR-usual-customary-and-reasonable/

v https://www.ama-assn.org/practice-management/rbrvs-resource-based-relative-value-scale

vi http://www.leg.state.fl.us/Statutes/index.cfm?App_mode=Display_Statute&URL=0600-0699/0627/Sections/0627.736.html

vii https://www.ama-assn.org/rbrvs-overview

viii http://www.cms.gov/transmittals/downloads/R177083.pdf

ix http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion605.page

P.O. Box 47537, Tampa, FL 33647
P: 813.475.4114 • F: 813.280.6180 • JREIMER@MEDICALCODINGREVIEW.COM

# PLAINTIFF'S
# EXHIBIT "C"



**The Rawlings Company** LLC
Subrogation Division

Post Office Box 2000
LaGrange, Kentucky 40031-2000

One Eden Parkway
LaGrange, Kentucky 40031-8100

February 12, 2020

Verna Murray
Farah & Farah
10 West Adams Street
Jacksonville, FL 32202

Re:    Our Client:          Aetna
       Member/Patient:      Lester Counts/Lester Counts
       Date of Loss:        02/12/2018
       Our Reference No.:   86412047
       Your Client:         Lester Counts
       **Your Number:**     **2018J00764**
       **Claim Amount:**    **$6,074.34**

Dear Ms. Murray:

Enclosed, please find a summary of the medical expenses paid by our client on behalf of Lester Counts. Please notify me if any of the charges are unrelated to the accident.

If you have information that indicates our client has paid claims that are not listed on the attached summary, please advise so we may investigate. As you are aware, the amount of the claim **may increase** if additional health benefits are paid. Therefore, please contact me prior to settlement to obtain the final amount.

We are also requesting an update on this claim. Please provide the current status. You may fax your response to the number listed below.

Sincerely,

Nicholas J. Colyer | Subrogation Operations Management
Ph: 502-614-4870 | Fax: 502-753-6824 | NJC@rawlingscompany.com

Comments:

**Healthcare information is personal and sensitive information, and you, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Disclosure of this information without additional patient consent or as permitted by law is prohibited.**

Aetna

The Rawlings Company

Wednesday, February 12, 2020 04:25 PM

Patient's Name: Lester Counts

Member's Name: Lester Counts

File Number: 18AIN0400473

Make Checks Payable To:
The Rawlings Company
Attn: Nicholas J. Colyer
PO Box 2000
La Grange, KY 40031

Paid Amount  Subject to Change:
Please Call 502-614-4870 for final paid amount

Representative: Nicholas J. Colyer

| Trmt. Date In | Trmt. Date Out | Claim No | Provider | ICD | ICD Desc. | CPT | CPT Desc. | Bill Amount | Paid Amount | Remaining Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/12/2018 | 02/12/2018 | ESY05QCR600 | BAPTIST MEDICAL CENTER OF NASS | S13.4XXA | Sprain of ligaments of cervical spine, initial encounter | 251 | DRUGS/GENERIC | $3.55 | $0.00 | $0.00 |
| 02/12/2018 | 02/12/2018 | ESY05QCR600 | BAPTIST MEDICAL CENTER OF NASS | S13.4XXA | Sprain of ligaments of cervical spine, initial encounter | 320 | DX X-RAY | $383.00 | $0.00 | $0.00 |
| 02/12/2018 | 02/12/2018 | ESY05QCR600 | BAPTIST MEDICAL CENTER OF NASS | S13.4XXA | Sprain of ligaments of cervical spine, initial encounter | 320 | DX X-RAY | $479.00 | $0.00 | $0.00 |
| 02/12/2018 | 02/12/2018 | ESY05QCR600 | BAPTIST MEDICAL CENTER OF NASS | S13.4XXA | Sprain of ligaments of cervical spine, initial encounter | 450 | EMERG ROOM | $943.00 | $0.00 | $0.00 |
| 02/12/2018 | 02/12/2018 | E4Y04M7VV00 | EMERGENCY RESOURCES GROUP | S19.9XXA | Unspecified injury of neck, initial encounter | 99284 | EMERGENCY DEPT VISIT, DETAILED | $717.00 | $487.00 | $487.00 |
| 04/23/2018 | 04/23/2018 | P6PB02CHL00 | WILLENS, MICHAEL S | M54.5 | Low back pain | 64445 | INJECT NERVE BLOCK, SCIATIC, SINGLE | $440.00 | $0.00 | $0.00 |
| 04/23/2018 | 04/23/2018 | P6PB02CHL00 | WILLENS, MICHAEL S | M54.5 | Low back pain | 20553 | Inject trigger points 3/> | $205.00 | $0.00 | $0.00 |
| 04/23/2018 | 04/23/2018 | P6PB02CHL00 | WILLENS, MICHAEL S | M54.5 | Low back pain | 76942 | ULTRASONIC GUIDE NEEDLE PLCMNT S/I | $400.00 | $0.00 | $0.00 |
| 04/23/2018 | 04/23/2018 | P6PB02CHL00 | WILLENS, MICHAEL S | M54.5 | Low back pain | 99204 | OFFICE/OUTPT VISIT,NEW,MO D COMPLEX | $525.00 | $0.00 | $0.00 |
| 04/23/2018 | 04/23/2018 | P6PB02CHL00 | WILLENS, MICHAEL S | M54.5 | Low back pain | E0730 | TENS FOUR LEAD | $1,215.00 | $0.00 | $0.00 |
| 04/23/2018 | 04/23/2018 | EBPB5G7N400 | WILLENS, | M54.5 | Low back pain | 98927 | OSTEOPATHIC | $190.00 | $0.00 | $0.00 |

1

Tax Id Number: 31-1563156

Please write this number on your check:
18AIN0400473

**Aetna**                              **The Rawlings Company**                    **Wednesday, February 12, 2020 04:25 PM**

Patient's Name: Lester Counts

Member's Name: Lester Counts

File Number: 18AIN0400473

Make Checks Payable To:
The Rawlings Company
Attn: Nicholas J. Colyer
PO Box 2000
La Grange, KY 40031

Paid Amount  Subject to Change:
Please Call 502-614-4870 for final paid amount

Representative: Nicholas J. Colyer

| Date | Provider Code | Patient | ICD | Diagnosis | CPT | Procedure | Charged | Amount | Paid |
|---|---|---|---|---|---|---|---|---|---|
| 04/23/2018 | | MICHAEL S | | | | MANIP, 5-6 BODY REGIONS | | | |
| 04/23/2018 | P6PB02CHL00 | WILLENS, MICHAEL S | | Low back pain | L0631 | LSO SAG-CORO RIGID FRAME PRE | $2,430.00 | $0.00 | $0.00 |
| 05/21/2018 | EWFB5VWQU00 | WILLENS, MICHAEL S | M54.5 | Muscle spasm of back | 76942 | ULTRASONIC GUIDE NEEDLE PLCMNT S/I | $400.00 | $0.00 | $0.00 |
| 05/21/2018 | EWFB5VWQU00 | WILLENS, MICHAEL S | M62.830 | Muscle spasm of back | 98927 | OSTEOPATHIC MANIP, 5-6 BODY REGIONS | $190.00 | $49.19 | $49.19 |
| 05/21/2018 | EWFB5VWQU00 | WILLENS, MICHAEL S | M62.830 | Muscle spasm of back | 99215 | OFFICE/OUTPT VISIT,EST,HIGH COMPLEX | $460.00 | $112.40 | $112.40 |
| 05/21/2018 | EWFB5VWQU00 | WILLENS, MICHAEL S | M62.830 | Muscle spasm of back | 20553 | Inject trigger points 3> | $205.00 | $12.68 | $12.68 |
| 05/21/2018 | EWFB5VWQU00 | WILLENS, MICHAEL S | M62.830 | Muscle spasm of back | 64445 | INJECT NERVE BLOCK, SCIATIC, SINGLE | $440.00 | $128.02 | $128.02 |
| 05/30/2018 | EPY05FM6Z00 | WILLENS, MICHAEL S | M62.830 | Other intervertebral disc displacement, lumbosacral region | 97110 | TX PROC,1+AREA, TX EXER, EA 15 MIN | $210.00 | $28.05 | $28.05 |
| 05/30/2018 | EPY05FM6Z00 | WILLENS, MICHAEL S | M51.27 | Other intervertebral disc displacement, lumbosacral region | 97140 | MANUAL THERAPY 1+ REGIONS, EA 15 MN | $95.00 | $13.24 | $13.24 |
| 05/30/2018 | EPY05FM6Z00 | WILLENS, MICHAEL S | M51.27 | Other intervertebral disc displacement, lumbosacral region | 97162 | Physical Therapy Evaluation MOD Complex 30 Mns | $260.00 | $8.89 | $8.89 |
| 06/08/2018 | EQ3S5DBRY00 | WILLENS, MICHAEL S | M51.27 | Other intervertebral disc displacement, | 97110 | TX PROC,1+AREA, TX EXER, EA | $105.00 | $11.24 | $11.24 |
| | | | M51.26 | | | | | | |

Please write this number on your check:
18AIN0400473

Tax Id Number: 31-1563156

**Aetna**

**The Rawlings Company**

Wednesday, February 12, 2020 04:25 PM

Patient's Name: Lester Counts

Member's Name: Lester Counts

File Number: 18AIN0400473

Make Checks Payable To:
The Rawlings Company
Attn: Nicholas J. Colyer
PO Box 2000
La Grange, KY 40031

Paid Amount  Subject to Change:
Please Call 502-614-4870 for final paid amount

Representative: Nicholas J. Colyer

| Date | Code1 | Provider | Dx Code | Dx Desc | Proc Code | Proc Desc | Charge | Amt1 | Amt2 |
|---|---|---|---|---|---|---|---|---|---|
| 06/11/2018 | EV354G12K00 | WILLENS, MICHAEL S | M54.5 | Low back pain | 97110 | TX PROC,1+AREA, TX EXER, EA 15 MIN | $105.00 | $11.24 | $11.24 |
| 06/18/2018 | EQ355H5Q900 | WILLENS, MICHAEL S | M54.5 | Low back pain | 97110 | TX PROC,1+AREA, TX EXER, EA 15 MIN | $105.00 | $11.24 | $11.24 |
| 06/21/2018 | E2PB4J7KY00 | WILLENS, MICHAEL S | M47.816 | Spondylosis without myelopathy or radiculopathy, lumbar region | J1040 | METHYLPRED NISOLONE, 80 MG, INJECT | $25.00 | $13.30 | $13.30 |
| 06/21/2018 | E2PB4J7KY00 | WILLENS, MICHAEL S | M47.816 | Spondylosis without myelopathy or radiculopathy, lumbar region | 64493 | INJ PARAVERT F JNT L/S 1 LEV | $560.00 | $181.07 | $181.07 |
| 06/21/2018 | E2PB4J7KY00 | WILLENS, MICHAEL S | M47.816 | Spondylosis without myelopathy or radiculopathy, lumbar region | 64494 | INJ PARAVERT F JNT L/S 2 LEV | $290.00 | $110.30 | $110.30 |
| 06/21/2018 | E2PB4J7KY00 | WILLENS, MICHAEL S | M47.816 | Spondylosis without myelopathy or radiculopathy, lumbar region | 64495 | INJ PARAVERT F JNT L/S 3 LEV | $290.00 | $111.11 | $111.11 |
| 06/22/2018 | EWPB4M4T200 | WILLENS, MICHAEL S | M54.42 | Lumbago with sciatica, left side | G0283 | ELEC STIM OTHER THAN WOUND | $45.00 | $5.77 | $5.77 |
| 06/22/2018 | EWPB4M4T200 | WILLENS, MICHAEL S | M54.42 | Lumbago with sciatica, left side | 97110 | TX PROC,1+AREA, TX EXER, EA 15 MIN | $105.00 | $4.69 | $4.69 |
| 06/27/2018 | E2Y04M27B00 | WILLENS, MICHAEL S | M62.830 | Muscle spasm of back | 20553 | Inject trigger points 3/> | $205.00 | $25.36 | $25.36 |

Please write this number on your check:
18AIN0400473

3

Tax Id Number: 31-1563156

Aetna

The Rawlings Company

Wednesday, February 12, 2020 04:25 PM

| | | |
|---|---|---|
| Patient's Name: Lester Counts | Make Checks Payable To: | Paid Amount: Subject to Change: |
| Member's Name: Lester Counts | The Rawlings Company | Please Call 502-614-4870 for final paid amount |
| | Attn: Nicholas J. Colyer | Representative: Nicholas J. Colyer |
| File Number: 18AIN0400473 | PO Box 2000 | |
| | La Grange, KY 40031 | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 06/27/2018 | 06/27/2018 | E3354P1H400 | WILLENS, MICHAEL S | M54.5 | Low back pain | G0283 | ELEC STIM OTHER THAN WOUND | $45.00 | $5.77 | $5.77 |
| 06/27/2018 | 06/27/2018 | E2Y04M27B00 | WILLENS, MICHAEL S | M62.830 | Muscle spasm of back | 99214 | OFFICE/OUTPT VISIT, EST, DETAILED | $340.00 | $83.56 | $83.56 |
| 06/27/2018 | 06/27/2018 | E3354P1H400 | WILLENS, MICHAEL S | M54.5 | Low back pain | 97110 | TX PROC,1+AREA, TX EXER, EA 15 MIN | $105.00 | $18.21 | $18.21 |
| 06/27/2018 | 06/27/2018 | E2Y04M27B00 | WILLENS, MICHAEL S | M62.830 | Muscle spasm of back | 98927 | OSTEOPATHIC MANIP, 5-6 BODY REGIONS | $190.00 | $49.19 | $49.19 |
| 06/27/2018 | 06/27/2018 | E2Y04M27B00 | WILLENS, MICHAEL S | M62.830 | Muscle spasm of back | 64421 | INJECT NERVE BLOCK, INTERCOSTAL S | $440.00 | $105.80 | $105.80 |
| 07/10/2018 | 07/10/2018 | EBPB5W4QV00 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99204 | OFFICE/OUTPT VISIT,NEW,MOD COMPLEX | $329.00 | $90.44 | $90.44 |
| 07/24/2018 | 07/24/2018 | EHPB53HEFX00 | MANN, JUSTIN D | M54.5 | Low back pain | J3490 | DRUGS UNCLASSIFIED | $750.00 | $441.53 | $441.53 |
| 07/24/2018 | 07/24/2018 | EHPB53HEFX00 | MANN, JUSTIN D | M54.5 | Low back pain | 62323 | NJX INTERLAMINA R LMBR/SAC | $485.00 | $199.54 | $199.54 |
| 08/14/2018 | 08/14/2018 | E7355GRQD00 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99214 | OFFICE/OUTPT VISIT, EST, DETAILED | $214.00 | $43.86 | $43.86 |
| 08/21/2018 | 08/21/2018 | E2PB5G73SW00 | MANN, JUSTIN D | M54.5 | Low back pain | J1030 | METHYLPRED NISOLONE, 40 MG, INJECT | $13.00 | $7.21 | $7.21 |
| 08/21/2018 | 08/21/2018 | E2PB5G73SW00 | MANN, JUSTIN D | M54.5 | Low back pain | 62323 | NJX INTERLAMINA R LMBR/SAC | $485.00 | $159.54 | $159.54 |
| 09/24/2018 | 09/24/2018 | EFY062Q1W00 | CAREY, JOHN E | M54.5 | Low back pain | 99213 | OFFICE/OUTPT VISIT, EST, EXP PROB | $147.00 | $15.67 | $15.67 |

Please write this number on your check:
18AIN0400473

Tax Id Number: 31-1563156

Aetna                                    The Rawlings Company                       Wednesday, February 12, 2020 04:25 PM

| Patient's Name: Lester Counts | Make Checks Payable To: | Paid Amount Subject to Change: |
|---|---|---|
| Member's Name: Lester Counts | The Rawlings Company | Please Call 502-614-4870 for final paid amount |
| | Attn: Nicholas J. Colyer | |
| | PO Box 2000 | Representative: Nicholas J. Colyer |
| File Number: 18AIN0400473 | La Grange, KY 40031 | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/11/2018 | 10/11/2018 | EGAB7B9XR00 | MANN, JUSTIN D | M54.5 | Low back pain | 13490 | DRUGS UNCLASSIFIED | $750.00 | $441.53 | $441.53 |
| 10/11/2018 | 10/11/2018 | EGAB7B9XR00 | MANN, JUSTIN D | M54.5 | Low back pain | 62323 | NJX INTERLAMINA R LMBR/SAC | $488.00 | $199.54 | $199.54 |
| 11/07/2018 | 11/07/2018 | EJAB7TL5400 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99213 | OFFICE/OUTPT VISIT, EST, EXP PROB | $147.00 | $15.67 | $15.67 |
| 12/11/2018 | 12/11/2018 | EZ3569KCV00 | MANN, JUSTIN D | M54.5 | Low back pain | 13490 | DRUGS UNCLASSIFIED | $925.00 | $585.98 | $585.98 |
| 12/11/2018 | 12/11/2018 | EZ3569KCV00 | MANN, JUSTIN D | M54.5 | Low back pain | 64493 | INJ PARAVERT F JNT L/S 1 LEV | $341.00 | $137.42 | $137.42 |
| 12/11/2018 | 12/11/2018 | EZ3569KCV00 | MANN, JUSTIN D | M54.5 | Low back pain | 64494 | INJ PARAVERT F JNT L/S 2 LEV | $172.00 | $69.61 | $69.61 |
| 12/11/2018 | 12/11/2018 | EZ3569KCV00 | MANN, JUSTIN D | M54.5 | Low back pain | 64495 | INJ PARAVERT F JNT L/S 3 LEV | $172.00 | $69.61 | $69.61 |
| 12/26/2018 | 12/26/2018 | E6FB7FNZX00 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99213 | OFFICE/OUTPT VISIT, EST, EXP PROB | $147.00 | $15.67 | $15.67 |
| 01/17/2019 | 01/17/2019 | EKAB8T3LE00 | MANN, JUSTIN D | M54.5 | Low back pain | 11030 | METHYLPRED NISOLONE, 40 MG, INJECT | $14.00 | $6.60 | $6.60 |
| 01/17/2019 | 01/17/2019 | EKAB8T3LE00 | MANN, JUSTIN D | M54.5 | Low back pain | 64493 | INJ PARAVERT F JNT L/S 1 LEV | $346.00 | $97.42 | $97.42 |
| 01/17/2019 | 01/17/2019 | EKAB8T3LE00 | MANN, JUSTIN D | M54.5 | Low back pain | 64494 | INJ PARAVERT F JNT L/S 2 LEV | $177.00 | $69.61 | $69.61 |
| 01/17/2019 | 01/17/2019 | EKAB8T3LE00 | MANN, JUSTIN D | M54.5 | Low back pain | 64495 | INJ PARAVERT F JNT L/S 3 LEV | $177.00 | $69.61 | $69.61 |
| 02/14/2019 | 02/14/2019 | E0PB7J6JQM00 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99214 | OFFICE/OUTPT VISIT, EST, DETAILED | $218.00 | $0.00 | $0.00 |
| 02/14/2019 | 02/14/2019 | E0PB7J6JQM00 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99214 | OFFICE/OUTPT | $218.00 | $0.00 | $0.00 |

Please write this number on your check:
18AIN0400473

5

Tax Id Number: 31-1563156

Aetna

The Rawlings Company

Wednesday, February 12, 2020 04:25 PM

| Patient's Name: Lester Counts | Make Checks Payable To: | Paid Amount  Subject to Change: |
| :--- | :--- | :--- |
| Member's Name: Lester Counts | The Rawlings Company | Please Call 502-614-4870 for final paid amount |
| | Attn: Nicholas J. Colyer | Representative: Nicholas J. Colyer |
| File Number: 18AIN0400473 | PO Box 2000 | |
| | La Grange, KY 40031 | |

| | | | | | | | | | |
| :--- | :--- | :--- | :--- | :--- | :--- | :--- | :--- | :--- | :--- |
| 02/14/2019 | 02/14/2019 | E0PB76JQMA01 | MANN, JUSTIN D | | | | | | |
| 02/14/2019 | | E3TW8K45J00 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99214 | OFFICE/OUTPT VISIT, EST, DETAILED | $218.00 | $43.86 | $43.86 |
| 02/28/2019 | | E3TW8K45J00 | MANN, JUSTIN D | M54.5 | Low back pain | J1030 | METHYLPRED NISOLONE, 40 MG, INJECT | $14.00 | $6.60 | $6.60 |
| 02/28/2019 | | E3TW8K45J00 | MANN, JUSTIN D | M54.5 | Low back pain | 64483 | INJECT FORAMIN, LUMB/SACRAL SINGLE | $453.00 | $225.02 | $225.02 |
| 03/25/2019 | | E7TW8W28L00 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99213 | OFFICE/OUTPT VISIT, EST, EXP PROB | $149.00 | $15.67 | $15.67 |
| 03/28/2019 | | EA359074800 | MANN, JUSTIN D | M54.5 | Low back pain | J1030 | METHYLPRED NISOLONE, 40 MG, INJECT | $14.00 | $6.60 | $6.60 |
| 03/28/2019 | | EA359074800 | MANN, JUSTIN D | M54.5 | Low back pain | 64483 | INJECT FORAMIN, LUMB/SACRAL SINGLE | $453.00 | $225.02 | $225.02 |
| 04/30/2019 | | EJPCB3K1YK00 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99214 | OFFICE/OUTPT VISIT, EST, DETAILED | $218.00 | $43.86 | $43.86 |
| 05/16/2019 | | EFACBVKZ700 | MANN, JUSTIN D | M54.5 | Low back pain | J1030 | METHYLPRED NISOLONE, 40 MG, INJECT | $14.00 | $6.46 | $6.46 |
| 05/16/2019 | | EFACBVKZ700 | MANN, JUSTIN D | M54.5 | Low back pain | 64493 | INJ PARAVERT F JNT L/S 1 LEV | $346.00 | $97.42 | $97.42 |
| 05/16/2019 | | EFACBVKZ700 | MANN, JUSTIN D | M54.5 | Low back pain | 64494 | INJ PARAVERT F JNT L/S 2 LEV | $177.00 | $69.61 | $69.61 |
| 06/17/2019 | | E3S95DWF00 | MANN, JUSTIN D | M54.2 | Cervicalgia | 99214 | OFFICE/OUTPT VISIT, EST, DETAILED | $218.00 | $43.86 | $43.86 |
| 08/01/2019 | | EVTXBV4F00 | MANN, JUSTIN D | M54.5 | Low back pain | J1030 | METHYLPRED | $14.00 | $6.24 | |

6

Tax Id Number: 31-1563156

Aetna

The Rawlings Company

Wednesday, February 12, 2020 04:25 PM

| Patient's Name: Lester Counts | | Make Checks Payable To: | | Paid Amount  Subject to Change: |
| Member's Name: Lester Counts | | The Rawlings Company | | Please Call 502-614-4870 for final paid amount |
| File Number: 18AIN0400473 | | Attn: Nicholas J. Colyer | | Representative: Nicholas J. Colyer |
| | | PO Box 2000 | | |
| | | La Grange, KY 40031 | | |

| | | | | | | | NISOLONE, 40 MG, INJECT | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 08/01/2019 | 08/01/2019 | Low back pain | M54.5 | MANN, JUSTIN D | EVTXBV4FJ00 | 64493 | INJ PARAVERT F JNT L/S 1 LEV | $346.00 | $97.42 | $97.42 |
| 08/01/2019 | 08/01/2019 | Low back pain | M54.5 | MANN, JUSTIN D | EVTXBV4FJ00 | 64494 | INJ PARAVERT F JNT L/S 2 LEV | $177.00 | $69.61 | $69.61 |
| 08/28/2019 | 08/28/2019 | Low back pain | M54.5 | RAMSEY, DANIELLE M | EIY1DFW2L00 | 99203 | OFFICE/OUTPT VISIT, NEW, DETAILED | $327.00 | $80.74 | $80.74 |
| 09/11/2019 | 09/11/2019 | Cervicalgia | M54.2 | MANN MD, JUSTIN D | ELFCDJ44G00 | 99214 | OFFICE/OUTPT VISIT, EST, DETAILED | $218.00 | $43.86 | $43.86 |
| 09/24/2019 | 09/24/2019 | Low back pain | M54.5 | MANN MD, JUSTIN D | EYPCCMCLIT00 | 64635 | DESTRUCTION BY NEUROLYTIC AGENT, PA | $829.00 | $291.87 | $291.87 |
| 09/24/2019 | 09/24/2019 | Low back pain | M54.5 | MANN MD, JUSTIN D | EYPCCMCLIT00 | 64636 | DESTRUCTION BY NEUROLYTIC AGENT, PA | $339.00 | $136.18 | $136.18 |
| 10/22/2019 | 10/22/2019 | Unspecified inflammatory spondylopathy, lumbar region | M46.96 | MANN MD, JUSTIN D | EW71C0KF200 | 99213 | OFFICE/OUTPT VISIT, EST, EXP PROB | $149.00 | $15.67 | $15.67 |
| 12/20/2019 | 12/20/2019 | Unspecified inflammatory spondylopathy, lumbar region | M46.96 | MANN MD, JUSTIN D | E536D1ESC00 | 99213 | OFFICE/OUTPT VISIT, EST, EXP PROB | $149.00 | $15.67 | $15.67 |
| 01/16/2020 | 01/16/2020 | Low back pain | M54.5 | MANN MD, JUSTIN D | EQ3MGK5FS00 | 27096 | Inject sacroiliac joint | $323.00 | $82.72 | $82.72 |
| 01/16/2020 | 01/16/2020 | Low back pain | M54.5 | MANN MD, JUSTIN D | EQ3MGK5FS00 | 27096 | Inject sacroiliac joint | $323.00 | $125.44 | $125.44 |
| 01/16/2020 | 01/16/2020 | Low back pain | M54.5 | MANN MD, JUSTIN D | EQ3MGK5FS00 | J3301 | TRIAMCINOLONE ACETONIDE, /10MG, INJ | $4.00 | $1.56 | $1.56 |

Please write this number on your check:
18AIN0400473

Tax Id Number: 31-1563156

Aetna                            The Rawlings Company                    Wednesday, February 12, 2020 04:25 PM

Patient's Name: Lester Counts              Make Checks Payable To:              Paid Amount Subject to Change:
                                           The Rawlings Company                Please Call 502-614-4870 for final paid amount
Member's Name: Lester Counts               Attn: Nicholas J. Colyer
                                           PO Box 2000                         Representative: Nicholas J. Colyer
File Number: 18AIN0400473                  La Grange, KY 40031

                                           $25,332.55     $6,074.34     $6,074.34

8

Please write this number on your check:                                        Tax Id Number: 31-1563156
18AIN0400473

# PLAINTIFF'S EXHIBIT "D"

No *Shepard's* Signal™
As of: March 21, 2020 5:04 PM Z

## *Larrieux v. Old Dominion Freight Line, Inc.*

United States District Court for the Middle District of Florida, Jacksonville Division

March 2, 2020, Decided; March 2, 2020, Filed

Case No. 3:18-cv-861-J-32PDB

**Reporter**
2020 U.S. Dist. LEXIS 35341 *

ANA LARRIEUX, Plaintiff, v. OLD DOMINION FREIGHT LINE, INC., Defendant.

## Core Terms

billing, charges, providers

**Counsel:** [*1] For Ana Larrieux, Plaintiff: Donny A. Owens, LEAD ATTORNEY, Morgan & Morgan, PA, Jacksonville, FL.

For Old Dominion Freight Line, Inc., Defendant: Brian David Stokes, Pedro Raul Alvarez, Jr., LEAD ATTORNEYS, Alvarez Winthrop Thompson & Storey PA, Orlando, FL.

**Judges:** TIMOTHY J. CORRIGAN, United States District Judge.

**Opinion by:** TIMOTHY J. CORRIGAN

## Opinion

### ORDER

This personal injury case came before the Court for a final pretrial conference and hearing on pending motions on February 20, 2020, the record of which is incorporated by

reference. The Court ruled on most of the motions from the bench and those rulings are recounted below.[1] The Court took under advisement plaintiff's motion to limit or exclude defendant's medical billing expert, *Jeremy Reimer* (Doc. 21).

Under the familiar Daubert[2] standard for evaluating expert testimony under *Federal Rule of Evidence 703*, the Court serves as a gatekeeper to exclude challenged expert testimony unless the expert's proponent demonstrates that the expert is qualified to competently testify on the subject, the expert's method is sufficiently reliable, and the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340-41 (11th Cir. 2003)* (citing Daubert).

*Reimer*, who [*2] is certified in professional medical coding and billing and is a member of the American Academy of Professional Coders, has analyzed plaintiff's medical bills related to this case. Defendant seeks to admit his testimony to demonstrate that the medical procedures were not correctly billed, and that the bills far exceed the usual, customary and reasonable charges for the services rendered. *Reimer* will not testify as to the need for or reasonableness of plaintiff's treatment.[3]

In her motion, plaintiff does not raise any real challenge to *Reimer*'s qualifications to review, understand, and analyze medical bills and indeed, his CV reveals he has significant education, training and experience in the field of medical billing and coding. Nor does plaintiff seriously challenge

---

[1] The parties will note that the Court has shaved a week off two of the deadlines established at the hearing. The additional discovery discussed at the hearing must now be completed by **April 17, 2020**, and any further matters needing the Court's attention must be filed by **May 1, 2020**.

[2] *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*.

[3] As the Court announced from the bench, *Reimer* may not offer opinions as to the ethics of rendering medical services under a letter of protection as they are beyond his area of expertise.

*Reimer*'s methodology as it relates to his analysis of whether procedures were properly billed (such as the unbundling of services or upcoding), testimony the Court finds would be helpful to the jury in assessing the reasonableness of Larrieux's medical expenses, and which it will allow.

Instead, the crux of plaintiff's challenge is to the methodology and helpfulness of *Reimer*'s opinions that Larrieux's medical bills exceed [*3] the usual, customary and reasonable charges for the services rendered. To calculate the reasonable charges for various services, *Reimer* relies on benchmarks from the "resource-based relative value scale," which, according to *Reimer*, is a recognized "physician payment system used and endorsed by the American Medical Association, the U.S. Department of Health and Human Services, and most other medical providers." Doc. 31, Ex. D at ¶¶ 23-24. Although plaintiff argues this scale is not applicable to self-pay or uninsured patients, she offers no evidence of that and *Reimer*, who plaintiff did not depose, states to the contrary in his report. See Doc. 21, Ex. A at 2. *Reimer*'s opinions are also based on his professional experience, which includes review of "thousands of claim forms, medical billing statements, and medical records from all part[s] of Florida, including North and Central Florida" through which he has "become familiar with rates charged by medical providers in Central Florida for their medical services." Doc. 31, Ex. D at ¶ 20. The Court rejects plaintiff's argument that *Reimer*'s methodology for determining the reasonableness of medical billing in this case is unsound.[4]

The question of the helpfulness of *Reimer*'s testimony on this issue is a closer call. While some courts have excluded medical billing code expert testimony on the grounds that it will not help the jury to determine a fact in issue, or that it will cause undue confusion, other courts have found it to be probative of the reasonableness of plaintiff's medical expenses. Compare *Maluff v. Sam's East, Inc., No. 17-60264-CIV-MORENO, 2017 U.S. Dist. LEXIS 186335, 2017 WL 5290879, *2 (S.D. Fla. Nov. 9, 2017)* (granting Daubert motion to exclude billing expert whose testimony would not assist the jury), with *State Farm Mut. Auto. Ins. Co. v. Bowling, 81 So. 3d 538 (Fla. 2d DCA 2012)* (remanding for new trial on damages where trial court erred in excluding billing code expert who opined that she found "extreme

abuse" in charges submitted for plaintiff's medical treatment).

Without knowing what evidence will come in during the plaintiff's case-in-chief, the Court is unwilling to say that *Reimer*'s opinions as to the reasonableness of plaintiff's medical expenses will be unhelpful or will cause confusion or prejudice. As defendant points out, it cannot be that whatever plaintiff's medical providers charge is ipso facto reasonable. Thus, the Court will reserve ruling on whether *Reimer* may testify that plaintiff's medical bills exceed the usual, customary and [*5] reasonable charges for the services rendered. If plaintiff's medical providers are unable to explain the basis for their charges, or if their testimony appears ripe for impeachment, the Court will be inclined to permit testimony from *Reimer* as to the reasonableness of those bills.

Accordingly, it is hereby

ORDERED:

1. Plaintiff's Motion to Exclude or Limit the Testimony of Defendant's Billing Code Expert *Jeremy Reimer* (Doc. 21) is **granted** in part and **denied** in part as stated above.

2. Defendant's Motion to Exclude any Expert Testimony, Including But Not Limited to, From Plaintiff's Treating Physicians and Healthcare Providers (Doc. 19) is **denied** to the extent that the Court will allow plaintiff's treating physicians to testify despite the tardy *Rule 26(a)(2)(C)* disclosures; as to the treaters' testimony with regard to causation, plaintiff shall secure more complete causation opinions in writing from Dr. Christina Ruiz and/or Dr. Henry Moreno if they intend to testify as to causation, and must do so in time for defendant to depose either of them if it wishes before **April 17, 2020**;[5] however, any causation testimony from the treaters must relate to their treatment of Larrieux or their decision-making process [*6] with regard to her treatment.

---

[4] This case is therefore distinguishable from some cited by plaintiff where the purported billing expert lacked the necessary knowledge to competently testify. See, e.g., [*4] *Castellanos v. Target Corp., 568 F. App'x 886 (11th Cir. 2014)* (finding district court did not abuse discretion in excluding expert who lacked knowledge of background and underpinnings of information upon which she relied).

---

[5] While not precluding defendant from filing a further motion to challenge the treaters' testimony (no later than **May 1, 2020**), the Court assumes appropriate cross-examination and contrary evidence would be sufficient recourse.

Although not argued at the hearing, defendant also moved to exclude any testimony from the treaters on engineering or biomechanical issues on the grounds that such testimony is outside their area of expertise. The Court agrees with that general principle, but would permit the treaters to testify consistent with their treatment notes, which testimony is subject to cross-examination.

Plaintiff represented at the hearing that she no longer intends to call Dr. Chris Tomaselli to testify so the motion as to his testimony is moot.

3. Plaintiff's Motion to Exclude the Testimonies of Donald J. Fournier, Jr., P.E., and Steven Mitchell, P.E. (Doc. 22) is **moot** as to Donald Fournier, as defendant represents it does not intend to call him to testify; and is **denied** as to Steven Mitchell as stated on the record.[6]

4. Plaintiff's Motion to Exclude or Limit the Testimony of Ying Lu, Ph.D. (Doc. 23) is **denied** for the reasons stated on the record.

5. Defendant's Motion to Bifurcate Trial on the Issues of Liability and Damages (Doc. 42) is **denied** for the reasons stated on the record.

6. No later than **March 12, 2020**, the parties shall advise the Court whether their clients consent to having the Magistrate Judge pick the jury. Upon review of that filing, the Court will then issue a separate trial order, to include a **May 1, 2020** filing deadline for amended exhibit lists and any other motions, and scheduling the case for trial the week of **May 26, 2020** (with jury selection to be scheduled for the preceding Friday, **May 22, 2020**).

**DONE AND ORDERED** in Jacksonville, Florida this 2nd day of March, 2020.

/s/ Timothy J. Corrigan

TIMOTHY J. CORRIGAN

United States District Judge

---

End of Document

---

[6] Mitchell will issue an amended report based on the information received from PeopleNet regarding the Old Dominion trailer that PeopleNet states was in the area (and must do so in time for plaintiff to depose him if she wishes by **April 17, 2020**). The relevance of some of Mitchell's opinions (and their admissibility) is contingent on their application to the type of Old Dominion trailer that PeopleNet reports was present in the area. The parties shall bring any dispute to the Court's attention no later than **May 1, 2020**.

Additionally, as discussed on the record, the relevance (and, therefore, the admissibility) of Mitchell's opinion regarding whether a crank could have hit Larrieux's vehicle is contingent on the testimony of Larrieux.

RICHARD STAGGARD



**User Name:** RICHARD STAGGARD
**Date and Time:** Monday, March 30, 2020 2:38:00 PM EDT
**Job Number:** 113567535

## Document (1)

1. _Maluff v. Sam's East, Inc., 2017 U.S. Dist. LEXIS 186335_
   **Client/Matter:** 2018j00764

# PLAINTIFF'S
# EXHIBIT "E"

◆ Positive
As of: March 30, 2020 6:38 PM Z

# *Maluff v. Sam's East, Inc.*

United States District Court for the Southern District of Florida, Miami Division

November 9, 2017, Decided; November 9, 2017, Filed

Case Number: 17-60264-CIV-MORENO

**Reporter**
2017 U.S. Dist. LEXIS 186335 *

REINALDO DAMAS MALUFF, Plaintiff, vs. SAM'S EAST, INC., Defendant.

**Subsequent History:** Motion granted by *Maluff v. Sams East, Inc., 2018 U.S. Dist. LEXIS 33449 (S.D. Fla., Mar. 1, 2018)*

## Core Terms

treating physician, medical bill, injuries, causation, coding, billing, motion to strike, contends, treating

**Counsel:** [*1] For Reinaldo Damas Maluff, Plaintiff: Ian Jeffrey Boettcher, LEAD ATTORNEY, Rubenstein Law, P.A., Plantation, FL.

For SAMS EAST, INC., Defendant: Jerry Dean Hamilton, LEAD ATTORNEY, Schuyler Analise Smith, Hamilton Miller & Birthisel, LLP, Miami, FL; Patricia Concepcion, LEAD ATTORNEY, Hamilton Miller & Birthisel LLC, Miami, FL.

**Judges:** FEDERICO A. MORENO, UNITED STATES DISTRICT JUDGE.

**Opinion by:** FEDERICO A. MORENO

## Opinion

### ORDER

THIS CAUSE came before the Court upon (1) Plaintiff's Motion to Strike Expert Witness Testimony of Nicole Bonaparte (**D.E. 35**), filed on <u>**September 22, 2017**</u>, and (2) Defendant's Motion to Limit the Testimony of Plaintiff's Treating Physician (Dr. Kingsley Chin) (**D.E. 42**), filed on <u>**September 25, 2017**</u>.

THE COURT has considered the motions, the responses, the replies, the pertinent portions of the record, and being otherwise fully advised in the premises, it is

**ADJUDGED** as follows:

> (i) Plaintiff's Motion to Strike Expert Witness Testimony of Nicole Bonaparte (D.E. 35) is **GRANTED**.

> (ii) Defendant's Motion to Limit the Testimony of Plaintiff's Treating Physician (Dr. Kingsley Chin) (D.E. 42) is **GRANTED in part** and **DENIED in part**.

>> (a) Defendant's Motion is **GRANTED** to the extent it seeks to prevent Dr. Chin [*2] from offering his opinion about the cause of Plaintiff's injuries.

>> (b) Defendant's Motion is **DENIED** to the extent it seeks to exclude Dr. Chin's testimony about the reasonableness of Plaintiff's medical bills.

### DISCUSSION

This is a personal injury case arising from an incident at a Sam's Club store. Plaintiff Maluff alleges that an employee of Defendant Sam's East, Inc. negligently pushed a pallet jack loaded with merchandise into Maluff's back while he stood next to his shopping cart. The incident allegedly caused

RICHARD STAGGARD

Maluff serious lower back injuries that ultimately required him to undergo lumbar spine fusion surgery.

## A. Plaintiff's Motion to Strike Expert Witness Testimony of Nicole Bonaparte

Sam's East retained Nicole Bonaparte to provide expert opinions and testimony on medical coding and billing. Bonaparte's testimony is purportedly important "to audit and evaluate the coding and billing practices of Plaintiff's treating healthcare providers and the customary and reasonable charges for the services rendered." (Def.'s Resp. 3.) Sam's contends that Bonaparte's "testimony as a billing and coding expert on reasonableness of medical reimbursement is critical to Sam's East's defense" and "[e]xcluding [*3] such testimony would eviscerate one of the only damages defenses available to Sam's East." (Id.)

Maluff challenges the reliability and relevance of Bonaparte's testimony. His relevance argument alone provides sufficient grounds for precluding Bonaparte's testimony. Although Bonaparte may be qualified to opine on whether Plaintiff's treating physicians double-billed for a certain procedure or incorrectly charged for a certain injury, she cannot speak to Plaintiff's injuries or the appropriateness of certain treatments.

Sam's East disputes that conclusion, noting that under Florida law, "[a] plaintiff bears the burden of proving the reasonableness of his medical expenses." _Columbia Hosp. (Palm Beaches) Ltd. P'ship v. Hasson, 33 So.3d 148, 150 (Fla. 4th DCA 2010)_. It relies heavily on the Florida Court of Appeals' decision in _State Farm Mut. Auto. Ins. Co. v. Bowling_, which held that a personal injury plaintiff "must demonstrate that his or her medical expenses are reasonable and necessary." _81 So. 3d 538, 540 (Fla. Dist. Ct. App. 2012)_. According to Sam's East, _Bowling_ compels this Court to permit Bonaparte's testimony about the coding and billing practices of Maluff's healthcare providers in order to rebut Maluff's evidence of their reasonableness.[1]

However, the Eleventh Circuit already rejected that argument in [*4] _Castellanos v. Target Corp._, which involved analogous personal injury claims based on Defendant's alleged negligence. _568 F. App'x 886 (11th Cir. 2014)_.

Despite _Bowling's_ holding, the Eleventh Circuit held that Judge Kathleen Williams did not abuse her discretion by excluding similar billing and coding testimony from Nicole Bonaparte—the _same expert witness. Id. at 886_. The Court called _Bowling_ "materially different" because the defendant alleged that the Plaintiff fabricated or exaggerated his injuries, whereas _Castellanos_ involved merely "a conflict over the reasonableness of charges for medical services, assumed to have been delivered." _Id._

Given the Eleventh Circuit's holding, Judge Williams's rationale for striking Bonaparte's testimony is instructive. She explained in open court:

> If in fact [Bonaparte] has anything to offer, I imagine it would be in some rebuttal or impeachment context of how damages are being calculated by a treating hospital. She has nothing to do with the injuries. In as much as the motion was directed to that, it will be granted.
>
> [Bonaparte] speaks to the issue of how the charges are coded when they are reimbursed by the insurance companies. She can tell us whether something, for example, was double [*5] billed or they coded a broken leg as opposed to a compound fracture. She can't say or speak to the fact that this was a severe injury, they needed to do X number of things, this treatment was important, and here's my bill.
> [Y]ou can bring in a doctor to say if I treated X person I would have done this and the charge would have been this, and this is what is customarily charged for this particular procedure. You can have Ms. Bonaparte standing by. But unless something extraordinary comes up during the course of the Plaintiff's case I am not going to allow that testimony from Ms. Bonaparte. Right now she has no place in this case. As I said, you can call a doctor to get in that testimony.

_Transcript of Oral Argument at 3-4, Castellanos v. Target Corp._, No. 11-62467-CV, 2013 WL 12080185, at *I (S.D. Fla. Jan. 25, 2013).[2]

As in _Castellanos_, Bonaparte has no place in this case. Her testimony would not assist the "trier of fact . . . to understand

---

[1] The majority opinion in _Bowling_ explained that "[w]hile Ms. Pacha does not have the necessary medical background to render an opinion on whether the medical care allegedly provided to Mr. Bowling was reasonable, she does have the requisite skill and training to render an opinion on whether the bills submitted by his medical providers accurately reflect the care documented in the medical records of those same providers." _81 So. 3d at 541_.

[2] Judge Williams is not alone in striking the testimony of Nicole Bonaparte—_this Court_ granted Plaintiff's motion to strike expert testimony of Nicole Bonaparte in a 2016 case involving "claims of negligence and premises liability for personal injuries resulting from a slip and fall." _Rogers v. Fiesta Restaurant Group., Inc., No. 15-24073-CIV, 2016 U.S. Dist. LEXIS 186895, 2016 WL 7540540, at *1 (S.D. Fla. July 1, 2016), report and recommendation adopted, No. 15-24073-CIV, 2016 U.S. Dist. LEXIS 186914, 2016 WL 7644789 (S.D. Fla. July 8, 2016)_.

RICHARD STAGGARD

2017 U.S. Dist. LEXIS 186335, *5

the evidence or to determine a fact in issue." *United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004)*. Therefore, this Court **GRANTS** Plaintiff's Motion to Strike Expert Witness Testimony of Nicole Bonaparte.

### B. Sam's East's Motion to Limit the Testimony of Plaintiff's Treating Physician [*6] (Dr. Kingsley Chin)

A treating physician may offer expert opinions based on personal knowledge obtained during the care and treatment of the Plaintiff if he submits an expert disclosure narrative required under *Federal Rule of Civil Procedure 26(a)(2)(C)*. *Levine v. Wyeth Inc., No. 8:09-CV-854-T-33AEP, 2010 U.S. Dist. LEXIS 76000, 2010 WL 2612579, at *1 (M.D. Fla. June 25, 2010)*. This *26(a)(2)(C)* disclosure must summarize the subject matter, facts, and opinions to which the physician is expected to testify. However, "[w]here a doctor's opinion extends beyond the facts disclosed during care and treatment of the patient and the doctor is specially retained to develop opinion testimony, he or she is subject to the provisions of *Rule 26(a)(2)(B)*," which requires a more fulsome written expert report. *Brown v. Best Foods, 169 F.R.D. 385, 388 (N.D. Ala. 1996)*.

Dr. Chin—Maluff's treating physician—submitted his *26(a)(2)(C)* disclosure describing the facts and opinions he plans to address in his testimony. Maluff contends that the disclosed opinions "were derived through treatment" and that "Dr. Chin is not providing opinions based on information obtained from other sources." (Pl.'s Resp. 4.) Specifically, Dr. Chin plans testify about the following:
    (i) Causation
    (ii) The reasonableness of Plaintiff's medical bills
    (iii) Dr. Chin's care and treatment of the Plaintiff

    (iv) Plaintiff's future care [*7] and treatment
    (v) The cost of Plaintiff's medical care
    (vi) Plaintiff's future care and treatment, permanency or Plaintiff's restrictions/limitations

Sam's East disputes Dr. Chin's anticipated testimony regarding the first two topics: (i) causation; and (ii) the reasonableness of Plaintiff's medical bills. It contends that Dr. Chin's treatment of Maluff did not require him to determine "what caused the Plaintiff's injuries or whether the Plaintiff's medical bills were reasonable." (Def.'s Repl. 2.)

### 1. Motion to Limit Testimony on Causation

Courts recognize that resolution of these evidentiary issues often depend heavily on the particular facts. Here, Sam's East

notes that Dr. Chin's "medical records pertaining to the Plaintiff's treatment and care do not contain a causation opinion prior to June 7, 2016 . . . ." (*Id.*) In response, Maluff offers a conclusory assertion that "[a] treating physician would be of little value to his or her patient if the physician only treated the immediate injuries, but stopped short of telling the patient what caused the injury . . . ." (Pl.'s Resp. 4.) Maluff, however, provides no support for this statement, failing to cite even one case where the Court permitted [*8] a treating physician to opine on causation without producing a *Rule 26(a)(2)(B)* report.

Indeed, the Eleventh Circuit seemingly prefers for district courts to strike a treating physician's causation testimony if the physician failed to submit a *Rule 26(a)(2)(B)* report and the facts suggest he did not need to know the injury's cause to prescribe a course of treatment. In *Wilson v. Taser Int'l, Inc.*, the Eleventh Circuit affirmed the trial court's decision to exclude a treating physician's causation testimony because the physician did not need to know what caused the plaintiff's back fractures in order to treat the injury. *303 F. App'x 708, 712 (11th Cir. 2008)*. And the Eleventh Circuit in *United States v. Henderson* held that the district court erred by allowing the treating physician to opine on causation where the physician's treatment did not require a determination of how the plaintiff was injured. *409 F.3d 1293, 1300 (11th Cir. 2005)*.

Because Dr. Chin did not submit a *Rule 26(a)(2)(B)* report, and the facts suggest he neither considered nor relied on the cause of Maluff's injuries to prescribe treatment, this Court **GRANTS in part** Sam's East's Motion to Limit the Testimony of Plaintiff's Treating Physician to preclude Dr. Chin from offering his opinion about the cause of Maluff's injuries.

### 2. Motion to Limit [*9] Testimony on the Reasonableness of Plaintiff's Medical Bills

Sam's East contends that the Court should bar Dr. Chin from stating his opinion about the reasonableness of Plaintiff's medical bills. As with causation, Sam's East contends that "[a]t no time during the course of Plaintiff's treatment did Dr. Chin determine the reasonableness of Plaintiff's medical bills in order to treat the Plaintiff." (Def.'s Repl. 7.) Here, however, Sam's fails to provide any support for this statement—likely because Courts consistently allow treating physicians to opine on the reasonableness of a Plaintiff's medical bills. *See Transcript of Trial Proceedings at 272-73, Coleman v. Home Depot U.S.A., Inc., No. 1:15-CV-21555-UU, 2016 WL 4543120, at *1 (S.D. Fla. Mar. 23, 2016) (D.E. 105)* (Dr. Kingsley Chin testifying about the typical price of a specific

2017 U.S. Dist. LEXIS 186335, *9

medical procedure); *see also Hall's Camp, Inc. v. Decker, 394 So. 2d 1041 (Fla. Dist. Ct. App. 1981)* (treating physician testified as to amount of bills and their causal connection to treatment rendered); *S. Pac. R. R. v. Montalvo, 397 F.2d 50, 52-53 (5th Cir. 1968)* (rejecting contention that plaintiff did not provide sufficient proof "of the reasonableness of medical bills incurred for the services of doctors who were called into consultation by the treating physician," because "the treating physician testified that the charges of the consulted [*10] doctors were reasonable, and there was evidence that he was familiar with the services they had performed").

Accordingly, this Court **DENIES in part** Sam's East's Motion to Limit the Testimony of Plaintiff's Treating Physician in order to permit Dr. Chin's testimony about the reasonableness of Plaintiff's medical bills.

## CONCLUSION

Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** as follows:

(i) Expert Witness Testimony of Nicole Bonaparte (D.E. 35) is GRANTED.

(ii) Defendant's Motion to Limit the Testimony of Plaintiff's Treating Physician (Dr. Kingsley Chin) (D.E. 42) is **GRANTED in part** and **DENIED in part**.

(a) Defendant's Motion is **GRANTED** to the extent it seeks to prevent Dr. Chin from offering his opinion about the cause of Plaintiff's injuries.

(b) Defendant's Motion is **DENIED** to the extent it seeks to exclude Dr. Chin's testimony about the reasonableness of Plaintiff's medical bills.

DONE AND ORDERED in Chambers at Miami, Florida, this 9th of November 2017.

/s/ Federico A. Moreno

FEDERICO A. MORENO

UNITED STATES DISTRICT JUDGE

RICHARD STAGGARD